# In the United States Court of Federal Claims

### Nos. 16-1624L; 17-1931L; 17-468L; 17-4680L
### Filed: March 1, 2023

```
*  *  *  *  *  *  *  *    *  *  *    *  *  *    *
REINALDO CASTILLO, et al.,              *
                                        *
        Plaintiffs,                     *
                v.                      *
                                        *
UNITED STATES,                          *
                                        *
                     Defendant.         *
                                        *
*  *  *  *  *  *  *  *    *  *  *    *  *  *    *
NELSON MENENDEZ, et al.,                *
                                        *
        Plaintiffs,                     *
        v.                              *
                                        *
UNITED STATES,                          *
                                        *
                     Defendant.         *
                                        *
*  *  *  *  *  *  *  *    *  *  *    *  *  *    *
MIRIAM HERNANDEZ,                       *
                                        *
        Plaintiff,                      *
        v.                              *
                                        *
UNITED STATES,                          *
                                        *
                     Defendant.         *
                                        *
*  *  *  *  *  *  *  *    *  *  *    *  *  *    *
                                        *
CLARO LIMA,                             *
                                        *
        Plaintiff,                      *
        v.                              *
                                        *
UNITED STATES,                          *
                                        *
                     Defendant.         *
                                        *
*  *  *  *  *  *  *  *    *  *  *    *  *  *    *
```

**Meghan S. Largent,** Lewis Rice, LLC, St. Louis, MO, **James H. Hulme**, Arent Fox, LLP, Washington, D.C., **Mark F. Hearne, II**, True North Law LLC, St. Louis, MO, for plaintiffs as counsel of record. With them were **Lindsay S.C. Brinton**, Lewis Rice, LLC, St. Louis, MO, **Laurel LaMontange**, Arent Fox, LLP, Washington, D.C., and **Stephen S. Davis**, True North Law, LLC, St. Louis, MO.

**Davene D. Walker**, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her was **Todd Kim**, Assistant Attorney General, Environment and Natural Resources Division, Washington, D.C.

**O P I N I O N**

<u>HORN, J.</u>

The Opinion which follows addresses the limited remand of this court's decision in the cases of <u>Reinaldo Castillo, et al., v. United States</u>, Case No. 16-1624L (<u>Castillo</u>), and <u>Nelson Menendez, et al., v. United States</u>, Case No. 17-1931L (<u>Menendez</u>), <u>see</u> <u>Castillo v. United States</u>, 138 Fed. Cl. 707 (2018), <u>rev'd</u>, 952 F.3d 1311 (Fed. Cir. 2020), and this court's decision on motions to reconsider this court's Opinion in both cases. <u>See</u> <u>Castillo v. United States</u>, 140 Fed. Cl. 590 (2018), <u>rev'd</u>, 952 F.3d 1311 (Fed. Cir. 2020). The nineteen plaintiffs in <u>Castillo</u>,[1] three plaintiffs in <u>Menendez</u>,[2] one plaintiff in <u>Miriam</u>

---

[1] The plaintiffs in <u>Castillo</u> are as follows, in the form provided by the parties, in order of claim number: Gonzalo Padron Marino and Julia Garcia; and Mayda Rotella, parcel number 01-4002-002-0220; Shops on Flagler, Inc., parcel number 01-4002-002-1780; Jose F. and Dora A. Dumenigo, parcel number 01-4002-002-1730; Humberto J. and Josefa Marcia Diaz, parcel number 01-4002-002-1720; Luis Crespo, parcel number 01-4002-002-1650; Jose Luis and Grace Barsello Napole, parcel number 01-4002-002-1640; Bernardo D. and Norma A. Manduley, parcel number 01-4002-002-1630; Danilo A. and Dora Rodriguez, parcel number 01-4002-002-1610; Avimael and Odalys Arevalo, parcel number 01-4002-002-1600; Dalia Espinosa, Daniel Espinosa and Sofira Gonzalez, parcel number 01-4002-002-1580; Lourdez Rodriguez, parcel number 01-4002-001-1370; Alberto Perez, parcel number 01-4002-001-1380; Mayra Lopez, parcel number 01-4002-001-1390; Niraldo Hernandez Padron and Mercedes Alina Falero, parcel number 01-4002-001-1400; Luisa Palencia and Xiomara Rodriguez, parcel number 01-4002-001-1410; Reinaldo F. Castillo, parcel number 01-4002-001-1430; Hugo E. and Concepcion V. Diaz as Co-Trustees of the Diaz Family Revocable Trust, parcel number 01-4002-001-1440; South American Tile, LLC, parcel number 01-4002-001-1450; and Gladys Hernandez, parcel number 01-4002-001-1460.

[2] The plaintiffs in <u>Menendez</u> are as follows, in order of claim number: Norma D. Gomez and Jose M. Martinez, parcel number 01-4002-002-1710; Nelson Menendez and Osvaldo Borras, Jr., parcel number 01-4002-002-1690; and Luis R. Schmidt, parcel number 01-4002-002 -1660.

Hernandez v. United States,[3] Case No. 17-468L (Hernandez), and one plaintiff in Claro Lima v. United States,[4] Case No. 17-4680L (Lima), in the four above captioned cases before this court, are each owners of properties in one of two subdivisions in Miami-Dade County, Florida, the Princess Park Manor and Zena Gardens subdivisions. In a table submitted to the court attached to the parties' "Amended Joint Stipulations Regarding Title" after the remand, discussed below, each plaintiff in Castillo, Menendez, Hernandez, and Lima stipulated to ownership of a parcel of land "[a]djacent" to the Southern Little River Branch Railroad Line (railroad corridor).[5] All four sets[6] of plaintiffs allege that as "[a]djacent" landowners to the railroad corridor, they own the land that runs to the centerline of the railroad corridor. The plaintiffs further allege that when the United States government, pursuant to the National Trails System Act, 16 U.S.C. § 1241 et seq. (2018) (the Trails Act), authorized use of the railroad corridor as a public recreational trail, the government destroyed plaintiffs' reversionary rights to exclusive use and possession of the land underlying the railroad corridor, and thereby effected a taking of plaintiffs' property without just compensation. According to the Castillo, Menendez, Hernandez, and Lima plaintiffs, they are, therefore, entitled to receive just compensation under the Fifth Amendment to the United States Constitution for the government's taking of their private property.

### FINDINGS OF FACT

In 2018, the court issued an Opinion in Castillo and Menendez granting partial summary judgment in favor of the United States and finding that the Castillo and

---

[3] The plaintiff in Hernandez is Miriam Hernandez, parcel number 01-4002-002-1740.

[4] The plaintiff in Lima is Claro Lima, parcel number 01-4002-002-1590.

[5] A fifth case, also on the same rail line, Eduardo Alvarez, et al., v. United States, Case No. 21-610L (Alvarez), was filed more recently than the others, and in a May 11, 2022 joint submission, the Alvarez parties agreed the legal and factual issues were substantially similar to the Castillo, Menendez, Hernandez, and Lima cases and agreed to not take further action at this time, pending a decision in the Castillo, Menendez, Hernandez, and Lima cases. The plaintiff in Alvarez is Eduardo and Marilyn Alvarez, parcel number 01-4002-002-0260.

[6] The plaintiffs in the above captioned cases are organized according to parcel ownership in the two subdivisions in which the plaintiffs own property. As a result, one "plaintiff" may consist of multiple persons, as well as trusts, companies, or other entities, who together own one parcel of land and, thus, have one claim against the United States. The organization of plaintiffs in this opinion is consistent with the parties' representations of the plaintiffs' organization, including the table provided in the parties' "Amended Joint Stipulations of Title," discussed further below, as well as this court's prior Opinion issued June 29, 2018, in Castillo v. United States, 738 Fed. Cl. 707 (2018). While all plaintiffs from the June 29, 2018 Opinion remain before the court, due to differences between the parties' prior joint stipulations and the most recent "Amended Joint Stipulations of Title," some plaintiffs' names in this Opinion differ somewhat from the June 29, 2018 Opinion.

Menendez plaintiffs had no property interests in the land underlying the railroad corridor. See Castillo v. United States, 138 Fed. Cl. at 742. As relevant to the above captioned cases, from the record before the court at the time of the briefing of the prior cross-motions for partial summary judgment, defendant relied on the subdivision plats of the Zena Gardens and Princess Park Manor subdivisions in support of its cross-motions for partial summary judgment before the remand. After the issuance of the court's June 29, 2018 decision, the Castillo and Menendez plaintiffs filed motions for reconsideration trying to rely on additional evidence including, in relevant part, chains of title for the properties owned by the plaintiffs Reinaldo F. Castillo and Nelson Menendez,[7] which had not been previously submitted to the court prior to the decision on the earlier cross-motions for partial summary judgment, for which reason the motions for reconsideration were denied. See Castillo v. United States, 140 Fed. Cl. at 598, 606.[8] Defendant opposed the motions for reconsideration and tried to rely on a "tax deed," dated 1937, which defendant similarly produced for the first time during the briefing of the motions for reconsideration. This 1937 deed was not addressed in this court's Opinion denying the motions for reconsideration. After the motions for reconsideration were denied, the plaintiffs in Castillo and Menendez filed an appeal to the United States Court of Appeals for the Federal Circuit. See Castillo

_____

[7] According to the Menendez chain of title and to the table submitted by the parties showing all plaintiffs with claims currently before the court, the property owned by Nelson Menendez is also owned by Osvaldo Borras, Jr. The Menendez chain of title includes mentions of the surname "Borras" as well as "de Borras," although plaintiffs refer to the individual as Osvaldo Borras, Jr. For clarity, the court refers to the chain of title for the property owned by Nelson Menendez and Osvaldo Borras, Jr., as the Menendez chain of title.

[8] As the court explained in its October 30, 2018 Opinion denying the Castillo and Menendez plaintiffs' motions for reconsideration, after the motions for reconsideration were filed, plaintiffs in Castillo and Menendez submitted the chains of title of Mr. Castillo and Mr. Menendez as attachments to "notices of additional authority in support of their motions for reconsideration." See Castillo v. United States, 140 Fed. Cl. at 598. Moreover, the court further noted in the Opinion denying the motions for reconsideration that "[t]he plaintiffs, without explanation, did not attach to the notices of additional authority the chains of title for the parcels of land currently owned by the remaining eighteen Castillo plaintiffs and remaining two Menendez plaintiffs in the above-captioned cases." Id. (alteration added). In addition to the chains of title of Mr. Castillo and Mr. Menendez, plaintiffs tried to support their motions for reconsideration with two declarations, one of which was from a law professor at the University of Missouri, and the other of which was from a Florida attorney, as well as "a copy of three sections of the 2012 Florida Uniform Title Standards," and copies of the Zena Gardens and Princess Park Manor subdivision plats. See id. The declarations and Florida Uniform Title Standards produced by plaintiffs in support of their prior motions for reconsideration are not relied on by any party with respect to the cross-motions for partial summary judgment currently before the court on remand. With the exception of the subdivision plats, the evidence produced by plaintiffs in support of their motions for reconsideration had not been previously submitted to this court. See id.

v. United States, 952 F.3d 1311, 1315 (Fed. Cir. 2020). The Federal Circuit reversed and issued a limited remand of the decisions in Castillo and Menendez to this court on the issue of the application of the centerline presumption under Florida law, and directed "any appropriate further development of the factual record." Id. at 1325.[9] The Castillo and Menendez cases are now before this court on the limited remand, as well as the Hernandez and Lima cases which were joined for the purposes of resolving plaintiffs' claims with respect to the railroad corridor during the remand. Following the remand, the parties engaged in additional discovery, along with multiple rounds of supplemental briefing, and although plaintiffs produced no additional evidence to support their claims during the post-remand period, defendant on remand produced a 1938 quitclaim deed and a 1938 affidavit, both of which defendant argues clarify the 1937 deed defendant previously produced in opposition to the prior motions for reconsideration.[10] In their briefs with respect to the cross-motions for partial summary judgment currently before this court on remand and in multiple rounds of supplemental briefing, plaintiffs and defendant made arguments regarding Florida law in effect at the time of the conveyances referred to in the

---

[9] The Federal Circuit issued a precedential decision on appeal in the Castillo and Menendez cases on February 20, 2020, see Castillo v. United States, 950 F.3d 1362 (Fed. Cir. 2020), but upon defendant's petition for panel rehearing, the Federal Circuit issued a modified precedential decision, Castillo v. United States, 952 F.3d 1311, and the Federal Circuit also issued an order on the petition for panel rehearing, explaining that "[t]he only changes from the previously issued opinion are a revision of the sentence now on page 4, lines 22–29, and deletion of a phrase on page 7, line 22." Castillo v. United States, 796 F. App'x 746, 747 (Fed. Cir. 2020) (alteration added). The revised sentence noted by the Federal Circuit reads in the modified decision:

> If the railroad and trail operator reach a trail agreement during a negotiation period provided by the STB's issuance of a Notice of Interim Trail Use or Abandonment (NITU), and so notify the STB, trail use of the right-of-way is authorized and termination of the railroad easement through abandonment is blocked indefinitely.

Castillo v. United States, 952 F.3d at 1315. The modified decision also deleted the phrase "that would allow it to operate a trail on the corridor," Castillo v. United States, No. 2019-1158, slip op. at 7 (Fed. Cir. Feb. 20, 2020), from the sentence which in the modified decision reads: "On November 1, 2016, Florida East Coast Industries (FEC Industries) requested issuance of an NITU." Castillo v. United States, 952 F.3d at 1316. According to the Editor's Note currently available at the citation of the original Federal Circuit decision in Castillo, the Federal Circuit's original decision "was withdrawn from bound volume because it was superseded on rehearing," Castillo v. United States, 950 F.3d 1362, and is no longer available on legal databases.

[10] Consistent with the limited remand directed by the Federal Circuit, plaintiffs' arguments in their cross-motions for partial summary judgment on remand are limited to contending that the evidence now in the record before the court upon which defendant relies does not rebut the centerline presumption under Florida law.

1937 deed, 1938 quitclaim deed, and 1938 affidavit, discussed further below. The relevant findings of facts from this court's decision before the appeal, the June 29, 2018 Opinion on the parties' cross-motions for partial summary judgment in Castillo and Menendez, in relevant part, are incorporated into this Opinion and the facts established during discovery as part of the remand proceedings are described below.

Until its abandonment in 2016, the Florida East Coast Railway operated the section of the railroad corridor at issue, which spans 100 feet in width and runs approximately 1.21 miles on the railroad corridor between milepost LR (Left/Right) 11+3989 and milepost LR 13+0000 in Miami-Dade County, Florida. The land upon which the railroad corridor at issue was built was obtained by the Florida East Coast Railway through multiple conveyances in the 1920s. In particular, the section of the railroad corridor at issue in the above captioned cases is comprised of four unequally sized and separate rights-of-way as well as a strip of land resulting from a written deed (the Holman deed), that, when combined, span 100 feet wide and comprise part of the 1.21 mile long railroad corridor. In 1932, the Florida East Coast Railway constructed a railroad line on this 1.21 mile strip of land.

According to the map depicting an aerial view of the railroad corridor attached to plaintiffs' filings in the Castillo and Menendez cases, to which defendant did not take issue, the four separate rights-of-way obtained by condemnation and the one property interest obtained by the Holman deed are not all adjacent to the parcels now owned by plaintiffs in the above captioned cases.[11] According to the aerial map previously submitted to the court, three of the four rights-of-way, the Russo right-of-way,[12] the Johnson right-of-way,[13] and

---

[11] With respect to the Holman property interest, this court in its June 29, 2018 Opinion determined that the Florida East Coast Railway obtained fee simple title to the land covered by a 1923 deed from G.F. and Mary Holman, see Castillo v. United States, 138 Fed. Cl. at 711-12, and the Castillo and Menendez plaintiffs did not appeal that part of the holding to the Federal Circuit. See Castillo v. United States, 952 F.3d at 1317 n.2. This court's previous holding with respect to the Holman deed, therefore, is not at issue in this Opinion on remand.

[12] The Florida East Coast Railway obtained the Russo right-of-way in a condemnation proceeding in the Circuit Court of the Eleventh Judicial Circuit of Florida, in Dade County, Florida (Dade County Circuit Court) on October 28, 1924 against "Paul Russo and Southern Bank & Trust Company" that resulted in a final judgment appropriating land to be used "as a right of way for the construction, location, and maintenance of the extension of its line of railroad from Okeechobee, Florida to Miami, Florida" by Florida East Coast Railway.

[13] The Florida East Coast Railway obtained the Johnson right-of-way in a condemnation proceeding in the Dade County Circuit Court on November 21, 1924 against William H. Johnson, Seminole Fruit & Land Company, Clark G. Smith, Ethel C. Rewis, and Donald Rewis, that resulted in a final judgment appropriating land to be used "as a right of way

the J. Pyles and J. Owens right-of-way,[14] when combined, form the eastern edge of the railroad corridor that runs adjacent to all twenty-four parcels belonging to the plaintiffs in the above captioned cases. The Stanley right-of-way,[15] and the Holman property interest obtained by a deed,[16] when combined, form the western side of the railroad corridor, and, therefore, are separated from the Castillo, Menendez, Hernandez, and Lima plaintiffs' parcels by one of the other three rights-of-way at issue, as depicted on the Castillo and Menendez plaintiffs' aerial map.

### The Four Separate and Distinct Rights-of-Way by Condemnation

As noted above, the Russo right-of-way forms part of the eastern portion of the railroad corridor at issue in the case currently before the court. The Russo right-of-way measures a total of .41 acres, and is 25.33 feet wide along its northern border and 1.2 feet wide along its southern border, running north to south. To the east of, and adjacent

---

for the construction, location, and maintenance of the extension of its line of railroad from Okeechobee, Florida to Miami, Florida" by Florida East Coast Railway.

[14] The Florida East Coast Railway obtained the J. Pyles and J. Owens right-of-way in a condemnation proceeding in the Dade County Circuit Court on November 21, 1924 against the Seminole Fruit & Land Company, that resulted in a final judgment appropriating land to be used "as a right of way for the construction, location, and maintenance of the extension of its line of railroad from Okeechobee, Florida to Miami, Florida" by Florida East Coast Railway. The Castillo and Menendez plaintiffs refer to this final judgment as the "J. Pyles, J. Owens Judgment" in their "Joint Stipulations Regarding Title," while the Hernandez and Lima plaintiffs refer to this judgment as the "Seminole Fruit & Land Condemnation," or the "Seminole Fruit & Land Company condemnation," respectively, in their cross-motions for partial summary judgment. The court refers to the right-of-way as the J. Pyles and J. Owens right-of-way in this Opinion.

[15] The Florida East Coast Railway obtained the Stanley right-of-way in a condemnation proceeding in the Dade County Circuit Court on October 28, 1924 against R.S. Stanley that resulted in a final judgment in favor of the Florida East Coast Railway, which stated that the land obtained by the Florida East Coast Railway was to be used "as a right of way for the construction, location, and maintenance of the extension of its line of railroad from Okeechobee, Florida to Miami, Florida," measuring a total of 1.9 acres, and is 1320 feet long running north to south, 50.54 feet wide at its northern border, and 74.67 feet wide at its southern border. The Stanley right-of-way is not adjacent to any of the parcels belonging to the Castillo, Menendez, Hernandez, or Lima plaintiffs.

[16] While the land conveyed by the Holman deed constitutes a large portion of the railroad corridor to the west of the properties located in the Zena Gardens subdivision, according to the aerial map which the Castillo and Menendez plaintiffs included with their previous filings, the Holman deed land does not overlap with any of the four rights-of-way. Moreover, for all plaintiffs for whom the Holman deed is a relevant conveyance, at least a portion of the railroad corridor adjacent to the plaintiffs' properties is part of the Russo right-of-way.

to, the Russo right-of-way are the respective parcels of land owned by the following nine Castillo plaintiffs, as depicted on the Castillo plaintiffs' aerial map[17] of the railroad corridor:

- Lourdez Rodriguez
- Alberto Perez
- Mayra Lopez
- Niraldo Hernandez Padron and Mercedes Alina Falero
- Luisa Palencia and Xiomara Rodriguez
- Reinaldo F. Castillo
- Hugo E. and Concepcion V. Diaz as Co–Trustees of the Diaz Family Revocable Trust
- South American Tile, LLC
- Gladys Hernandez

The Johnson right-of-way forms part of the eastern portion of the railroad corridor at issue in the case currently before the court. The Johnson right-of-way measures approximately .48 acres, and is 37.39 feet wide at its northern border and 25.33 feet wide at its southern border, running north to south. The Johnson right-of-way is adjacent to the properties of the following six Castillo plaintiffs, as depicted on plaintiffs' aerial map of the railroad corridor previously submitted to the court before the remand:

- Luis Crespo
- Jose Luis and Grace Barsello Napole
- Bernardo D. and Norma A. Manduley
- Danilo A. and Dora Rodriguez
- Avimael and Odalys Arevalo
- Dalia Espinosa, Daniel Espinosa and Sofira Gonzalez

According to the "Amended Joint Stipulations of Title" submitted after the remand and as depicted on plaintiffs' aerial map of the railroad corridor submitted before the remand, the Johnson right-of-way is also adjacent to the properties of Menendez plaintiff Luis R. Schmidt and Lima plaintiff Claro Lima. Moreover, the Johnson right-of-way lies between the plaintiffs' properties to which it is adjacent and the southern portion of the Stanley right-of-way on the western edge of the railroad corridor.

The J. Pyles and J. Owens right-of-way forms part of the eastern portion of the railroad corridor at issue in the case currently before the court. The J. Pyles and J. Owens right-of-way is divided into two portions, a southern portion and a northern portion. According to the aerial map previously submitted by the Castillo and Menendez plaintiffs, the southern portion of the J. Pyles and J. Owens right-of-way shares the railroad corridor with the Stanley right-of-way. As depicted on plaintiffs' aerial map previously submitted before the remand in Castillo and Menendez, and on the valuation map submitted with the cross-motions for partial summary judgment currently before the court after the

---

[17] The Castillo plaintiffs' properties which are adjacent to the Russo right-of-way, are not identified on the aerial map submitted by the Menendez plaintiffs before the remand.

remand, the Stanley right-of-way covers the western portion of the railroad corridor, and the southern portion of J. Pyles and J. Owens right-of-way covers the eastern portion of the railroad corridor and is adjacent to the following plaintiffs' parcels:

Castillo plaintiffs:

- Humberto J. and Josefa Marcia Diaz
- Jose F. and Dora A. Dumenigo

Menendez plaintiffs:

- Norma D. Gomez and Jose M. Martinez
- Nelson Menendez and Osvaldo Borras, Jr.

According to the parties' "Joint Stipulations Regarding Title" filed in this court in Hernandez and the valuation map attached to the motions for partial summary judgment currently before the court after the remand, the southern portion of the J. Pyles and J. Owens right-of-way is also adjacent to the property of Hernandez plaintiff Miriam Hernandez.[18] Moreover, the southern portion of the J. Pyles and J. Owens right-of-way lies between the plaintiffs' properties to which it is adjacent and the northern portion of the Stanley right-of-way on the western edge of the railroad corridor.

According to the aerial map previously provided to the court by the Castillo plaintiffs before the remand,[19] and on the valuation map attached to the cross-motions for partial summary judgment currently before the court after the remand, the northern portion of the J. Pyles and J. Owens right-of-way is adjacent to the parcels for the following two Castillo plaintiffs: Shops on Flagler Inc., and Gonzalo Padron Marino, Julia Garcia and Mayda Rotella. Notably, as depicted on the plaintiffs' aerial map previously submitted in Castillo before the remand, the northern portion of the J. Pyles and J. Owens right-of-way is the only portion of the railroad corridor at issue in which only one right-of-way covers the full width of the railroad corridor, which is 100 feet.

**The Plats of the Subdivisions and Plaintiffs' Deeds**

The land to the east of the right-of-way eventually became the properties of two families, the Merwitzers and the Mosses, who would plat their lands as the Zena Gardens

---

[18] While the claims in Alvarez are not considered in the current Opinion, according to the "Amended Joint Stipulations Regarding Title" and the valuation map attached to the cross-motions for partial summary judgment currently before the court, the J. Pyles and J. Owens right-of-way is also adjacent to the property of the Alvarez plaintiff Eduardo and Marilyn Alvarez.

[19] Similar to the Russo right-of-way, the Castillo plaintiffs whose properties are adjacent to the northern portion of the J. Pyles and J. Owens right-of-way are not identified on the aerial map submitted by the Menendez plaintiffs before the remand.

and Princess Park Manor subdivisions, respectively. On September 30, 1947, Louis and Rebecca Merwitzer platted a parcel of their land and called it the "Zena Gardens" subdivision. According to the subdivision plat for Zena Gardens, which was attached to the government's previous cross-motions for partial summary judgment in Castillo and Menendez before the remand and to which the plaintiffs do not take issue, the western border of Zena Gardens is adjacent to the railroad corridor, which measures 100 feet wide and is labeled "Florida East Coast Railway." According to the respective deeds submitted by the Castillo plaintiffs as attachments to their amended complaint,[20] the respective parcels of land owned by the following nine Castillo plaintiffs are located in the Zena Gardens subdivision:

- Lourdez Rodriguez
- Alberto Perez
- Mayra Lopez
- Niraldo Hernandez Padron and Mercedes Alina Falero
- Luisa Palencia and Xiomara Rodriguez
- Reinaldo F. Castillo
- Hugo E. and Concepcion V. Diaz as Co–Trustees of the Diaz Family Revocable Trust
- South American Tile, LLC
- Gladys Hernandez

According to the Menendez, Hernandez, and Lima plaintiffs' deeds, none of the Menendez, Hernandez, or Lima plaintiffs own property in the Zena Gardens subdivision.

The Zena Gardens subdivision plat states, in relevant part:

That Louis Merwitzer and Rebecca Merwitzer his wife owners of the S.E. ¼ of the S.E. ¼ of Section 2, Township 54 South, Range 40 East, Miami, Dade County, Florida, excepting therefrom a strip of land off the westerly side which is the right of way of the Okeechobee–Miami Extension of the Florida

---

[20] As the court noted in the June 29, 2018 decision on the prior cross-motions for summary judgment before the remand, after the original complaint in Castillo was filed, the complaint was amended twice, the first time, on March 31, 2017, "to join an additional twenty-two plaintiffs," and the second time, on September 29, 2017, "to dismiss certain plaintiffs, resulting in the current nineteen plaintiffs in Castillo." Castillo v. United States, 138 Fed. Cl. at 716. As the court also noted in the June 29, 2018 Opinion, the Menendez plaintiffs amended their complaint once, on January 19, 2018, after Castillo and Menendez were consolidated, to join an additional plaintiff, resulting the three current Menendez plaintiffs. See id. at 717. All Castillo and Menendez plaintiffs whose claims were previously at issue in the June 29, 2018 Opinion remain parties to the current litigation; no parties have been dismissed or joined in the Castillo and Menendez cases in the time since the June 29, 2018 Opinion. Since the original filing of the Hernandez and Lima plaintiffs' claims on March 31, 2017, neither the Hernandez plaintiff nor the Lima plaintiff have filed amended complaints.

East Coast Railway, have caused to be made the attached plat entitled "Zena Gardens."

The Streets, Avenues and Terrace as shown together with all existing and future planting, trees and shrubbery there on are hereby dedicated to the perpetual use of the Public for proper purposes reserving to the said Louis Merwitzer and Rebecca Merwitzer, his wife, their heirs, successors or assigns, the reversion or reversions thereof whenever discontinued by law.

On November 3, 1949, Erving and Harriett Moss platted a parcel of their land and called it the "Princess Park Manor" subdivision. According to the subdivision plat for the Princess Park Manor, previously submitted by the defendant in Castillo and Menendez before the remand and to which the plaintiffs do not take issue, the western border of Princess Park Manor is adjacent to the railroad corridor, which measures 100 feet wide and is labeled "East R/W Line of F.E.C. Ry." Princess Park Manor is directly north of Zena Gardens, separated only by a street. According to the respective deeds submitted by the plaintiffs, the respective parcels of land owned by the following remaining plaintiffs in Castillo, and the plaintiffs in Menendez, Hernandez, and Lima are located in the Princess Park Manor subdivision:

Castillo plaintiffs:

- Gonzalo Padron Marino and Julia Garcia; and Mayda Rotella
- Shops on Flagler, Inc.
- Jose F. and Dora A. Dumenigo
- Humberto J. and Josefa Marcia Diaz
- Luis Crespo
- Jose Luis and Grace Barsello Napole
- Bernardo D. and Norma A. Manduley
- Danilo A. and Dora Rodriguez
- Avimael and Odalys Arevalo
- Dalia Espinosa, Daniel Espinosa and Sofira Gonzalez

Menendez plaintiffs:

- Norma D. Gomez and Jose M. Martinez
- Nelson Menendez and Osvaldo Borras, Jr.
- Luis R. Schmidt

Hernandez plaintiff:

- Miriam Hernandez

Lima plaintiff:

- Claro Lima

The Princess Park Manor subdivision plat states, in relevant part:

> That ERVING A.MOSS and HARRIETT E.MOSS his wife, owners of the South ½ of the N.E. ¼, South of the Canal and East of the Florida East Coast Right–of–Way, located in Sec. 2 TWP.54 South, RGE. 40 East, Dade County Florida; being the land East of the Florida East coast Right–of–way and between Flagler Street and the Tamiami canal and extending East to Ludlum Road, <u>ALSO</u> The West ½ of the Northeast ¼ of the Southeast ¼ less the Florida East coast Right–of–way all in Sec. 2 Township 54 South RGE.40 East, Dade County, Florida, Said Florida East coast Right–of–way being the right-of-way of the Okeechobee Miami Extension of the Florida East Coast Railway, have caused to made the attached Plat entitled "PRINCESS PARK MANOR."
>
> The Streets, Avenues, Roads, Terraces, Courts and Alleys as shown together with all existing and future planting, trees and shrubbery thereon are hereby dedicated to the perpetual use of the public for proper purposes, reserving to the said ERVING A.MOSS and HARRIETT E.MOSS, his wife their heirs; successors or assigns, the reversion or reversions thereof whenever discontinued by law.

(capitalization and emphasis in original). As noted above, the subdivision plats for both the Zena Gardens and Princess Park Manor plats were previously submitted to the court before the remand.

Between March 1977 and July 2016, all the plaintiffs in the above captioned cases acquired title in their respective parcels of land in the Princess Park Manor and Zena Gardens subdivisions. None of the deeds for any of the plaintiffs in <u>Castillo</u>, <u>Menendez</u>, <u>Hernandez</u>, and <u>Lima</u> provide the measurements of the respective parcels. Instead, the deeds for all plaintiffs in the above captioned cases state the particular subdivision in which the parcel is located, the parcel's "Lot" number in the subdivision, and reference the particular subdivision plat in which the parcel is located. For example, the warranty deed for <u>Menendez</u> plaintiff Norma D. Gomez and Jose M. Martinez states that on May 31, 2005:

> [G]rantor [Margaret Ann Arguelles], for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee [Norma D. Gomez and Jose M. Martinez], the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in **Miami–Dade County, Florida** to-wit:
>
> **Lot 15, Block 11, of PRINCESS PARK MANOR, according to the Plat thereof, recorded in Plat Book 50, at Page 18, in the Public Records of Miami–Dade County, Florida.**
>
> **Parcel Identification Number: 0140020021710**

(capitalization and emphasis in original; alterations added). Similarly, the warranty deed for <u>Castillo</u> plaintiff Reinaldo F. Castillo states that on June 15, 1977:

> [T]he grantor [Ramon and Maria Perez], for and inconsideration of the sum of $10.00 and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee [Reinaldo F. and Margarita Castillo], all that certain land situate in Dade County, Florida, viz:
> **Lot 8, in Block 11, of ZENA GARDENS, according to the Plat thereof, as recorded in Plat Book 46, at Page 51, of the Public Records of Dade County, Florida**.

(capitalization and emphasis in original; alterations added). Each of the parcels of land belonging to the plaintiffs is depicted, including the measurements thereof, on either the Zena Gardens plat or Princess Park Manor plat. All of the parcels belonging to the plaintiffs in <u>Castillo</u>, <u>Menendez</u>, <u>Hernandez</u>, and <u>Lima</u> are depicted on the subdivision plats as being directly to the east of the railroad corridor, however, none of the parcels, as depicted on the plats, extend onto the railroad corridor.

In 2004, service over the railroad corridor ceased when the Florida East Coast Railway temporarily closed off a portion of the railway to perform emergency repair work on a bridge at milepost 12.23+. The temporary closure blocked access to the railroad corridor. When the section of the railroad opened again, shippers did not resume rail service and, according to the combined environmental and historical report attached to the Florida East Coast Railway's abandonment petition before the United States Surface Transportation Board (STB), which along with the combined environmental and historical report was included as exhibits to the <u>Castillo</u> and <u>Menendez</u> plaintiffs' previous submissions to the court before the remand, there were "no new sources of potential local traffic."

**The Florida East Coast Railway Begins the Abandonment Process of the Railroad Corridor**

On January 21, 2016, the Florida East Coast Railway began the process to "abandon" the railroad corridor at issue by filing a verified notice of exemption with the STB. The Florida East Coast Railway's January 21, 2016 "Verified Notice of Exemption" stated that the Florida East Coast Railway "plans to abandon the Line, salvage the track and materials and convert the property to trail use." On February 10, 2016, the STB published the notice exemption in the Federal Register and the exemption became effective on March 11, 2016. On October 31, 2016, Florida East Coast Industries, LLC sent a letter to the STB requesting a "notice of interim trail use/rail banking" over the railroad corridor and submitting its willingness to assume financial responsibility pursuant to 49 C.F.R. § 1152.29 (2016). On November 1, 2016, the Florida East Coast Railway sent a letter to the STB stating it "agree[d] to negotiate interim trail use/rail banking for the Line with FECI [Florida East Coast Industries]." (alterations added). On November 21, 2016, the STB invoked section 8(d) of the Trails Act, 16 U.S.C. § 1247(d) (2012), and

issued its "DECISION AND NOTICE OF INTERIM TRAIL USE OR ABANDONMENT" (NITU), authorizing the Florida East Coast Railway to negotiate a trail use agreement with the Florida East Coast Industries. (capitalization in original). On July 18, 2017, the Florida East Coast Railway notified the STB that it had entered a purchase sale agreement with the Florida East Coast Industries for the "rail banking/interim trail use" of the rail line at issue.

## PROCEDURAL HISTORY

The plaintiffs in the Castillo and Menendez cases originally brought suit on December 7, 2016, and December 12, 2017, respectively. The Menendez case was originally assigned to Judge Thomas C. Wheeler of this court and was subsequently transferred to the undersigned. The Menendez complaint raised the same issues of law and fact as alleged by the Castillo plaintiffs, and the Menendez plaintiffs alleged they own land underlying the same section of the railroad corridor at issue in the Castillo case. The plaintiffs and defendant in both Castillo and Menendez were previously represented in each case by the same attorneys of record,[21] who filed a joint notice before this court on February 23, 2018, stating that the "same issues of law and facts apply to both cases." This court previously ordered the two cases consolidated on January 12, 2018.

---

[21] Davene Walker of the United States Department of Justice has been defendant's counsel of record for the Castillo and Menendez cases since the filing of each case. The initial complaint in Castillo was filed by counsel of record Mark F. Hearne, II, then of Arent Fox, LLP. On March 21, 2017, Lindsay S.C. Brinton, also of Arent Fox, LLP, moved to substitute herself as counsel of record in Castillo, which the court granted the following day. Following the substitution of Ms. Brinton in Castillo, the initial complaint Menendez was filed by Ms. Brinton as counsel of record, then still of Arent Fox, LLP. Two days after the initial Menendez complaint was filed, a Notice of Indirectly Related Case, referring to Castillo, was filed in Menendez, however, Mr. Hearne was listed as the counsel of record on that notice. A motion to substitute Ms. Brinton for Mr. Hearne as counsel of record in Menendez was filed and granted on January 12, 2018. At the time the cases were consolidated on January 12, 2018, all Castillo and Menendez plaintiffs were represented by Ms. Brinton as counsel of record. Ms. Brinton remained counsel of record for both Castillo and Menendez as of the time of filing the respective motions for reconsiderations in those cases on July 30, 2018, and the notice of appeal in both Castillo and Menendez on October 31, 2018. Mr. Hearne notified the court by a Notice of Change of Contact Information on October 9, 2019, that he had left Arent Fox, LLP for a new firm, the True North Law Group, LLC. At a time not indicated by the filings in Castillo and Menendez, Ms. Brinton and Meghan S. Largent also left Arent Fox, LLP for Lewis Rice, LLC. Between April 29, 2020 and May 5, 2020, Ms. Largent, James H. Hulme of Arent Fox, LLP, and Mr. Hearne filed motions to substitute themselves as counsels of record for certain individual Castillo and Menendez plaintiffs. The current arrangement of plaintiffs and counsels of record, including affiliations of plaintiffs' attorneys, is discussed below.

The plaintiffs in the Hernandez and Lima cases originally brought suit as co-plaintiffs in one case, Hernandez, et al., v. United States, on March 31, 2017.[22] The Hernandez case was originally assigned to Judge Lydia Kay Griggsby of this court, was reassigned to Judge Richard A. Hertling on June 21, 2019, and was subsequently transferred to the undersigned on May 14, 2020. On April 16, 2021, this court severed the claims of plaintiff Claro Lima from the claims of then pro se plaintiff Miriam Hernandez. Ms. Hernandez had failed to appear at scheduled hearings, leading to the decision to proceed as two distinct cases: Hernandez, Case No. 17-468L, and Lima, Case No. 17-4680L. Plaintiff Miriam Hernandez subsequently retained counsel Meghan S. Largent of Lewis Rice, LLC on May 7, 2021, and is now represented by the same counsel of record as the plaintiff in Lima and certain Castillo and Menendez plaintiffs.[23]

In the complaints currently before the court, the Castillo and Menendez plaintiffs allege they are "Florida landowners who are owed compensation for their property rights

---

[22] Davene Walker of the United States Department of Justice has been the defendant's counsel of record for the Hernandez and Lima cases since those cases were originally filed. The initial complaint in Hernandez was filed by counsel of record Cecilia Hagan Stultz of Maglio, Christopher & Toale, PA. On January 29, 2018, Christina E. Unkel, also of Maglio, Christopher & Toale, PA, filed a motion to substitute herself as counsel of record in Hernandez, which was granted the same day. On April 11, 2019, Ms. Unkel filed a motion to withdraw from the representation of Miriam Hernandez, and on April 24, 2019, Ms. Largent of Lewis Rice, LLC filed a motion to substitute herself as counsel of record for Claro Lima. Ms. Largent's motion to substitute was granted on April 24, 2019, and Ms. Unkel's motion to withdraw was granted on April 29, 2019, after which point Ms. Hernandez proceeded pro se until her hiring of Ms. Largent over two years later, after the Lima case had been severed from Hernandez.

[23] In the time since the plaintiffs in the above captioned cases filed their respective initial complaints, the attorneys representing certain plaintiffs have shuffled on multiple occasions as attorneys representing various clients have changed law firms. As of the time of filing this Opinion, the plaintiffs are represented as follows. The following plaintiffs are represented by James H. Hulme, with Laurel LaMontagne, of Arent Fox, LLP:

Castillo plaintiffs:

- Reinaldo Castillo
- Danilo and Dora Rodriguez

The following plaintiffs are represented by Mark F. Hearne, II, with Stephen S. Davis, of True North Law, LLC, who were formerly attorneys at Arent Fox, LLP:

Castillo plaintiffs:

- Avimael and Odalys Arevalo
- Luis Crespo
- Hugo and Concepcion V. Diaz as Co-Trustees of Diaz Family Revocable Trust
- Bernard and Norma Manduley
- Jose Luis and Grace Barsello Napole

taken by the federal government as a result of its authorization that the right-of-way be converted to a public recreation trail." The Castillo and Menendez complaints state that each of the Castillo and Menendez plaintiffs owned their property on November 21, 2016, when the STB issued the NITU, and that each plaintiff's "property abuts[24] and underlies

_____

- Niraldo Hernandez Padron and Mercedes Alina Falero
- Luisa Palencia and Xiomara Rodriguez
- Alberto Perez
- Lourdez Rodriguez
- Shops on Flagler, Inc.

Menendez plaintiff:

- Nelson Menendez and Osvaldo Borras, Jr.

The following plaintiffs are represented by Meghan S. Largent, with Lindsay S.C. Brinton, of Lewis Rice, LLC, who were formerly attorneys at Arent Fox, LLP:

Castillo plaintiffs:

- Humberto J. and Josefa Marica Diaz
- Jose F. and Dora A. Dumenigo
- Dalia Espinosa, Daniel Espinosa and Sofira Gonzalez
- Gladys Hernandez
- Mayra Lopez
- Gonzalo Padron Marino and Julia Garcia; and Mayda Rotella
- South American Tile, LLC

Menendez plaintiffs:

- Norma D. Gomez and Jose M. Martinez
- Luis R. Schmidt

Hernandez plaintiff:

- Miriam Hernandez

Lima plaintiff:

- Claro Lima

[24] Plaintiffs state in their complaints in Castillo and Menendez that their respective properties "abut" the railroad corridor. It appears, however, that both sets of plaintiffs use the term "abut" interchangeably with "adjacent" in their filings in Castillo and Menendez. In the parties' "Joint Stipulations Regarding Title," filed in both Castillo and Menendez before the remand, the parties stated that the respective properties for both sets of plaintiffs are "[a]djacent" to the railroad corridor. Likewise, the government states in its cross-motion for partial summary judgment prior to the remand in Castillo and Menendez that all of the plaintiffs' properties are "adjacent" to the railroad corridor. (alteration added). The plaintiffs in Hernandez and Lima state that their property is "adjacent to the

the former Railroad right-of-way, which is now subject to an easement for an interim public-access trail and possible future railroad reactivation." (alteration added). The Castillo and Menendez plaintiffs claim that the government "took these Florida owners' land for a public recreational trail by an order of the federal Surface Transportation Board invoking a provision of the federal Trails Act." The Castillo and Menendez plaintiffs also claim that "when the federal government authorizes a public recreational trail across an owner's land, the fifth amendment requires the government to compensate the owner." The Castillo and Menendez plaintiffs seek "full fair-market value of the property taken by the government on the date it was taken," including "severance damage," "delay" damages, litigation costs and attorneys' fees, and "[s]uch further relief as this Court may deem just and proper." (alteration added).

In their original complaint, filed before the claims of the Hernandez and Lima plaintiffs were severed, the Hernandez and Lima plaintiffs allege that they "are the fee owners of real property in Miami Dade County, Florida," that their land is "adjacent to the abandoned railroad right-of-way," and that "Plaintiffs' predecessor owners granted easements to FEC [Florida East Coast Railway] for the sole purpose of operating a railroad, and not for any other general or recreational purpose." (alteration added). The Hernandez and Lima plaintiffs further allege that "[o]n November 21, 2016, the STB issued an [sic] NITU for the Line," which amounted to "[t]he appropriation of a new easement for an interim public recreational trail," that "is a taking of Plaintiffs' property for which the Fifth Amendment to the United States Constitution requires that the United States pay just compensation to Plaintiffs." (alterations added). The Hernandez and Lima plaintiffs seek "just compensation for the value of their property taken by the federal government," which "includes compensation for the delay between the time their property was taken, November 21, 2016, and when the federal government ultimately pays Plaintiffs their compensation," as well as "attorneys' fees, costs, and expenses incurred in bringing this action pursuant to the URA [Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970], 42 U.S.C. §4654(c)." (alteration added).

The parties in Castillo and Menendez filed "Joint Stipulations Regarding Title" during earlier proceedings before remand, and the parties in Hernandez and Lima filed "Joint Stipulations Regarding Title" after remand, on May 19, 2021 with respect to Ms. Hernandez and on August 18, 2021 with respect to Mr. Lima. All parties have stipulated to certain threshold issues. All parties agree that all plaintiffs owned their corresponding parcels on November 21, 2016, when the STB issued the NITU, and that plaintiffs' corresponding parcels are "[a]djacent" to the railroad corridor. (alteration added). The parties in Castillo and Menendez also stipulate that the rights-of-way the Florida East Coast Railway obtained through the four final judgments in the condemnation proceedings were each an "[e]asement." (alteration added). The parties in Hernandez and Lima did not stipulate that the Florida East Coast Railway obtained the rights-of-way as an easement, but in defendant's filings in the Hernandez and Lima cases, defendant acknowledged that "[a]ll of the condemnation orders granted the railroad *easements* over

_____

abandoned railroad right-of-way" and do not use the phrase "abuts," unlike the Castillo and Menendez plaintiffs.

the subject lands, not fee simple title to those lands." (emphasis in original; alteration added).

On January 19, 2022, the parties filed "Amended Joint Stipulations" in <u>Castillo</u>, <u>Menendez</u>, <u>Hernandez</u>, and <u>Lima</u>, as well as in <u>Alvarez</u>, each containing the same table reflecting the claims of all plaintiffs whose claims are currently before the court, as well as the claim of the <u>Alvarez</u> plaintiff. The table, reproduced below in the form provided by the parties, displays each plaintiff's name, claim number (with respect to <u>Castillo</u> plaintiffs) or case name and number (with respect to <u>Menendez</u>, <u>Hernandez</u>, <u>Lima</u> and <u>Alvarez</u> plaintiffs), and parcel number of the plaintiff's parcel located in either the Zena Gardens or Princess Park Manor subdivision. The table also displays the "Applicable RR [Railroad] Conveyance" claimed by plaintiffs and defendant for each of the plaintiffs' parcels, which refers to one of the four condemnation proceedings.[25] (alteration added). The table further displays the "Nature of RR [Railroad] Ownership" as alleged by plaintiffs and defendant, which refers to the interest the Florida East Coast Railway obtained in each of the conveyances at issue. (alteration added). At present, plaintiffs claim that the "Nature of RR [Railroad] Ownership" with respect to every conveyance is that of an easement, and defendant claims that the "Nature of RR [Railroad] Ownership" with respect to every conveyance is that of fee title. (alterations added). The table also indicates that each plaintiff owned his or her particular parcel of land on the NITU date and states that each of the plaintiffs' parcels are "Adjacent to ROW [right-of-way]." (alteration added).

---

[25] Prior tables of plaintiffs' claims submitted by the parties included reference to the Stanley judgment and Holman deed as applicable conveyances to certain plaintiffs. The most recent chart joint submitted by the parties on January 19, 2022, however, does not indicate that either the Stanley judgment or the Holman deed is an applicable conveyance to any plaintiff in any of the above captioned cases.

Castillo, et al., v. United States, Case No. 16-1624L; Menendez, et al. v. United States, Case No. 17-1931L; Hernandez v. United States, Case No. 17-468L; Lima v. United States, Case No. 17-4680L; Alvarez v. United States, Case No. 21-610L

| Claim Number (Castillo) or Case No. | Plaintiffs | Parcel Number | Owned Parcel on NITU Date | Adjacent to ROW [right-of-way] | Applicable RR [Railroad] Conveyance (Plaintiffs) | Applicable RR [Railroad] Conveyance (US) | Nature of RR [Railroad] Ownership (Plaintiffs) | Nature of RR [Railroad] Ownership (US) |
|---|---|---|---|---|---|---|---|---|
| 12 | Gonzalo Padron Marino and Julia Garcia; and Mayda Rotella | 01-4002-002-0220 | Yes | Yes | J. Pyles, J. Owens Judgment (Bk 24, Pg 208) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 17 | Shops on Flagler, Inc. | 01-4002-002-1780 | Yes | Yes | J. Pyles, J. Owens Judgment (Bk 24, Pg 208) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 21 | Jose F. and Dora A. Dumenigo | 01-4002-002-1730 | Yes | Yes | J. Pyles, J. Owens Judgment (Bk 24, Pg 208) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 22 | Humberto J. and Josefa Marcia Diaz | 01-4002-002-1720 | Yes | Yes | J. Pyles, J. Owens Judgment (Bk 24, Pg 208) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 29 | Luis Crespo | 01-4002-002-1650 | Yes | Yes | W. Johnson Judgment (Bk 24, Pg 207) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 30 | Jose Luis and Grace Barsello Napole | 01-4002-002-1640 | Yes | Yes | W. Johnson Judgment (Bk 24, Pg 207) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |

| 31 | Bernardo D. and Norma A. Manduley | 01-4002-002-1630 | Yes | Yes | W. Johnson Judgment (Bk 24, Pg 207) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
|----|----|----|----|----|----|----|----|----|
| 33 | Danilo A. and Dora Rodriguez | 01-4002-002-1610 | Yes | Yes | W. Johnson Judgment (Bk 24, Pg 207) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 34 | Avimael and Odalys Arevalo | 01-4002-002-1600 | Yes | Yes | W. Johnson Judgment (Bk 24, Pg 207) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 36 | Dalia Espinosa, Daniel Espinosa and Sofira Gonzalez [26] | 01-4002-002-1580 | Yes | Yes | W. Johnson Judgment (Bk 24, Pg 207) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 43 | Lourdez Rodriguez | 01-4002-001-1370 | Yes | Yes | P. Russo Judgment (Bk 24, Pg 83) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 44 | Alberto Perez | 01-4002-001-1380 | Yes | Yes | P. Russo Judgment (Bk 24, Pg 83) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 45 | Mayra Lopez | 01-4002-001-1390 | Yes | Yes | P. Russo Judgment (Bk 24, Pg 83) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |

---

[26] The table provided by the parties in their "Amended Joint Stipulations of Title" after remand omits the surname "Gonzalez" from Castillo plaintiff Sofira Gonzalez.

| 46 | Niraldo Hernandez Padron and Mercedes Alina Falero | 01-4002-001-1400 | Yes | Yes | P. Russo Judgment (Bk 24, Pg 83) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
|----|----|----|----|----|----|----|----|----|
| 47 | Luisa Palencia and Xiomara Rodriguez | 01-4002-001-1410 | Yes | Yes | P. Russo Judgment (Bk 24, Pg 83) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 49 | Reinaldo F. Castillo | 01-4002-001-1430 | Yes | Yes | P. Russo Judgment (Bk 24, Pg 83) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 50 | Hugo E. and Concepcion V. Diaz as Co-Trustees of the Diaz Family Revocable [Trust[27]] | 01-4002-001-1440 | Yes | Yes | P. Russo Judgment (Bk 24, Pg 83) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 51 | South American Tile, LLC | 01-4002-001-1450 | Yes | Yes | P. Russo Judgment (Bk 24, Pg 83) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| 52 | Gladys Hernandez | 01-4002-001-1460 | Yes | Yes | P. Russo Judgment (Bk 24, Pg 83) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |

[27] The table provided by the parties in their "Amended Joint Stipulations of Title" after remand omits the word "Trust" from Castillo plaintiff Hugo E. and Concepcion V. Diaz as Co-Trustees of the Diaz Family Revocable Trust.

| Menendez, Case No. 17-1931 | Norma D. Gomez and Jose M. Martinez | 01-4002-002-1710 | Yes | Yes | J. Pyles, J. Owens Judgment (Bk 24, Pg 208) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| Menendez, Case No. 17-1931 | Nelson Menendez and Osvaldo Borras, Jr. | 01-4002-002-1690 | Yes | Yes | J. Pyles, J. Owens Judgment (Bk 24, Pg 208) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| Menendez, Case No. 17-1931 | Luis R. Schmidt | 01-4002-002-1660 | Yes | Yes | W. Johnson Judgment (Bk 24, Pg 207) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| Hernandez, Case No. 17-468 | Miriam Hernandez | 01-4002-002-1740 | Yes | Yes | J. Pyles, J. Owens Judgment (Bk 24, Pg 208) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| Hernandez, Case No. 17-468 [sic] | Claro Lima | 01-4002-002-1590 | Yes | Yes | W. Johnson Judgment (Bk 24, Pg 207) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |
| Alvarez, Case No. 21-610 | Eduardo and Marilyn Alvarez | 01-4002-002-0260 | Yes | Yes | J. Pyles, J. Owens Judgment (Bk 24, Pg 208) | 1937 Quitclaim Deed (Bk 1806, Pg 127) | Easement | Fee |

(capitalization and emphasis in original; alterations and footnotes added).

**The United States Court of Federal Claims' June 29, 2018 Opinion Granting Defendant's Cross-Motions for Partial summary judgment**

As detailed above, after plaintiffs filed their complaints, the <u>Castillo</u> plaintiffs twice amended their complaint to join and voluntarily dismiss certain plaintiffs, the <u>Menendez</u> plaintiffs amended their complaint once to join one plaintiff, and defendant filed answers. The <u>Castillo</u> and <u>Menendez</u> plaintiffs moved for partial summary judgment as to the government's liability for taking their property without just compensation with respect to the relevant easements making up portions of the railroad corridor. The government in <u>Castillo</u> cross-moved for partial summary judgment with respect to the portion of the railroad corridor conveyed by the Holman deed, stating that it was not liable for any takings with respect to that portion of the railroad corridor because the Holman deed granted fee simple title to the Florida East Coast Railway as to that portion of the railroad

corridor. See Castillo v. United States, 138 Fed. Cl. at 730 ("In Castillo, the government has cross-moved for partial summary judgment 'as to the railroad's ownership of portions of the rail line' that the Florida East Coast Railway 'acquired by [the Holman] deed.'" (alteration in original)).[28] The government further argued in both its cross-motions for partial summary judgment before the remand in Castillo and Menendez that it was not liable for any alleged takings of the railroad corridor at issue because the Castillo and Menendez plaintiffs could not prove that they owned the land underlying the rights-of-way at issue. See id. at 734 ("The government responds in its cross-motion for summary judgment in Castillo that the plaintiffs 'have failed to prove that they are the fee owners of some or all of the portions of the railroad corridor acquired by condemnation.'") and id. at 735 (explaining that "in Menendez, the government argues in its cross-motion for partial summary judgment that the 'plaintiffs cannot prove that they are the owners of portions of the railroad corridor acquired by condemnation'"). Plaintiffs argued, for the first time in their respective reply briefs in support of their motions for partial summary judgment before remand, that under Florida law the "centerline presumption" provides that "'[e]ach landowner whose property borders the abandoned right-of-way is presumed by Florida law to own the land underlying the right-of-way, up to the center line of the right-of-way.'" Castillo v. United States, 138 Fed. Cl. at 734 (alteration added). The subdivision plats which are also at issue in the cross-motions for partial summary judgment currently before the court after remand were first relied on by defendant in support of its cross-motions for partial summary judgment in Castillo and Menendez before the remand, and subsequently by plaintiffs in support of their motions for reconsideration. Before the remand, the court found that the Holman deed conveyed fee simple title to the Florida East Coast Railway and that the nine Castillo plaintiffs who alleged their interests in the land underlying the railroad corridor were in whole or in part derived from the Holman deed had no cognizable property interest in the portion of the railroad corridor conveyed in the Holman deed, and, therefore, that no taking occurred with respect to that land.[29] See id.

---

[28] As this court previously explained in its June 29, 2018 Opinion before the remand, the Castillo plaintiffs who had previously claimed an interest in the land conveyed by the Holman deed "responded to the government's cross-motion for partial summary judgment as to the Holman conveyance that none of the Castillo plaintiffs are 'seeking summary judgment [in their motion for partial summary judgment] for any land described in the 1923 Holman Deed.'" Castillo v. United States, 168 Fed. Cl. at 731 (alteration in original). This court further explained, however, that the relevant portion of the railroad corridor "is comprised of both the Russo right-of-way and the result of the Holman conveyance," and, therefore, "whether these nine Castillo plaintiffs own the land underlying what was included in the Holman conveyance is at issue." Id.

[29] As noted above, after the remand, no plaintiff with a claim currently before the court alleges a property interest in the land conveyed by the Holman deed as the basis for their claim in the above captioned cases, although certain plaintiffs alleged such an interest when their claims were first filed in this court before the remand. All plaintiffs who previously alleged an interest in the land conveyed by the Holman deed also previously

When evaluating the Castillo and Menendez plaintiffs' argument regarding the centerline presumption before the remand, this court interpreted the centerline presumption under Florida law, and relied on a decision of the Supreme Court of Florida, which had analyzed Florida law certified to it by the United States Court of Appeals for the Federal Circuit, Rogers v. United States, 184 So. 3d 1087 (Fla. 2015), as well as other Supreme Court of Florida precedents of Jacksonville, Tallahassee & Key West Railway Co. v. Lockwood, 15 So. 327 (Fla. 1894), and Smith v. Horn, 70 So. 435 (Fla. 1915). As this court explained in the June 29, 2018 Opinion, the centerline presumption "'is a rule of construction that is employed to aid in determining the grantor's intent' as to whether the grantor intended to retain title to the land underlying the easement or pass title to his grantees." Castillo v. United States, 138 Fed. Cl. at 736 (quoting Rogers v. United States, 184 So. 3d at 1098). As the Supreme Court of Florida explained, the centerline presumption holds "that where a street or highway is the boundary of a lot or piece of land, that the owner of such land owns the soil to the center of such street or highway, subject to the right of the public to pass and repass over and along it." Fla. So. Ry. Co. v. Brown, 1 So. 512, 513 (Fla. 1887). The centerline presumption is not absolute, however, and, as this court held in its June 29, 2018 Opinion, the centerline presumption "can be rebutted in certain circumstances." Castillo v. United States, 138 Fed. Cl. at 736. This court determined that

> the center line presumption can be rebutted, for example, by evidence that the grantor did not own the land underlying the easement at issue, or, if there was ownership of such land, evidence that the grantor clearly reserved title to the land, such that the adjoining landowner would have no interest in the easement.

Id. at 738.

This court construed the plats of the two subdivisions in which the Castillo and Menendez plaintiffs' properties were located, consistent with the Florida District Court of Appeal for the Second District's decision in North Lauderdale Corp. v. Lyons, 156 So. 2d 690 (Fla. Dist. Ct. App. 1963), which held that "[t]he plat must be construed as a whole and every part of the instrument be given effect" and that "the plat should be construed fairly and reasonably with no part rejected as superfluous." N. Lauderdale Corp. v. Lyons, 156 So. 2d at 692 (alteration added). With respect to the Zena Gardens plat, this court determined that the language "excepting therefrom a strip of land off the westerly side which is the right of way of the Okeechobee-Miami Extension of the Florida East Coast Railway," included in the plat, indicated that "the railroad corridor is not included in the Zena Gardens subdivision," and that the nine Castillo plaintiffs' parcels "end at the edge of the railroad corridor." Castillo v. United States, 138 Fed. Cl. at 740. With respect to the Princess Park Manor plat, this court determined that the language "'East of the Florida East Coast Right-of-Way'" and "'less the Florida East Coast Right-of-Way,'" included in the plat, indicated that "the railroad corridor is not included in the platted subdivision" and that the ten Castillo and three Menendez plaintiffs' parcels "end at the edge of the railroad corridor." Id. at 741. For these reasons, this court concluded that the centerline

---

alleged an interest in land underlying the Russo right-of-way, and continue to allege such interests after the remand.

presumption was rebutted with respect to all <u>Castillo</u> and <u>Menendez</u> plaintiffs and that the <u>Castillo</u> and <u>Menendez</u> plaintiffs had no cognizable interest in the railroad corridor. Therefore, this court held that all <u>Castillo</u> and <u>Menendez</u> plaintiffs' takings claims failed as to the portion of the railroad corridor that the Florida East Coast Railway obtained through the four condemnation proceedings in 1924. <u>See id.</u> at 740, 742. Accordingly, this court granted the government's cross-motions for partial summary judgment in <u>Castillo</u> and <u>Menendez</u>, and denied the <u>Castillo</u> and <u>Menendez</u> plaintiffs' respective motions for partial summary judgment. <u>See id.</u> at 742.

Following this court's decision on the parties' cross-motions for partial summary judgment, the <u>Castillo</u> and <u>Menendez</u> plaintiffs moved for reconsideration, <u>see Castillo v. United States</u>, 140 Fed. Cl. at 593, challenging "'whether this Court correctly applied the centerline presumption,'" but did not seek reconsideration of the court's Opinion with respect to the Holman deed. <u>See id.</u> at 597-98. The <u>Castillo</u> and <u>Menendez</u> plaintiffs tried to support their motions for reconsideration with the subdivision plats of the Zena Gardens and Princess Park Manor subdivisions, which defendant previously produced in support of its cross-motions for partial summary judgment before remand. The <u>Castillo</u> and <u>Menendez</u> plaintiffs also submitted evidence to support their motions for reconsideration in this court which was "not previously submitted by the <u>Castillo</u> and <u>Menendez</u> plaintiffs when briefing their motions for summary judgment" prior to the court's issuance of its June 29, 2018 Opinion, including the chains of title for <u>Castillo</u> plaintiff Reinaldo F. Castillo, in the Zena Gardens subdivision, and <u>Menendez</u> plaintiff Nelson Menendez, in the Princess Park Manor subdivision.[30] <u>See id.</u> at 598. Chains of title for the properties of "the remaining eighteen <u>Castillo</u> plaintiffs and remaining two <u>Menendez</u> plaintiffs" were not submitted, which omission was "without explanation," as this court noted in its Opinion denying the motions for reconsideration. <u>See id.</u> The two chains of title submitted by plaintiffs have subsequently been relied upon by defendant in support of its motions for partial summary judgment currently under consideration after remand and are discussed below.

Each of the deeds in the Zena Gardens chain of title, which plaintiffs first produced in support of their motions for reconsideration, up to and including the 1946 Merwitzer deed, conveyed a parcel of land approximately 40 acres in area, the size of the Zena

---

[30] In addition to the chains of title, the <u>Castillo</u> and <u>Menendez</u> plaintiffs attempted to support their motions for reconsideration in this court with two declarations, "a copy of three sections of the 2012 Florida Uniform Title Standards," and two deeds which were duplicative of deeds in the chains of title. <u>See Castillo v. United States</u>, 140 Fed. Cl. at 598. The <u>Castillo</u> and <u>Menendez</u> plaintiffs put forth the declarations as authorities on Florida law, which this court held "do not change the court's June 29, 2018 conclusion." <u>Id.</u> at 603. This court explained that "[a]ny explanation or interpretation offered" in the declarations "as to how the centerline presumption should be applied in the above-captioned cases, however, is not binding on this court," because "[i]t is the role of the court to interpret and apply Florida State law in the above-captioned cases, as interpreted by the Florida courts." <u>Id.</u> at 602 (alteration added) (citing <u>Chi. Coating Co., LLC v. United States</u>, 892 F.3d 1164, 1170 (Fed. Cir. 2018)).

Gardens subdivision once platted. The chain of title report for the Zena Gardens subdivision contains the following deeds. Three deeds described the property conveyed as "subject to" the Florida East Coast Railway right-of-way: the 1924 Russo deed, from Paul and Lucy Russo to Antonio Lanese, described the property conveyed therein as "SUBJECT TO: Judgment dated Oct. 28, 1924 in the case, Florida East Coast Railway Company, a corp., vs. Paul Russo, et al. [sic],"[31] (capitalization in original; alteration added), while both the 1925 Lanese deed, from Antonio and Marie Lanese to the Lanese Investment Company, and the 1927 Lanese deed, from the Lanese Investment Company to Antonio Lanese, described the property conveyed therein as "subject to the right of way of the Florida East Coast Railway." The 1945 Hollett deed, from Carmen Lanese to T.C. and Myrtle Hollett, described the land it conveyed as

> less that certain strip of land off the Westerly portion of the above described property, more particularly described as:
>
> Said strip being bounded on the West by the West boundary line of above mentioned fractional part of said Section, on the East by a line parallel to and fifty (50) feet East of the center line of the Okeechobee-Miami Extension of the Florida East Coast Railway as surveyed, and located, and on the North and South by the respective boundary lines of said aforementioned fractional part of said Section, said strip being twenty-five and thirty-three one-hundredths (25.33) feet wide at the North end, and one and two-tenths (1.2) feet wide at the South end, containing in all forty-one one-hundredths (0.41) acres, more or less.

(capitalization in original). The 1945 Merwitzer deed, from T.C. and Myrtle Hollett to Louis Merwitzer, the 1945 Central Construction deed, from Louis and Rebecca Merwitzer to Central Construction Company, Inc., and the 1946 Merwitzer deed, from Central Construction Company, Inc., to Louis Merwitzer, all contain nearly identical descriptions of the property conveyed as the 1945 Hollett deed, with only slight variations such as the placement and capitalization of the word "less;" the spelling out of "50," "25.33," "1.2," and "0.41;" and minor differences in capitalization, punctuation, spelling, and wording of the descriptions. Following the 1946 Merwitzer deed, in 1947 a conveyance was made by deed from Louis and Rebecca Merwitzer to Zena Gardens, Inc. in order to plat the Zena Gardens subdivision, with the land conveyed thereby described by reference to the attached Zena Gardens plat.

The Princess Park Manor chain of title, which plaintiffs first produced in support of their motions for reconsideration, begins with three quitclaim deeds conveying property to A. B. Small from W.J. and Mary Elle Weller, from L.A. and Mabel E. Lins, and from Douglas and Theodora W. Nicholson, each recorded on December 7, 1925, and none of

---

[31] The three deeds providing an identical description of the land conveyed with a reference to the 1924 Russo judgment do not provide a citation to the 1924 Russo judgment. Moreover, while a typewritten form memorializing the judgment is included in the record before the court, the judgment, which was entered by the Circuit Court for Dade County, Florida, in 1924, does not appear to be reported or otherwise available on legal databases.

which refer to the Florida East Coast Railway right-of-way. Following the 1925 Small deeds, the next conveyance was the 1934 Dallas Investment Company deed, from the City of Miami to Dallas Investment Company, which described the land it conveyed as:

> S1/2 of NE1/4 S of Canal less F. E. C. & S. A. F. right of way, and W1/2 of NE1/4 of SE1/4, less F. E. C. right of way, less N. 35' St. and less S. 35' St., Section 2, Township 54 South, Range 40 East, in the City of Miami, County of Dade, State of Florida.

(capitalization in original). The 1936 Long Company deed, from the Southern Drainage District to The Long Company, described the land it conveyed as:

> The West Half of the North-east Quarter of the South-east Quarter less the Railway, all in Section Two, Township Fifty-four South, Range Forty East, consisting of Thirty-five acres and Nineteen 11/100 acres respectively.

(capitalization in original). The 1947 Eristavi-Tchitcherine deed, from The Long Company to Princess Lucy Eristavi-Tchitcherine, described the land it conveyed as:

> The South one-half (S ½) of the Northeast one-quarter (NE ¼) South of the Canal and East of the F.E.C. right-of-way, located in Section 2, Township 54-South, Range 40-East, Dade County, Florida; being the Land East of the F.E.C. right-of-way and between Flagler Street and the Tamiami Canal and extending East to Ludlam Road; also

> The West one-half (W ½) of the Northeast one-quarter (NE ¼) of the Southeast one-quarter (SE ¼) less the F.E.C. right-of-way, all in Section 2, Township 54-South Range 40-East, Dade County, Florida, together with the improvements thereon.

(capitalization in original). The 1949 Moss deed, from the Estate of Lucy Cotton Thomas (identified in the prior deed as Princess Lucy Eristavi-Tchitcherine) to Erving A. Moss, who would plat the Princess Park Manor subdivision, provided an identical description of the land as the 1947 Eristavi-Tchitcherine deed, with exception of capitalization differences, spelling differences such as "Northeast Quarter" instead of "Northeast one-quarter (NE ¼)" and "Southeast Quarter" instead of "Southeast one-quarter (SE ¼)," omitting "(W ½)" and certain hyphens, spelling out "Florida East Coast," and omitting the phrase "together with the improvements thereon." (capitalization in original). The 1949 Moss deed was the final conveyance before the platting of the Princess Park Manor subdivision in 1949.

In opposition to the <u>Castillo</u> and <u>Menendez</u> plaintiffs' motions for reconsideration of the court's June 29, 2018 Opinion, and more than one and a half years after the <u>Castillo</u> plaintiffs filed their original complaint, defendant produced, for the first time, a quitclaim deed, executed May 6, 1937 and identified by defendant as a "tax deed" (the 1937 deed).[32] The 1937 deed identifies two separate land conveyances involving the Southern Drainage District, a local taxing authority, the first conveyance on August 7, 1933, and

---

[32] Because the 1937 deed is identified as a "tax deed" but memorializes a quitclaim conveyance, the court identifies the deed as "the 1937 deed" to avoid confusion.

the second conveyance on May 6, 1937. According to the 1937 deed, the 1933 conveyance and the 1937 conveyance both concerned the same parcels of land.

According to the 1937 deed, "at a sale held by Bob Simpson, as Tax Collector of Dade County, on the 7th day of August, 1933, to enforce the collection of the unpaid taxes levied by said District for the year 1932," the Southern Drainage District acquired interests in certain parcels of land. The 1937 deed, however, does not specify if the Southern Drainage District acquired fee simple or some other type of interest in the parcels of land at the 1933 tax sale. Further, although the 1937 deed states that the 1933 tax sale was held "to enforce the collection of the unpaid" drainage taxes for 1932, the 1937 deed does not identify the parties who failed to pay the drainage taxes in 1932. Defendant has not produced any records from the 1933 tax sale at any point in the litigation of the above captioned cases.

Additionally, the 1937 deed memorializes a conveyance by the Southern Drainage District to the Florida East Coast Railway on May 6, 1937. The 1937 deed provides:

This Indenture, Made this 6th day of May, A. D. 1937, between the SOUTHERN DRAINAGE DISTRICT, a drainage district of the State of Florida, created by Chapter 7599, Laws of Florida, Acts of 1917 and Acts amendatory thereto, party of the first part, and Florida East Coast Railway, A Florida Corporation St. Augustine [sic] of the County of St. Johns and State of Fla., party of the second part:

WITNESSETH, that the said party of the first part, for and in consideration of the sum of ONE DOLLAR ($1.00) AND OTHER VALUABLE CONSIDERATION, in hand paid by the party of the second part the receipt whereof is hereby acknowledged, has remised, released, and quit-claimed, and by these presents does remise, release, and quit-claim unto the said party of the second part, and his heirs and assigns forever, all the right, title, interest, claim, and demand which the said party of the
# 193, 480, 482, 484, 662[33]
first part acquired at a sale held by Bob Simpson, as Tax Collector of Dade County, on the 7th day of August, 1933, to enforce the collection of the unpaid taxes levied by said District for the year 1932), in and to the following described land, lying and being in the County of Dade and State of Florida, to-wit:

A One Hundred Foot Strip across East Half of Section Two, Township Fifty-four South, Range Forty East, Tallahassee Meridian, Fla.
Also- East Half of the North-west Quarter of the North-east Quarter, East of the West line of the R/W in Section Twenty-three, Township Fifty-four South, Range Forty East, Tallahassee Meridian, Fla.

---

[33] Defendant asserts that the numbers, typewritten between the lines of the original 1937 tax deed and reproduced above, "appear to represent the tax certificates previously sold by the Tax Collector," which plaintiffs have not challenged.

Also- A Strip as in Deed Book 410 at Page 85, in Section Twenty-three, Township Fifty-four South, Range Forty East, Tallahassee Meridian, Fla.
Also- A Strip as in Deed Book 366 at Page 357, in Section Twenty-three, Township Fifty-four South, Range Forty East, Tallahassee Meridian, Fla.
Also- F. E. C. R/y across South-west Quarter of the North-east Quarter of the North-east Quarter of Section Twenty-one, Township Fifty-five South, Range Forty East, Tallahassee Meridian, Fla.[34]

This deed acknowledges receipt of Southern Drainage District taxes for the years of 1932, 1933, 1934, 1935, 1936 on the above named Lands.

TO HAVE AND TO HOLD the same, together with all and singular the appurtenances thereunto belonging or in anywise appertaining and all the estate, right, title, interest, and claim whatsoever of the said party of the first part, either in law or equity, to the only proper use, benefit, and behoof of the said party of the second part and his heirs and assigns forever.

(capitalization in original; alteration and footnotes added).

In their motions for reconsideration, the Castillo and Menendez plaintiffs argued "that the court committed 'clear error' resulting in 'manifest injustice' when the court concluded that both sets of plaintiffs do not own any of the land underlying the railroad corridor." Castillo v. United States, 140 Fed. Cl. at 600. The Castillo and Menendez plaintiffs claimed that the chains of title they submitted in support of the motions for reconsideration "'demonstrate that the Moss and Merwitzer families did not "clearly reserve title"' to the land under the railroad right-of-way easement.'" Id. at 601. On October 30, 2018, this court issued an Opinion denying the Castillo and Menendez plaintiffs' motions for reconsideration. The court identified three primary grounds for reconsideration: "'(1) an intervening change in the controlling law; (2) the availability of

---

[34] According to the parties' filings in the above captioned cases, including the aerial maps submitted by the Castillo and Menendez plaintiffs before the remand, the Castillo, Menendez, Hernandez, and Lima plaintiffs currently before the court own property only in Section Two, Township Fifty-four South, Range Forty East. Only one description of land in the 1937 deed is found within the same Section Two as plaintiffs' properties, which is the description of the "One Hundred Foot Strip across East Half of Section Two, Township Fifty-four South, Range Forty East, Tallahassee Meridian, Fla." Moreover, the other Sections referred to in the 1937 deed are located miles away from the railroad corridor currently at issue, and the lands described in the 1937 deed other than the "One Hundred Foot Strip" in Section Two are not addressed in any other documents produced by plaintiffs or defendant during the motions for reconsideration, during the appeal to the Federal Circuit before the remand, or during the additional discovery period after the remand. Of the remaining four descriptions of land stated in the 1937 deed, three descriptions refer to lands in "Section Twenty-three, Township Fifty-four South, Range Forty East," and one description refers to land in "Section Twenty-one, Township Fifty-five South, Range Forty East." Accordingly, only the description of the "One Hundred Foot Strip" in Section Two is relevant to the issues before the court on remand.

new evidence; and (3) the need to correct clear error or prevent manifest injustice.'" Id. at 599 (quoting Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC, 597 F.3d 1374, 1383 (Fed. Cir. 2010) (internal quotations omitted)). The court stated that "'a motion for reconsideration should not be based on evidence that was readily available at the time the motion was heard.'" Id. at 600 (quoting Johnson v. United States, 127 Fed. Cl. 661, 664 (2016) (internal quotations omitted)). The court held that "the chains-of-title are public records and, therefore, were available to the Castillo and Menendez plaintiffs when they briefed the motions for summary judgment" and accordingly "should not have been left for a post-decision motion for reconsideration." Id. The court also addressed the merits of the chains of title and determined that the language "less" and "East of," used in the deeds in the chains of title with reference to the railroad corridor, indicated the deeds did not convey title to the railroad corridor. See id. at 601-02. The court further addressed the Castillo and Menendez plaintiffs' argument, asserted for the first time in their motions for reconsideration, that "[t]he description of the property conveyed in the Zena Garden [sic] and Princess Park Manor plats is rightly understood under Florida law and land title standards as a conveyance of the *entire* fee estate *subject to* the existing railroad easement.'" Id. at 602 (emphasis and alterations in original). The court explained that "'a party may not raise an issue for the first time on reconsideration when the issue was available to be litigated,'" id. (quoting CANVS Corp. v. United States, 116 Fed. Cl. 294, 300 (2014)), and held that the "plaintiffs' newly raised arguments that the excepting language in the Zena Gardens and Princess Park Manor plats means the subdivision is 'subject to' the railroad right-of-way" did not constitute "a basis for reconsideration of the court's June 29, 2018 Opinion" granting partial summary judgment to defendant. See id.

Additionally, the court addressed the Castillo plaintiffs' argument "that the court 'clearly erred when it granted summary judgment' in favor of defendant regarding the portion of the railroad corridor obtained by condemnation because the government did not move for summary judgment as to this portion of the railroad corridor," because, in Castillo, defendant had "moved for summary judgment as to the portion of the railroad corridor obtained through the Holman deed and not to the portion of the railroad corridor" composed of the four rights-of-way. Id. at 604.[35] The court explained that "'[a] court may . . . grant summary judgment in favor of the nonmoving party,'" id. (ellipsis in original; alteration added) (quoting U.S. Sur. Co. v. United States, 83 Fed. Cl. 306, 309-10 (2008)), and the court held that "[e]ven though defendant did not move for summary judgment as to the portion of the railroad corridor obtained through condemnation, the Castillo plaintiffs had adequate notice and opportunity to argue to the court as to why the subdivision plats did not preclude their takings claims." Id. at 605 (alteration added). For these reasons, the court denied the Castillo and Menendez plaintiffs' attempt to seek reconsideration on the basis of evidence not previously before the court prior to the issuance of its June 29, 2018 Opinion, see generally Castillo v. United States, 138 Fed. Cl. 707, in particular, as relevant to the above captioned cases, the subdivision chains of title produced by the Castillo and Menendez plaintiffs. Accordingly, the court denied the motions for reconsideration, because "the Castillo and Menendez plaintiffs have not presented this

---

[35] The Menendez plaintiffs did not make a similar argument with respect to the court's grant of partial summary judgment to the government in Menendez.

court with any proper grounds to reconsider its June 29, 2018 Opinion or the July 2, 2018 judgments entered in Castillo and Menendez." Castillo v. United States, 140 Fed. Cl. at 606 (capitalization in original).

The plaintiffs in Castillo and Menendez appealed this court's rulings on the prior cross-motions for partial summary judgment, see generally Castillo v. United States, 138 Fed. Cl. 707, to the United States Court of Appeals for the Federal Circuit. See generally Castillo v. United States, 952 F.3d 1311. The Federal Circuit on appeal paraphrased this court's holding as having been "that the only reasonable finding on the evidence in this case was that the centerline presumption was overcome or was inapplicable." Id. at 1315. On appeal, the Castillo and Menendez plaintiffs argued that the United States Court of Federal Claims had "misapplied the centerline presumption under Florida law" by "improperly interpret[ing] the Zena Gardens and Princess Park Manor plats as reserving a reversionary interest in the FEC right-of-way to the Merwitzers and Mosses, so that the subsequent deeds to the subdivision parcels at issue did not grant any ownership of land in the railroad corridor." [36] Id. at 1319-20 (alteration added). "[I]n the absence of a contrary indication under Florida law," the Federal Circuit "conclude[d] that the centerline presumption applies to railroad rights-of-way that serve as boundaries of a plot, including a plot within a subdivision," a conclusion this court had also reached in its earlier Opinion. See id. at 1320 (alterations added). Applying the centerline presumption to the subdivision plats, the Federal Circuit reached the conclusion that the language of the Zena Gardens and Princess Park Manor plats is not sufficient to avoid the centerline presumption. See id. at 1322-23. The Federal Circuit on appeal relied on Bischoff v. Walker, 107 So. 3d 1165 (Fla. Dist. Ct. App. 2013), a decision from the Florida District Court of Appeal for the Fifth District, to determine that the "East of" language of the Princess Park Manor plat did not rebut the centerline presumption because it was "nearly identical to the plat language" "'lying East of [the] Canal'" which the court in Bischoff held did not rebut the centerline presumption. Castillo v. United States, 952 F.3d at 1322 (alteration in original) (quoting Bischoff v. Walker, 107 So. 3d at 1166-68). The Federal Circuit further relied on Dean v. MOD Properties, Ltd., 528 So. 2d 432 (Fla. Dist. Ct. App. 1988), also a decision from the Florida District Court of Appeal for the Fifth District, to determine that the "less" language of the Princess Park Manor plat and the "excepting" language of the Zena Gardens plat also did not rebut the centerline presumption, because the plat language was "'relevantly similar to the language'" "'less and except'" which did not rebut the centerline presumption in Dean.[37] See Castillo v. United States, 952 F.3d at 1322 (quoting Dean v. MOD Props.,

---

[36] The Castillo and Menendez plaintiffs did "not challenge that aspect of the trial court's ruling" concerning the Holman deed on appeal, and, therefore, that portion of this court's previous Opinion on the cross-motions for partial summary judgment before appeal has not been disturbed. See Castillo v. United States, 952 F.3d at 1317 n.2.

[37] The Federal Circuit also addressed the reservation language included in the subdivision plats, but the Federal Circuit would only "assume, without deciding" that the plats rebutted the centerline presumption with respect to the reservation of "the 'Streets, Avenues and Terrace'" in the Zena Gardens plat and of "the 'Streets, Avenues, Roads, Terraces, Courts, and Alleys'" in the Princess Park Manor plat. See Castillo v. United States, 952 F.3d at 1323. The reservations, the Federal Circuit noted, omitted the railroad corridor,

Ltd., 528 So. 2d at 432-33). The Federal Circuit concluded that this court had "erroneously granted summary judgment in its original rulings" and that the subdivision plats did not "contain clear expressions of exclusion of the railroad corridor from the subdivisions whose parcels were to be conveyed to purchasers." Id. at 1323.

With respect to the chains of title first produced by the Castillo and Menendez plaintiffs in support of their motion for reconsideration, the Federal Circuit observed that "[a]t least some of the pre-platting property documents to which we have been pointed themselves use the FEC [Florida East Coast] right-of-way as a boundary." Id. at 1324 (alterations added). The Federal Circuit, however, did not come to a conclusion with respect to the significance of the plaintiffs' chains of title, stating:

> Interpreting such documents, like interpreting the [subdivision] plats themselves, requires use of the centerline presumption to the extent it applies. The trial court's discussion of pre-platting issues in the reconsideration order may have been colored by an understanding of the presumption that we have determined to be incorrect in rejecting the trial court's original summary-judgment ruling.

Id. (footnote omitted). In a footnote appended to the above quoted material, the Federal Circuit also analyzed the 1937 deed which defendant had produced for the first time in opposition to the motions for reconsideration:

> Under the summary-judgment standard requiring evidence to be viewed favorably to the nonmoving party, see Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994), the 1937 deed indicates, at most, that the FEC [Florida East Coast] Railway fell behind on its drainage-tax payments owed to the District and that, to clear the debt, the FEC Railway paid the unpaid drainage taxes for 1932-1936 and received from the District, in return, the quitclaim deed reflecting the clearance and removal of the District's tax lien. Under Florida law, the 1937 quitclaim deed conveyed only such "title or interest as possessed by the grantor [here, the Southern Drainage District] at the time of the making of the deed." See Florida East Coast Ry. Co. v. Patterson, 593 So. 2d 575, 577 (Fla. Dist. Ct. App. 1992). Moreover, "the execution of a quitclaim deed, without more, does not necessarily import that the grantor possesses any interest at all and if the grantor has no interest in the land described at the time of the conveyance, the quitclaim conveys nothing to the grantee." Miami Holding Corp. v. Matthews, 311 So. 2d 802, 803 (Fla. Dist. Ct. App. 1975). The government has not presented evidence that the Southern Drainage District had ownership interests in the corridor land at the time of the quitclaim deed. Accordingly, the evidence does not support the government's summary-judgment position that the FEC Railway acquired fee title through the 1937 quitclaim deed.

---

which the Federal Circuit stated "confirms the absence of a reservation by the grantors as to the railroad corridor." Id.

Castillo v. United States, 952 F.3d at 1324 n.6 (second alteration in original). The Federal Circuit "remand[ed] the case for further proceedings" only "with respect to the portions of the FEC [Florida East Coast] Railway right-of-way related to the condemnation orders," "including any appropriate further development of the factual record," including "such record development as is appropriate" on the issue of whether "the Merwitzers and Mosses did not own the corridor land now at issue when they filed their plats." Id. at 1325 (alterations added). As described above, the Federal Circuit did not disturb this court's holding with respect to the fee simple title conveyed by the Holman deed, which did not implicate the centerline presumption. The Federal Circuit stated that, in remanding the case, it would "not prejudge what conclusion may be justified on remand, whether or not the evidentiary record is supplemented." Id.

Following the remand of the Castillo and Menendez cases to this court, the case of Hernandez, et al., v. United States, Case No. 17-468L, in which the Hernandez and Lima plaintiffs were initially co-plaintiffs, was transferred to the undersigned. The parties proceeded to engage in additional discovery to supplement the evidentiary record "as is appropriate," see Castillo v. United States, 952 F.3d at 1325, with respect to the question of whether the Merwitzers and Mosses owned the land at the time of the platting of the Princess Park Manor and Zena Gardens subdivisions that now constitutes the railroad corridor at issue. As noted above, the parties engaged in discovery with the exception of the Hernandez plaintiff Miriam Hernandez, who at the time of the remand was proceeding pro se, failed to appear at scheduled hearings, and did not participate actively in the additional discovery on remand, and the Alvarez plaintiff, who had agreed to wait while the remand was proceeding.

During the additional discovery period after remand, defendant stated that it had "located two additional documents that confirm the nature of the 1937 tax deed," and produced both documents for the first time. The first document defendant produced for the first time during the additional discovery period on remand is a quitclaim deed, executed July 16, 1938 by the Florida East Coast Railway and its receivers (the 1938 quitclaim deed). The 1938 quitclaim deed memorializes a conveyance from the Florida East Coast Railway to the Southern Drainage District. The 1938 quitclaim deed provides:

> THIS INDENTURE, Made this 16th day of July A. D. 1938, between FLORIDA EAST COAST RAILWAY COMPANY, a corporation organized and existing under the laws of the State of Florida, party of the first part, William R. Kenan, Jr., and Scott M. Loftin as Receivers of the properties of said Florida East Coast Railway Company, and not individually, parties of the second part, and SOUTHERN DRAINAGE DISTRICT, a drainage district organized and existing under the laws of the State of Florida, party of the third part:
> WITNESSETH:
>
> That the said party of the first part, for and in consideration of the sum of One One Dollar ($1.00) to it in hand paid by the said party of the third part, the receipt whereof is hereby acknowledged, has granted, remised, released and quit-claimed, and by these presents doth grant, remise, release and quit-claim unto the said party of the third part, its successors and assigns

forever, all the right, title, interest, claim and demand which the said party of the first part hath in and to the following described lot, piece or parcel of land, situate, lying and being in the County of Dade and State of Florida, to wit:

All that part of the East half of Section 2, Township 54 South, Range 40 East, except a strip of land one hundred feet wide used as right of way for Florida East Coast Railway, the center line of said one hundred foot strip being described as follows:

Beginning at a point in the north line of Section 2, which is 1265 feet west of its Northeast corner and continuing thence southerly across the East half of said Section 2 to a point in the south line thereof which is 1353.1 feet west of the southeast corner of said Section.
The land hereby quit-claimed not now being held or required for railroad purposes.

TO HAVE AND TO HOLD the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest and claim whatsoever of the said party of the first part, either in law or equity, to the only proper use, benefit and behoof of the said party of the third part, its successors and assigns forever.

And the parties of the second part, as evidencing their consent, approval and authorization of the quit-claim and release of the above described property by the party of the first part to the party of the third part, join in the execution of this Indenture.

(capitalization in original).

The second document defendant produced for the first time during the additional discovery period on remand is an affidavit executed September 20, 1938 by the President and Secretary of the Southern Drainage District (the 1938 affidavit), who had previously been signatories to the 1937 deed. In the 1938 affidavit, the affiants swore:

1. On May 6, 1937, a tax deed was issued by the said SOUTHERN DRAINAGE DISTRICT to the FLORIDA EAST COAST RAILWAY COMPANY, wherein the said Drainage District quit-claimed its rights acquired by the purchase on August 7, 1933, for unpaid taxes levied by said Drainage District for the year 1932 in and to the following described land:

A strip 100' across East one-half (1/2) of Section 2, Township 54 South Range forty (40) East, Tallahassee Meridian, Florida (also other lands);

that the above described description of the property conveyed was an error in that the said SOUTHERN DRAINAGE DISTRICT intended to convey the following described land:

> A strip of land 100' wide used as right-of-way for Florida East Coast Railway, passing across the East one-half (1/2) of Section 2, Township 54 South Range forty (40) East, Tallahassee Meridian, Florida;

that the error occurred by reason of the fact that said quit-claim deed failed to state that said property deeded was the said right-of-way of the Florida East Coast Railway;

2. That on the 16th day of July, 1938, the said FLORIDA EAST COAST RAILWAY COMPANY, a Florida corporation, WILLIAM R. KENAN, JR. and SCOTT M. LOFTIN, as Receivers of the properties of the said FLORIDA EAST COAST RAILWAY COMPANY, did execute a quit-claim deed to the said SOUTHERN DRAINAGE DISTRICT, reconveying all of the property hereinabove described, save and except that which was intended to be deeded by the said original quit-claim deed heretofore mentioned;

3. That the said SOUTHERN DRAINAGE DISTRICT has no claim of title whatsoever against any part of the East half of Section 2, Township 54 South, Range 40 East, and that it makes this affidavit, by its said officers, for the purpose of clearing and quieting any cloud upon the title of the said land which may have been raised by the original deed made by it to the FLORIDA EAST COAST RAILWAY COMPANY or by the reconveyance by the said FLORIDA EAST COAST RAILWAY COMPANY to the said SOUTHERN DRAINAGE DISTRICT of all of said property, save and except that originally intended to have been deeded; and that the purpose of this affidavit is to permit the conveyance of all of said land heretofore clouded by said deeds, without the necessity of the making of several quit-claim deeds to the individual owners of the said land and by this affidavit the said SOUTHERN DRAINAGE DISTRICT does herewith estop itself from claiming any right, interest or title in and to the land lying in the East half of Section 2, Township 54, South, Range 40 East, other than its right to levy and collect taxes against said land in accordance with the statutes of the State of Florida, and to acquire further deeds of conveyance to said property for non-payment of Southern Drainage District taxes.

(capitalization in original). The 1938 affidavit appears to have been intended by the affiants to clarify the 1937 and 1938 conveyances memorialized in the 1937 deed and 1938 quitclaim deed, respectively. Neither the 1938 quitclaim deed nor the 1938 affidavit indicate whether the interest "originally intended to have been deeded" in 1937 was fee simple title. The 1938 quitclaim deed and 1938 affidavit were the only new pieces of evidence produced during an extensive post remand discovery and then submitted by

defendant following the remand, which had not been before this court when this court's earlier Opinions were issued, or before the Federal Circuit when it reviewed this court's earlier rulings. Plaintiffs did not submit additional evidence during the post remand discovery period.

After discovery on remand, defendant filed two motions for partial summary judgment[38] pursuant to Rule 56(a) and (c) of the United States Court of Federal Claims (RCFC) (2021), first, with respect to the claims of the Castillo and Menendez plaintiffs, and second, with respect to the claims of the Hernandez and Lima plaintiffs, who at that time had not been severed and were proceeding as co-plaintiffs in Hernandez. In the first motion for partial summary judgment on remand, defendant moves for partial summary judgment with respect to the claims of the Castillo and Menendez plaintiffs arguing that defendant has rebutted the centerline presumption by demonstrating "that FECR [Florida East Coast Railway] acquired fee title from the 1937 tax deed to the subject railroad corridor," as well as that the plaintiffs "have no property interest in that portion of the corridor" at issue. In the second motion, defendant moves for partial summary judgment with respect to the Hernandez and Lima plaintiffs, making identical arguments to those made in its motion for partial summary judgment in Castillo and Menendez, except that the defendant's motion regarding the Hernandez and Lima plaintiffs is concerned only with the railroad corridor adjacent to Princess Park Manor, the subdivision in which plaintiffs Miriam Hernandez and Claro Lima own property.

In support of its motions for partial summary judgment on remand, defendant argues that the 1937 deed, which defendant produced for the first time in opposition to plaintiffs' motions for reconsideration, indicates that the Florida East Coast Railway "acquired fee simple title to the subject railroad corridor from Southern Drainage District," and tries to rely on the 1938 quitclaim deed and 1938 affidavit, which defendant produced for the first time during the additional discovery period on remand, as well as a Florida statute, Chapter 12406 of the Florida Acts of 1927 (the 1927 Florida statute), to "confirm the nature of the 1937 tax deed." After two rounds of supplemental briefing, defendant further identified Florida statutes enacted in 1917, 1929, and 1931, all concerning the Southern Drainage District, to try to further support its argument that the 1937 deed conveyed fee simple title to the Florida East Coast Railway. Defendant additionally argues that the Florida East Coast Railway's fee simple ownership of the railroad corridor is evidenced by the deeds in the subdivision chains of title, which plaintiffs first produced in support of their motions for reconsideration, the language of which deeds defendant argues changed following the conveyance memorialized in the 1937 deed (1937 conveyance) to exclude the railroad corridor from conveyance. Accordingly, defendant argues that it "has rebutted the centerline presumption." Of the evidence relied upon by

---

[38] Defendant styles its motions as motions for summary judgment, not for partial summary judgment. Because the sole issue before the court on remand is the application of the centerline presumption to plaintiffs' claims, because the other issues of liability previously decided by this court's earlier decisions were affirmed by the Federal Circuit, and also because damages are yet to be considered, the court refers to defendant's motions as motions for partial summary judgment.

defendant to support its motions for partial summary judgment after the remand, the 1937 deed and the chains of title were previously submitted to this court at the time of the briefing of the earlier motions for reconsideration in Castillo and Menendez, and the 1938 quitclaim deed, 1938 affidavit, and 1917, 1927, 1929, and 1931 Florida statutes were produced for the first time during the additional discovery periods after the remand.

The plaintiffs in Castillo, Menendez, Hernandez, and Lima did not produce additional documents during the additional extended discovery period after remand. Plaintiffs in Castillo and Menendez jointly filed a response to defendant's motion for partial summary judgment on remand with respect to their claims and a cross-motion for partial summary judgment pursuant to RCFC 56(a) on the issue of the government's liability. Then-Hernandez plaintiff, now Lima plaintiff, Claro Lima also filed a separate response to defendant's motion for partial summary judgment in Hernandez and a cross-motion for partial summary judgment pursuant to RCFC 56(a) on the issue of the government's liability.[39] On May 19, 2021, after the severing of Claro Lima's claims and the creation of the Lima case, Hernandez plaintiff Miriam Hernandez filed her own response to defendant's motion for partial summary judgment in Hernandez and cross-moved for partial summary judgment pursuant to RCFC 56(a) on the issue of the government's liability, making arguments consistent with those made by the Lima plaintiff. As a result of the severing of Miriam Hernandez and Claro Lima's claims, plaintiffs in the above captioned cases filed a total of three cross-motions for partial summary judgment on remand: one from the Castillo and Menendez plaintiffs, one from the Hernandez plaintiff, and one from the Lima plaintiff.

The Castillo and Menendez plaintiffs' cross-motion, the Hernandez plaintiff's cross-motion, and the Lima plaintiff's cross-motion make similar, though not identical, arguments. All plaintiffs argue in their cross-motions on remand that the Federal Circuit on appeal held that neither the language of the subdivision plats nor the 1937 deed was proof that plaintiffs' predecessors-in-interest did not own the land underlying the railroad corridor. The Castillo and Menendez plaintiffs argue that the 1938 quitclaim deed and 1938 affidavit "produced on remand do nothing to support a different outcome." The Hernandez and Lima plaintiffs in their cross-motions for partial summary judgment similarly argue that on remand "[t]he government has put forth no evidence that rebuts" the centerline presumption. (alteration added). All plaintiffs in their cross-motions for partial summary judgment after remand argue that summary judgment must be entered in their favor with respect to liability on the basis of defendant's failure to rebut the centerline presumption. All plaintiffs, therefore, argue that the court should deny the government's motions and find that, because the centerline presumption has not been rebutted, the government is liable for taking plaintiffs' land up to the centerline of the railroad corridor, and the court should "proceed to determine" the just compensation owed to the plaintiffs.

In its combined responses to the plaintiffs' cross-motions for partial summary judgment and replies in support of its own motions for partial summary judgment on

---

[39] As noted above, on April 16, 2021, the court severed the claims of Claro Lima and Miriam Hernandez and created two cases, Lima and Hernandez.

remand, defendant acknowledges that unless defendant shows that the Florida East Coast Railway obtained fee simple title to the railroad corridor in 1937, "the centerline presumption would likely allow Plaintiffs to be the presumed owners of a portion of the former railroad right-of-way." (capitalization in original). Although defendant appears to acknowledge that its relied-upon evidence is unclear as to the nature of the 1937 conveyance, defendant argues that the court need not

> speculate as to what occurred almost ninety years ago. All material facts are known; there was a tax sale and a tax deed memorializing the sale was recorded. Under Florida law, as described in the United States' motion, the 1937 tax deed is sufficient on its own to show that (1) the Southern Drainage District acquired title to the subject lands as a result of the tax sale and (2) the FECR [Florida East Coast Railway] acquired the fee simple estate to the disputed corridor through the deed. The 1938 affidavit and quitclaim deed further confirm that FECR acquired fee title to the entire 100' strip of land that comprised the former railroad corridor.

(alteration added).

The Castillo, Menendez, Hernandez, and Lima plaintiffs argue in their replies[40] in support of their cross-motions for partial summary judgment on remand that, "[w]hile the exact circumstances surrounding the execution of the 1937 quitclaim deed are unclear, the evidence available demonstrates that the unrecorded 1937 quitclaim deed was most likely a product of a bankrupt railroad's failure to pay drainage taxes assessed on its right-of-way." (alteration added). Although plaintiffs acknowledge the lack of clarity presented by the evidence in the record before the court on remand, plaintiffs argue that "even viewing the facts in a light most favorable to the government," a phrase that appears to misstate the standard for a decision on a motion for summary judgment, the evidence presented by the government "cannot constitute proof of the railroad's ownership of the fee estate in the land." After an opportunity for extended discovery after remand, the parties' cross-motions for partial summary judgment after remand have been fully briefed with multiple rounds of supplemental briefing to address issues identified by the court submitted as well.

## DISCUSSION

As an initial matter, plaintiffs respond to defendant's motion for partial summary judgment and argue that the mandate issued by the United States Court of Appeals for the Federal Circuit when remanding Castillo and Menendez to this court "forecloses" the arguments with respect to rebutting the centerline presumption which defendant makes in its motions for partial summary judgment on remand, and plaintiffs argue that the issues raised by defendant "were already decided by the Federal Circuit." Defendant responds to plaintiffs, arguing that plaintiffs mischaracterize the mandate issued by the Federal Circuit when remanding Castillo and Menendez to this court, and defendant argues that "[t]he Federal Circuit did not remand this case for judgment to be entered in favor of Plaintiffs," but rather, "the Federal Circuit remanded to this Court for further consideration"

---

[40] Instead of filing a separate reply brief, the Hernandez plaintiff decided to adopt the reply brief filed by the Lima plaintiff as her own.

of whether the centerline presumption could be rebutted "with or without further development of the record." (alteration added). Defendant characterizes the mandate as an "open-ended remand" which "plainly authorizes the Court to consider the additional evidence presented by the United States." The Federal Circuit has explained that, when a lower court must interpret the mandate of an appeals court on remand, "both the letter and the spirit of the mandate must be considered," and "[o]nly the issues actually decided—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration." Engel Indus., Inc. v. Lockformer Co., 166 F.3d 1379, 1383 (Fed. Cir. 1999) (alteration added). While plaintiffs are correct that the Federal Circuit held "that, under Florida law, the centerline presumption applies to the railroad right-of-way context of the present case," Castillo v. United States, 952 F.3d at 1321, and that the Federal Circuit determined that the Zena Gardens and the Princess Park Manor subdivision plats did not rebut the centerline presumption, see id. at 1322, the mandate of the Federal Circuit on remand does not prohibit defendant's arguments in its motions for partial summary judgment. As discussed above, the Federal Circuit ordered "[f]urther proceedings, including such record development as is appropriate" and the Federal Circuit specifically did "not prejudge what conclusion may be justified on remand, whether or not the evidentiary record is supplemented." Id. at 1325 (alteration added). Accordingly, the Federal Circuit did not "actually decide[]" whether the centerline presumption would be rebutted on remand. See Engel Indus., Inc. v. Lockformer Co., 166 F.3d at 1383 (alteration added). Rather, the Federal Circuit explicitly remanded the question of whether the centerline presumption would be rebutted, including, "as is appropriate," with an expanded factual record, to this court after discovery. See Castillo v. United States, 952 F.3d at 1325. Moreover, while defendant tries to rely on the 1937 deed and subdivision chains of title, first produced following the court's June 29, 2018 Opinion, see generally Castillo v. United States, 138 Fed. Cl. 707, defendant now also tries to rely on the 1938 quitclaim deed, the 1938 affidavit, discussed above, and the historical Florida statutes from 1917, 1927, 1929, and 1931, which were first identified by the defendant following remand and in supplemental briefing to the cross-motions on remand. As defendant's arguments in its motions for partial summary judgment after the remand rely on additional evidence produced after remand, and defendant's arguments focus on the ownership of the railroad corridor land prior to the platting of the subdivisions, the Federal Circuit's mandate on remand does not preclude this court from addressing the arguments made in defendant's motions for partial summary judgment after remand. Additionally, the court now re-considers the question of whether the evidence rebuts the centerline presumption, as a result of an expanded evidentiary record after the Federal Circuit's remand of the above captioned cases, the subsequent additional discovery conducted by the parties after the remand as well as the supplemental briefing opportunities afforded to the parties. The conclusion reached in this court's decision after the remand is the result of the evidentiary material produced on remand, as explained by the arguments offered in the parties' cross-motions for partial summary judgment after remand and the supplemental briefs filed in support thereof, and are discussed below.

RCFC 56 is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." RCFC 56(a); Fed. R. Civ. P. 56(a) (2023) (alteration added); <u>see also</u> <u>Young v. United Parcel Serv., Inc.</u>, 575 U.S. 206, 231 (2015); <u>Alabama v. North Carolina</u>, 560 U.S. 330, 344 (2010); <u>Hunt v. Cromartie</u>, 526 U.S. 541, 549 (1999); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Anderson v. United States</u>, 23 F.4th 1357, 1361 (Fed. Cir. 2022); <u>Shell Oil Co. v. United States</u>, 7 F.4th 1165, 1171 (Fed. Cir. 2021); <u>Authentic Apparel Grp., LLC v. United States</u>, 989 F.3d 1008, 1014 (Fed. Cir. 2021); <u>Biery v. United States</u>, 753 F.3d 1279, 1286 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en banc denied</u> (Fed. Cir. 2014); <u>Ladd v. United States</u>, 713 F.3d 648, 651 (Fed. Cir. 2013); <u>Minkin v. Gibbons, P.C.</u>, 680 F.3d 1341, 1349 (Fed. Cir. 2012); <u>Consol. Coal Co. v. United States</u>, 615 F.3d 1378, 1380 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en banc denied</u> (Fed. Cir. 2010), <u>cert. denied</u>, 564 U.S. 1004 (2011); <u>1st Home Liquidating Trust v. United States</u>, 581 F.3d 1350, 1355 (Fed. Cir. 2009); <u>Arko Exec. Servs., Inc. v. United States</u>, 553 F.3d 1375, 1378 (Fed. Cir. 2009); <u>Casitas Mun. Water Dist. v. United States</u>, 543 F.3d 1276, 1283 (Fed. Cir. 2008), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en banc denied</u>, 556 F.3d 1329 (Fed. Cir. 2009); <u>Moden v. United States</u>, 404 F.3d 1335, 1342 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en banc denied</u> (Fed. Cir. 2005); <u>Am. Pelagic Fishing Co., L.P. v. United States</u>, 379 F.3d 1363, 1370-71 (Fed. Cir.), <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2004), <u>cert. denied</u>, 545 U.S. 1139 (2005); <u>Capitol Indem. Corp. v. United States</u>, 162 Fed. Cl. 388, 397 (2022); <u>King v. United States</u>, 159 Fed. Cl. 450, 461 (2022); <u>Desert Sunlight 250, LLC v. United States</u>, 157 Fed. Cl. 209, 222 (2021).

A fact is material if it will make a difference in the result of a case under the governing law. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248; <u>see also</u> <u>Marriott Int'l Resorts, L.P. v. United States</u>, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248); <u>Mata v. United States</u>, 114 Fed. Cl. at 744; <u>Arranaga v. United States</u>, 103 Fed. Cl. at 467-68; <u>Thompson v. United States</u>, 101 Fed. Cl. 416, 426 (2011); <u>Cohen v. United States</u>, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 247-48; <u>see also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Monon Corp. v. Stoughton Trailers, Inc.</u>, 239 F.3d 1253, 1257 (Fed. Cir. 2001); <u>Gorski v. United States</u>, 104 Fed. Cl. 605, 609 (2012); <u>Walker v. United States</u>, 79 Fed. Cl. 685, 692 (2008); <u>Curtis v. United States</u>, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), <u>cert. denied</u>, 361 U.S. 843 (1959), <u>reh'g</u> <u>denied</u>, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249; <u>see, e.g.</u>, <u>Schlup v. Delo</u>, 513 U.S. 298, 332 (1995); <u>BASF Corp. v. SNF Holding Co.</u>, 955 F.3d 958, 963 (Fed. Cir. 2020); <u>TigerSwan, Inc. v. United States</u>, 118 Fed. Cl. 447, 451 (2014); <u>Dana R. Hodges Trust v. United States</u>, 111 Fed. Cl. 452, 455 (2013); <u>Cohen v. United States</u>, 100 Fed. Cl. at 469-70; <u>Boensel v. United States</u>, 99 Fed. Cl. 607, 611 (2011); <u>Macy Elevator, Inc. v. United States</u>, 97 Fed. Cl. 708, 717 (2011); <u>Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States</u>, 87 Fed. Cl. 113, 126 (2009); <u>Johnson v. United States</u>, 49 Fed. Cl. 648, 651 (2001), <u>aff'd</u>, 52 F. App'x 507 (Fed. Cir. 2002), <u>published</u> <u>at</u> 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or

whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; 3rd Eye Surveillance, LLC v. United States, 151 Fed. Cl. 49, 54 (2020) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587); Pfizer Inc. v. United States, 149 Fed. Cl. 711, 715 (2020) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

Summary judgment, however, will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Lab'ys, Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 562 U.S. 827 (2010); Dethmers Mfg. Co., Inc. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanless v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; and Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 807 (Fed. Cir. 1999). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir.

2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; Univ. South Florida v. United States, 146 Fed. Cl. 274, 280 (2019).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co., Inc. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968-69; Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Massey v. Del Lab'ys, Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010), aff'd, 814 F.3d 1299 (2015); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378 (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Beard v. United States, 125 Fed. Cl. 148, 156 (2016); Two Shields v. United States, 119 Fed. Cl. 762, 775 (2015), aff'd sub nom. Ramona Two Shields v. United States, 820 F.3d 1324 (Fed. Cir. 2016).

In the above-captioned cases, plaintiffs allege that defendant effected a taking under the Fifth Amendment to the United States Constitution through the operation of the Trails Act. The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part, "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision "is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), recognized by S. Grande View Dev. Co., Inc. v. City of Alabaster, Ala., 1 F.4th 1299 (11th Cir. 2021), and Hageland Aviation Servs., Inc. v. Harms, 210 P.3d 444 (Alaska 2009); see also Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 123-24, reh'g denied, 439 U.S. 883 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005); E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Pumpelly v. Green Bay & Miss. Canal Co., 80

U.S. (13 Wall.) 166, 179 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified"); Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2009), cert. denied, 559 U.S. 935 (2010); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009).

"[A] claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (alteration added) (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Acceptance Ins. Cos. Inc. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "'If there is a taking, the claim is "founded upon the Constitution" and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine.'" Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (Preseault I) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (stating that the "'classic taking'" is one in which the government directly appropriates private property for its own use (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 324 (2002)), cert. denied, 579 U.S. 902 (2016); Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). "The issue of whether a taking has occurred is a question of law based on factual underpinnings." Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Fishermen's Finest, Inc. v. United States, No. 2021-2326, 59 F.4th 1269, 2023 WL 1807477, at *4 (Fed. Cir. Feb. 8, 2023); Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. See

Fishermen's Finest, Inc. v. United States, 59 F.4th 1269, 2023 WL 1807477, at *4 ("'First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking.'" (quoting Acceptance Ins. Cos. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009))); Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348; Jackson v. United States, 135 Fed. Cl. 436, 444 (2017) (citation omitted). Then, the court must determine whether the government action is a "'compensable taking of that property interest.'" Huntleigh USA Corp v. United States, 525 F.3d 1377 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372); see also Fishermen's Finest, Inc. v. United States, 59 F.4th 1269, 2023 WL 1807477, at *4 ("'Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was "taken."'" (quoting Acceptance Ins. Cos. v. United States, 583 F.3d at 854)).

To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); Piszel v. United States, 833 F.3d 1366, 1374 (Fed. Cir. 2016), cert. denied, 138 S. Ct. 85 (2017); Rogers v. United States, 814 F.3d 1299, 1303 (Fed. Cir. 2015); Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348; CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 563 U.S. 989 (2011); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002); and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (alterations added) (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003); and M & J Coal Co. v. United States, 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381; and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005); see also Balagna v. United States, 135 Fed. Cl. 16, 22 (2017), recons. denied, No. 14-21L, 2017 WL 5952123 (Fed. Cl. Dec. 1, 2017). Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372); see also Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348.

The STB has authority to regulate most railroad lines in the United States. See 49 U.S.C. § 1302 (2018).[41] A railroad seeking to abandon any part of its railroad line must either (1) file an application to abandon or (2) file a notice of exemption to abandon the line. See 49 U.S.C. § 10903 (2018); see also Behrens v. United States, No. 2022-1277, 2023 WL 1944933, at *1 (Fed. Cir. Feb. 13, 2023) (citing 49 U.S.C. §§ 10502, 10903); 49 C.F.R. § 1152.50 (2022). "If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect." Caldwell v. United States, 391 F.3d 1226, 1228-29 (Fed. Cir. 2004) (citing Preseault I, 494 U.S. at 6-8), reh'g en banc denied (Fed. Cir.), cert. denied, 546 U.S. 826 (2005), holding modified by Hardy v. United States, 965 F.3d 1338, 1349 (Fed. Cir. 2020) (recognizing that Caquelin v. United States, 959 F.3d 1360 (Fed. Cir. 2020), "clarifies the legal standard for 'the timing of a NITU-based taking' under Caldwell [391 F.3d at 1235] and its progeny" (quoting Caquelin v. United States, 959 F.3d at 1370) such that "'a NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU'" (quoting Caquelin v. United States, 959 F.3d at 1363)).

"The Trails Act is designed to preserve railroad rights-of-way by converting them into recreational trails." Bywaters v. United States, 670 F.3d 1221, 1225 (Fed. Cir.), reh'g denied, 684 F.3d 1295 (Fed. Cir. 2012). By operation of the Trails Act, the STB may issue a NITU, "suspending exemption proceedings for 180 days to allow a third party to enter into an agreement with the railroad to use the right-of-way as a recreational trail." Barclay v. United States, 443 F.3d 1368, 1371 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 846 U.S. 1209 (2007), holding modified by Hardy v. United States, 965 F.3d at 1349 (recognizing that Caquelin v. United States "acknowledges that 'other language in Caldwell' and its progeny," including Barclay, 443 F.3d at 1371 (citing Caldwell v. United States, 391 F.3d at 1235), "'uses a shorter formulation'" for the timing of a NITU-based taking which is a "'shorthand'" not reflecting the actual but-for rule of timing (quoting Caquelin v. United States, 959 F.3d at 1372)). Section 8(d) of the Trails Act, codified at 16 U.S.C. § 1247(d) (2018), "allows a railroad to negotiate with a state, municipality, or private group (the 'trail operator') to assume financial responsibility for operating the railroad right of way as a recreational trail." See Behrens v. United States, 2023 WL 1944933, at *1 (citing Preseault I, 494 U.S. at 6-7); Bright v. United States, 603 F.3d 1273, 1275 (Fed. Cir.) (citing Caldwell v. United States, 391 F.3d at 1229), reh'g and reh'g en banc denied (Fed. Cir. 2010), holding modified by Hardy v. United States, 965 F.3d at 1349 (recognizing that Caquelin v. United States "acknowledges that 'other language in Caldwell' and its progeny," including Bright, 603 F.3d at 1276 (citing Caldwell v. United States, 391 F.3d at 1235), "'uses a shorter formulation'" for the timing of a NITU-based

---

[41] The statute at 49 U.S.C. § 1302 was previously found at 49 U.S.C. § 702 in the 2012 United States Code. The old section 702 was moved to the current section 1302 in December 2015. See Surface Transportation Board Reauthorization Act of 2015, Pub. L. 114-110, § 3(a)(3), 129 Stat. 2228, 2228.

taking which is a "'shorthand'" not reflecting the actual but-for rule of timing (quoting Caquelin v. United States, 959 F.3d at 1372)). If the railroad and an authorized trail provider[42] reach an agreement, the NITU extends indefinitely, and the corridor is railbanked, with interim trail use permitted. See 49 C.F.R. § 1152.29(d)(1)-(2) (2022) ("The NITU will indicate that interim trail use is subject to future restoration of rail service . . . . Additionally, the NITU will provide that if the sponsor intends to terminate interim trail use on all or any portion of the right-of-way covered by the interim trail use agreement, it must send the [STB] a copy of the NITU and request that it be vacated on a specific date." (alteration added); Behrens v. United States, 2023 WL 1944933, at *1-2 (quoting Caldwell v. United States, 391 F.3d at 1230); Biery v. United States, 753 F.3d at 1285 ("If the railroad and the [Surface Transportation] Board reach agreement, the land underlying the railway may be transferred to a trail operator (e.g., state, political subdivision, or qualified private organization) for interim trail use." (alteration added) (citing Citizens Against Rails–to–Trails v. Surface Transp. Bd., 267 F.3d 1144, 1149 (D.C. Cir. 2001))); Caldwell v. United States, 57 Fed. Cl. 193, 194 (2003) ("The term railbanking refers to the 'preservation of railroad corridor for future rail use,' while making the corridor available for other activities." (quoting Neb. Trails Council v. Surface Transp. Bd., 120 F.3d 901, 903 n.1 (8th Cir. 1997))), aff'd, 391 F.3d 1226 (Fed. Cir. 2004), reh'g en banc denied (Fed. Cir.), cert. denied, 546 U.S. 826 (2005).

When the NITU extends indefinitely and the corridor is railbanked, the STB retains jurisdiction and abandonment of the railroad corridor is blocked. See 16 U.S.C. § 1247(d) ("[I]n the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."); see also Behrens v. United States, 2023 WL 1944933, at *2 (quoting 16 U.S.C. § 1247(d)); Rasmuson v. United States, 807 F.3d 1343, 1344 (Fed. Cir. 2015) ("NITUs 'preserve established railroad rights-of-way for future reactivation of rail service' and permit the railroad operator to cease operation without legally abandoning any 'rights-of-way for railroad purposes.'" (quoting 16 U.S.C. § 1247(d))).

> As described by the United States Court of Appeals for the Federal Circuit:
> Thus, section 8(d) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment—property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners." Rail Abandonments—Use of Rights-of-Way as Trails, Ex Parte No. 274 (Sub-No. 13), 2 I.C.C. 2d 591, 1986 WL 68617 (1986). A Fifth Amendment taking occurs if the original

---

[42] The Trails Act indicates that a trail provider may be "a State, political subdivision, or qualified private organization [that] is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way . . . ." 16 U.S.C. § 1247(d) (ellipsis added).

easement granted to the railroad under state property law is not broad enough to encompass a recreational trail. <u>See</u> <u>Preseault</u> [<u>v. United States</u>], 100 F.3d [1525,] 1552 [Fed. Cir. 1996] ("<u>Preseault II</u>")]; <u>see</u> <u>also</u> <u>Toews</u> [<u>v. United States</u>], 376 F.3d [1371,] at 1376 [(Fed. Cir.), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2004)].

<u>Caldwell v. United States</u>, 391 F.3d at 1229 (alterations added); <u>see</u> <u>also</u> <u>Behrens v. United States</u>, 2023 WL 1944933, at *2 (quoting <u>Preseault v. United States</u>, 100 F.3d 1525, 1550 (Fed. Cir. 1996) (<u>Preseault II</u>)); <u>Caquelin v. United States</u>, 959 F.3d at 1364; <u>Rogers v. United States</u>, 814 F.3d at 1303 ("As we have previously explained in other rails-to-trails cases, a taking, if any, occurs when, pursuant to the Trails Act, the STB issues a Notice of Interim Trail Use ('NITU') to suspend the abandonment of the rail line by a railroad and preserve it for future active railroad use." (citing <u>Barclay v. United States</u>, 443 F.3d at 1373)); <u>Burnett v. United States</u>, 139 Fed. Cl. 797, 804 (2018) ("A Fifth Amendment takings occurs in rails-to-trails cases when the government, through the issuance of a CITU [Certificate of Interim Trail Use] or NITU, destroys an individual's state law reversionary interest in property underlying a railroad right-of-way." (citing <u>Ladd v. United States</u>, 630 F.3d 1015, 1023-24 (Fed. Cir. 2010), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u>, 646 F.3d 910 (Fed. Cir. 2011), <u>holding</u> <u>modified</u> <u>by</u> <u>Hardy v. United States</u>, 965 F.3d at 1349 (recognizing that <u>Caquelin v. United States</u> "acknowledges that 'other language in <u>Caldwell</u>' and its progeny," including <u>Ladd</u>, 630 F.3d at 1023 (citing <u>Caldwell v. United States</u>, 391 F.3d at 1235), "'uses a shorter formulation'" for the timing of a NITU-based taking which is a "'shorthand'" not reflecting the actual but-for rule of timing (quoting <u>Caquelin v. United States</u>, 959 F.3d at 1372)))); <u>BHL Props., LLC v. United States</u>, 135 Fed. Cl. 222, 227-28 (2017) (citing <u>Caldwell v. United States</u>, 391 F.3d at 1233).

The Federal Circuit has established a three-part inquiry to determine takings liability in cases involving the conversion of railroad rights-of-way for recreational trail use by means of 16 U.S.C. § 1247(d) of the Trails Act, as follows:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

<u>Preseault II</u>, 100 F.3d at 1533 (ellipsis added). Phrased differently, the Federal Circuit has also indicated:

> the determinative issues for takings liability are (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad

purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing Preseault II, 100 F.3d at 1533); see also Behrens v. United States, 2023 WL 1944933, at *2 (quoting Caldwell v. United States, 391 F.3d at 1229, and Preseault II, 100 F.3d at 1550); Caquelin v. United States, 959 F.3d at 1364 (stating that "establishment of a trail under the Trails Act results in a Fifth Amendment taking when the original easement granted to the rail carrier under state property law is not sufficiently broad in scope to encompass recreational trail use"); Chi. Coating Co., LLC v. United States, 892 F.3d at 1170 (citing Ellamae Phillips Co. v. United States, 564 F.3d at 1373); Butler v. United States, 139 Fed. Cl. 617, 622 (2018) (quoting Ellamae Phillips Co. v. United States, 564 F.3d at 1373).

According to the United States Court of Appeals for the Federal Circuit, "[i]t is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." Ladd v. United States, 630 F.3d at 1019 (alteration added); see also Rogers v. United States, 814 F.3d at 1303; Ellamae Phillips Co. v. United States, 564 F.3d at 1373. "It is the law-created right to own private property, recognized and enforced by the Constitution, legislation, and common law, that gives the owner an historically rooted expectation of compensation." Preseault II, 100 F.3d at 1540. The United States Court of Appeals for the Federal Circuit in Preseault II also indicated

that power includes the power to preempt state-created property rights, including the rights to possession of property when railroad easements terminate. However, as Justice O'Connor succinctly pointed out in her concurring opinion [in Preseault I], having and exercising the power of preemption is one thing; being free of the Constitutional obligation to pay just compensation for the state-created rights thus destroyed is another.

Id. at 1537 (alteration added) (citing Preseault I, 494 U.S. at 22).

To determine the nature of the property interest at issue, the court looks to state law. See Rogers v. United States, 814 F.3d at 1305 ("We analyze the property rights of the parties in a rails-to-trails case under the relevant state law."); see also Behrens v. United States, 2023 WL 1944933, at *2 ("These cases depend upon state law and the facts of the particular land grants."); Hardy v. United States, 965 F.3d at 1344 (citing Chi. Coating Co., LLC v. United States, 892 F.3d at 1170); Chi. Coating Co., LLC v. United States, 892 F.3d at 1170 (citing Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). The United States Court of Appeals for the Federal Circuit, interpreting a takings claim for a railroad right-of-way, stated that, "state law generally creates the property interest in a

railroad right-of-way." Barclay v. United States, 443 F.3d at 1374 (citing Preseault I, 494 U.S. at 8, 16). In a footnote on the same page, the United States Court of Appeals for the Federal Circuit repeated, "[i]n Toews v. United States, 376 F.3d 1371 (Fed. Cir. 2004), we reiterated that state law controls the basic issue of whether trail use is beyond the scope of the right-of-way." Barclay v. United States, 443 F.3d at 1374 n.4 (alteration added).

> The nature of the interest conveyed is determined according to the law of the state where the conveyance occurred. "[S]tate law creates and defines the scope of the reversionary or other real property interests affected by the ICC's [Interstate Commerce Commission] action pursuant to Section 208 of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d)."

Chevy Chase Land Co. of Montgomery Cty. v. United States, 37 Fed. Cl. 545, 565 (1997) (second alteration added) (quoting Preseault I, 494 U.S. at 20 (O'Connor, J., concurring) (citing Ruckelshaus v. Monsanto Co., 467 U.S. at 1001)), aff'd, 230 F.3d 1375 (Fed. Cir. 1999), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 531 U.S. 957 (2000); see also Whispell Foreign Cars, Inc. v. United States, 97 Fed. Cl. 324, 331 ("Whether an individual has a compensable private property interest is determined by state law."), amended after recons. in part, 100 Fed. Cl. 529 (2011). Moreover, in Ruckelshaus v. Monsanto Co., 467 U.S. at 1001, the Supreme Court stated, "we are mindful of the basic axiom that "'[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'"" (alteration and omission in original) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980) (quoting Bd. of Regents v. Roth, 408 U.S. at 577)). In Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363 (1977), the United States Supreme Court stated that, "[u]nder our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States." Id. at 378 (alteration added); see also Davies Warehouse Co. v. Bowles, 321 U.S. 144, 155 (1944) ("The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state.").

**The Centerline Presumption Under Florida Law**

The parties agree that Florida law applies in the above captioned cases. In the cases currently before the court on remand, plaintiffs assert a property interest in the railroad corridor adjacent to their properties by virtue of the centerline presumption under Florida law. Once the centerline presumption has been asserted, the burden of proof lies with the challenger, here, the defendant, to present evidence rebutting the presumption. See, e.g., Bischoff v. Walker, 107 So. 3d at 1171; Castillo v. United States, 952 F.3d at 1325.

When remanding the question of the centerline presumption to this court, the United States Court of Appeals for the Federal Circuit explained that the centerline

presumption holds "that when a road or other corridor forms the boundary of a landowner's parcel, that landowner owns the fee interest in the abutting corridor land up to the corridor's centerline, unless there is clear evidence to the contrary." Castillo v. United States, 952 F.3d at 1314; see also Banks v. Ogden, 69 U.S. (2 Wall.) 57, 68 (1864); Servando Bldg. Co. v. Zimmerman, 91 So. 2d 289, 293 (Fla. 1956); Smith v. Horn, 70 So. at 436; Seaboard Air Line Ry. v. S. Inv. Co., 44 So. 351, 353 (Fla. 1907); Fla. S. Ry. Co. v. Brown, 1 So. at 515. Stated another way, according to the Federal Circuit's decision on appeal in Castillo and Menendez,

> if a grantor conveys property identified as bounded by a road, stream or similar corridor, and the grantor owns the land under that boundary corridor, the grant also conveys title to the land underlying the corridor up to the corridor's centerline, unless there is clear evidence of non-conveyance as to that corridor land.

Castillo v. United States, 952 F.3d at 1318. The United States Supreme Court in an 1864 case, Banks v. Ogden discussed the centerline presumption in the context of Illinois law as "a familiar principle of that law, that a grant of land bordering on a road or river, carries the title to the centre [sic] of the river or road, unless the terms or circumstances of the grant indicate a limitation of its extent by the exterior lines." Banks v. Ogden, 69 U.S. (2 Wall.) at 68 (alteration added). The Supreme Court of Florida has described the centerline presumption, as it applies under Florida law, as "the well settled rule that the fee to the middle of the street is in the abutting owner." State Road Dep't v. Bender, 2 So. 2d 298, 300 (Fla. 1941); see also Burns v. McDaniels, 140 So. 314, 316 (Fla. 1932) ("We have held here that, in the absence of evidence to the contrary, and [sic] abutting lot owner is presumed to own the same to the center of the street." (alteration added)); Tampa & G. C. R. Co. v. Mulhern, 74 So. 297, 298 (Fla. 1917) (explaining that the owner of the abutting property's "fee in the street is appurtenant to the title to the abutting land, he cannot sell the fee in the street independent of the same"); Seaboard Air Line Ry. v. S. Inv. Co., 44 So. at 354 ("The abutting proprietor has the fee to the middle of the street. He is the owner of the soil to the middle of the highway."); Rawls v. Tallahassee Hotel Co., 31 So. 237, 239 (Fla. 1901) ("In the absence of evidence to the contrary, she [the proprietor of the lot abutting the street] is presumed to have owned the soil of the street to the center thereof." (alteration added)); Joseph v. Duran, 436 So. 2d 316, 317 (Fla. Dist. Ct. App. 1983) ("When the Morrows conveyed lots 19 through 23 to appellees, they conveyed not only title to the lots described in the deed, but also title to the center line of the alley abutting the lots."); Langston v. City of Miami Beach, 242 So. 2d 481, 483 (Fla. Dist. Ct. App. 1971) ("[I]t has been held that a description by lot and block per a recorded plat is sufficient to carry with it any interest in an abutting street." (alteration added)).

In the 1887 case of Florida Southern Railway Co. v. Brown, the Supreme Court of Florida explained:

> It seems to be established that where a street or highway is the boundary of a lot or piece of land, that the owner of such land owns the soil to the center of such street or highway, subject to the right of the public to pass and repass over and along it. Cortelyou v. Van Brundt, 2 Johns. [357,] 363 [(N.Y. Sup. Ct. 1807)]; Babcock v. Lamb, 1 Cow. [238,] 240 (N.Y. Sup. Ct.

1823)]; 3 Kent, Comm. 433; <u>Garnett v. Jacksonville, St. A & H. R. R. Co.</u>, 20 Fla. 889 [(Fla. 1884)]. It seems also to be established that when no street or highway is specifically mentioned in the conveyance, but the land is described by words or figures, and abuts on a street, that the same rule prevails. <u>Bissel v. New York [Cent.] R. [R.] Co.</u>, 23 N.Y. 61 [(N.Y. 1861)]. The rule seems to be based on the supposed intention of the parties, and the improbability of the grantor desiring or intending to reserve his interest in the street when he had parted with his title to adjoining land. Such intention will never be presumed. <u>Id.</u>

<u>Fla. S. Ry. Co. v. Brown</u>, 1 So. at 513-14 (alterations added). The Supreme Court of Florida in <u>Florida Southern Railway Co. v. Brown</u> elaborated:

A deed describing land as bounded by a street <u>or other way</u> passes all the title of the grantor in and to the soil of such way, extending to the center line thereof, subject to the easement of the pubic, in the absence of an express or implied reservation of such street or way. <u>Kohler v. Kleppinger</u>, (Pa.) 8 Atl. Rep. 750 [sic][[43]], and note [(Pa. 1886)]; <u>Freeman v. Sayre</u>, (N.J.) 2 Atl. Rep. 650 [(N.J. 1886)]. Such boundary will be referred to the street as opened and used. <u>O'Brien v. King</u>, (N.J.) 7 Atl. Rep. 34 [(N.J. 1886)]; <u>Cleveland v. Obenchain</u>, (Ind.) 8 N.E. Rep. 624 [(Ind. 1886)]. When the land is described as being bounded by the side line of the street, it is so bounded, and not by the center line, <u>Holmes v. Turner's Falls Co.</u>, (Mass.) 8 N.E. Rep. 646 [(Mass. 1886)]; as it is also if bounded by a line which is in a line with such side line, <u>Hamlin v. Pairpoint Manuf'g Co.</u>, (Mass.) 6 N.E. Rep. [531,] 533 [(Mass. 1886)].

Where the premises were described as 'beginning at a stake and stones on the county road; thence running westerly, bounding northerly on land of' B. and T.; 'thence southerly; thence running southeasterly to said county road, bounded south-westerly on said county road,' etc, [sic]—it was held that, if the jury found the stake and stones to have been on the side line of the highway, the deeds included no part of the highway; but if they were unable to fix where the stake and stones were, and could not ascertain the starting point at all, the deed conveyed the title to the middle line of the highway as it existed when the deeds were made. <u>Chadwick v. Davis</u>, (Mass.) 8 N.E. Rep. 601 [(Mass. 1886)]. And where a town which owned the soil in a highway, for the purpose of narrowing the road, set off a part of the way, and conveyed it to the owner of land abutting thereon, it was held that the deed did not convey to the center of the way, there being nothing in the proceedings of the town to show such an intention. <u>Gaylord v. King</u>, (Mass.) 8 N.E. Rep. 596 [(Mass. 1886)].

<u>Fla. S. Ry. Co. v. Brown</u>, 1 So. at 515 (emphasis, alterations, and footnote added); <u>see also</u> <u>Garnett v. Jacksonville, St. A. & H. R. Ry. Co.</u>, 20 Fla. 889, 904 (Fla. 1884) ("So far as the title is concerned it is presumed from the allegation of abutting proprietorship that

---

[43] The correct citation for <u>Kohler v. Kleppinger</u> is 5 A. 750 (Pa. 1886).

the fee to one-half of the street is in the owner of the lot adjoining and bounded by the street.").

In the case of <u>Lovett v. State</u>, 11 So. 550 (Fla. 1892), the Supreme Court of Florida echoed the principles articulated in <u>Florida Southern Railway Co. v. Brown</u>:

> It is, however, not always necessarily the case that the title of the owner of the lot extends to the middle of the street, or further than the boundary of the lot. 3 Kent, Comm. marg. p. 434; <u>Willoughby v. Jenks</u>, 20 Wend. 96 [(N.Y. Sup. Ct. 1838)]. The grant or title under which he holds may otherwise limit his ownership, and whether the title extends to the center or only to the side of the highway is a question of construction of the grant; but, in the absence of words which clearly manifest the latter, or more limited, intent, the former, or more liberal, purpose will always be presumed to have been intended by the grantor. <u>Railway Co. v. Brown</u>, [sic] 23 Fla. 104, 1 South. Rep. 512; <u>City of Boston v. Richardson</u>, [95 Mass.] 13 Allen, 146 [(Mass. 1866)]; <u>Cox v. Railroad Co.</u>, [sic] 48 Ind. 178 [(Ind. 1874)]. A grant of land bounded by a highway carries the boundary to the center of the highway, if the grantor owned to the center, and there be no words or specific description showing a contrary intent. 3 Kent, Comm. marg. pp. 433, 434. In <u>Rice v. Worcester</u>, [sic] [77 Mass.] 11 Gray, 283, note, [(Mass. 1858)] the decision was that the title of the owner (the land abutting on a highway) should be presumed to extend to the center of the highway, the way being one so ancient that its origin was unknown. The presumption or inference of law is always, in the absence of a clear showing to the contrary, that the title of the owner of a lot bounded on a public highway extends out to the center of the highway. <u>Railway Co. v. Brown</u>, supra; <u>Garnett v. Railroad Co.</u>, 20 Fla. 889; Kent, Comm., supra; Elliott, Roads & S. 519; <u>Bissell v. Railroad Co.</u>, 23 N. Y. 61, 64; <u>Smith v. Slocomb</u>, [77 Mass.] 11 Gray, 280 [(Mass. 1858)]; <u>Perley v. Chandler</u>, 6 Mass. 453 [sic][[44]] [(1810)]. The rule is founded upon the improbability of a grantor's retaining the title to the land under the highway, which can hardly ever be of any use to him.

<u>Lovett v. State</u>, 11 So. at 555 (alterations and footnote added).

In 1915, the Supreme Court of Florida in <u>Smith v. Horn</u> explained the application of the centerline presumption to lots in a platted subdivision:

> Where the owner of land has it surveyed, mapped, and platted, showing subdivisions thereof, with spaces for intervening streets or other highways between the subdivisions clearly indicated upon the map or plat, and conveyances in fee of the subdivisions are made with reference to such map or plat, the owner thereby evinces an intention to dedicate an easement in the streets or other highways to the public use as such, the title to the land under the street remaining in the owner or his grantees; and, where such conveyances are made with reference to the map or plat, the dedication of the easement for street purposes cannot be subsequently

---

[44] The correct citation for <u>Perley v. Chandler</u> is 6 Mass. 454 (1810).

> revoked as against the grantees, and the title of the grantees of subdivisions abutting on such streets, in the absence of a contrary showing, extends to the center of such highway, subject to the public easement. And, where the highway is lawfully surrendered, the then holder of the title to abutting property and to the center of the street has the property relieved of the public easement.

Smith v. Horn, 70 So. at 436. The Supreme Court of Florida in Smith v. Horn continued to explain the centerline presumption as follows:

> This rule is one for construing conveyances, and must be applied to carry out, and not to frustrate the intention of the parties. Where no contrary intent appears, a conveyance to a street carries title to the center of the street, subject to the public easement, the title to the land under the street passing by construction, and not as appurtenant to the abutting land.

Id. at 436-37.

Consistent with the Supreme Court of Florida's decisions in Florida Southern Railway Co. v. Brown, Lovett v. State, and Smith v. Horn, Florida courts have routinely applied the centerline presumption. See, e.g., Wilson v. Dunlap, 101 So. 2d 801, 803-04 (Fla. 1958); Ocean Beach Hotel Co. v. Town of Atlantic Beach, 2 So. 2d 879, 885 (Fla. 1941); New Fort Pierce Hotel Co., for Use of Carlton v. Phoenix Tax Title Corp., 171 So. 525, 526 (Fla. 1936); Marshall v. Hartman, 139 So. 441, 445-46 (Fla. 1932); Kirkland v. City of Tampa, 78 So. 17, 21 (Fla. 1918); Lehmann v. Cocoanut Bayou Ass'n, Inc., 269 So. 3d 599, 609 (Fla. Dist. Ct. App. 2019); Pelican Creek Homeowners, LLC v. Pulverenti, 243 So. 3d 467, 471 (Fla. Dist. Ct. App. 2018); Bellizzi v. Islamorada, Village of Islands, 151 So. 3d 486, 490 (Fla. Dist. Ct. App. 2014); Bischoff v. Walker, 107 So. 3d at 1169 ("[U]nless a contrary intent is clearly expressed by the grantor, a presumption arises that the boundary line when the land is bounded by a nonnavigable stream or highway, extends to the center of such stream or highway, if the grantor is the owner of the fee." (internal quotations omitted; alteration added)); Calvert v. Morgan, 436 So. 2d 314, 315-16 (Fla. Dist. Ct. App. 1983); Peninsular Point, Inc. v. S. Ga. Dairy Co-op., 251 So. 2d 690, 692 (Fla. Dist. Ct. App. 1971); Hurt v. Lenchuk, 223 So. 2d 350, 352 (Fla. Dist. Ct. App. 1969); Travis Co. v. City of Coral Gables, 153 So. 2d 750, 751 (Fla. Dist. Ct. App. 1963); Feig v. Graves, 100 So. 2d 192, 196 (Fla. Dist. Ct. App. 1958).[45]

---

[45] It does not appear that Florida courts applying the centerline presumption have specified the level of proof required to rebut the centerline presumption. With respect to rebuttable presumptions under Florida law in general, the Florida Evidence Code, codified in 1976, specifically provides:

> Every rebuttable presumption is either:
>
> (1) A presumption affecting the burden of producing evidence and requiring the trier of fact to assume the existence of the presumed fact, unless credible evidence sufficient to sustain a finding of the nonexistence of the presumed fact is introduced, in which event, the

On a question of Florida law certified to the Supreme Court of Florida by the United States Court of Appeals for the Federal Circuit in 2015, the Supreme Court of Florida in Rogers v. United States reiterated the centerline presumption, explaining,

> a conveyance of a lot bordered by a street is presumed to carry title to the center of the street. This rule of construction does not apply if a contrary intention is made clear by the language of the deed. To the same effect is the decision in United States v. 16.33 Acres of Land, 342 So. 2d 476 (Fla.

---

> existence or nonexistence of the presumed fact shall be determined from the evidence without regard to the presumption; or
>
> (2) A presumption affecting the burden of proof that imposes upon the party against whom it operates the burden of proof concerning the nonexistence of the presumed fact.

FLA. STAT. § 90.302 (2022); see also Universal Ins. Co. of N. Am. v. Warfel, 82 So. 3d 47, 52 (Fla. 2012) (explaining that "[p]rior to the enactment of the Florida Evidence Code, the procedural effect given to presumptions in Florida was defined in a common law approach," and elaborating on the forms of rebuttable presumption as they existed at common law (alteration added)); Dep't of Agric. and Consumer Servs. v. Bonanno, 568 So. 2d 24, 31 (Fla. 1990) (explaining that section 90.302 "sets forth the two types of rebuttable presumptions recognized in Florida"). The Florida Evidence Code defines the first type of rebuttable presumption as "a presumption established primarily to facilitate the determination of the particular action in which the presumption is applied, rather than to implement public policy," and as "a presumption affecting the burden of producing evidence." FLA. STAT. § 90.303 (2022). In addition, the Supreme Court of Florida has characterized the first type of a rebuttable presumption identified by the Florida Evidence Code "as a vanishing presumption, or a 'bursting bubble' presumption. Once evidence rebutting the presumption is introduced, the presumption disappears and the jury is not told of it." Dep't of Agric. and Consumer Servs. v. Bonanno, 568 So. 2d at 31. The Florida Evidence Code defines the second type of a rebuttable presumption as "all rebuttable presumptions which are not defined in s. [section] 90.303," and as "presumptions affecting the burden of proof." FLA. STAT. § 90.304 (2022) (alteration added). The Supreme Court of Florida has stated that a presumption of the second type "remains in effect even after evidence rebutting the presumption has been introduced and the jury must decide if the evidence is sufficient to overcome the presumption." Dep't of Agric. and Consumer Servs. v. Bonanno, 568 So. 2d at 31. Because the challenger bears the burden of proof, under Florida law, to rebut the centerline presumption, the court concludes that, consistent with the text of Florida Statutes §§ 90.302(2), 90.304, the centerline presumption operates according to the principles of the second type of rebuttable presumption, "affecting the burden of proof," FLA. STAT. § 90.302(2), and, in the absence of a jury, the court will decided if the evidence introduced by defendant is sufficient to overcome the centerline presumption.

> 1977). The presumption is also inapplicable if the strip of land being claimed is titled in someone else.

Rogers v. United States, 184 So. 3d at 1098. Two additional cases issued by the Florida District Courts of Appeal provided subsequent, more recent applications of the centerline presumptions to properties in platted subdivisions. In 2018, the Florida District Court of Appeal for the Fifth District in Pelican Creek Homeowners, LLC v. Pulverenti explained:

> When the owner of a tract of land makes a subdivision and includes on the plat a dedication of roads, canals, or walkways for public use, the conveyance of the lots abutting the roads, canals, or walkways includes title to the property subject to the easement, unless expressly reserved by the dedicator.

Pelican Creek Homeowners, LLC v. Pulverenti, 243 So. 3d at 471.[46] Similarly, in 2019, the Florida District Court of Appeal for the Second District in Lehmann v. Cocoanut Bayou Association, Inc., explained:

> From the time of the 1912 plat through to today, it has been the law that when property owners retain title to an area subject to a public use easement as a street, title to the land up to the centerline of the street is conveyed by any conveyance of the land abutting the street unless title is expressly reserved by the grantor.

Lehmann v. Cocoanut Bayou Ass'n, Inc., 269 So. 3d at 609.

The parties have not identified a case in which Florida law applied to the centerline presumption with respect to a railroad right-of-way. The parties and the court, however, have identified cases in which the centerline presumption has applied to lots abutting "streets" and "highways," see, e.g., Rogers v. United States, 184 So. 3d at 1098; Peninsular Point, Inc. v. South Georgia Dairy Co-op., 251 So. 2d at 692-93; Servando Bldg. Co. v. Zimmerman, 91 So. 2d at 291-93; Smith v. Horn, 70 So. at 436; Fla. S. Ry. Co. v. Brown, 1 So. at 513, "alleys," see, e.g., Joseph v. Duran, 436 So. 2d at 317,

---

[46] The centerline presumption specifically with respect to subdivision plat dedication language has been codified at Florida Statute § 177.085(1) (2022):

> When any owner of land subdivides the land and dedicates streets, other roadways, alleys or similar strips on the map or plat, and the dedication contains a provision that the reversionary interest in the street, roadway, alley or other similar strip is reserved unto the dedicator or his or her heirs, successors, assigns, or legal representative, or similar language, and thereafter conveys abutting lots or tracts, the conveyance shall carry the reversionary interest in the abutting street to the centerline or other appropriate boundary, unless the owner clearly provides otherwise in the conveyance.

FLA. STAT. § 177.085(1) (emphasis added).

"walkways," see, e.g., Pelican Creek Homeowners, LLC v. Pulverenti, 243 So. 3d at 471, "canals," see, e.g., Pelican Creek Homeowners, LLC v. Pulverenti, 243 So. 3d at 471; Bischoff v. Walker, 107 So. 3d at 1168-71; Travis Co. v. City of Coral Gables, 153 So. 2d at 751 (including a strip of land shown on a plat as a "canal" but never dug), "lakes," see, e.g., Feig v. Graves, 100 So. 2d at 196, and "nonnavigable"[47] bodies of water, see, e.g., Bischoff v. Walker, 107 So. 3d at 1168-69; Smith v. Horn, 70 So. at 436, as well as boundaries defined by "monuments." See, e.g., Bischoff v. Walker, 107 So. 3d at 1168-69.

The Supreme Court of Florida applied the centerline presumption in Florida Southern Railway Co. v. Brown, which involved lots abutting streets over which a railroad had built or begun to build a railway, stating,

> [t]hat where a person owning a lot on a public street of a town or city, and the fee in the soil as far as the center of the street, the laying of a railroad track along said street, wholly or partly *on his soil*, without his consent, and without taking it, and paying just compensation therefor, in accordance with the statute regulating the method by which private property may be taken for public use, is an unlawful appropriation of the property of such owner, and that he is entitled to damage therefor.

Fla. S. Ry. Co. v. Brown, 1 So. at 514 (emphasis in original; alteration added); see also Seaboard Air Line Ry. v. S. Inv. Co., 44 So. at 353. In Florida Southern Railway Co. v. Brown, however, unlike in the above captioned cases, the Supreme Court of Florida's decision concerned the interest that a property owner held in a street which was, at that time, taken by a railroad, while the above captioned cases concern the interest that property owners have in a railroad corridor which is being taken by the federal government. See Fla. S. Ry. Co. v. Brown, 1 So. at 514. Considering that the statute at Florida Statutes section 177.085(1), which codifies the centerline presumption with respect to subdivision plat dedication language, applies the centerline presumption to "street[s], roadway[s], alley[s] or other similar strip[s]," and that the Supreme Court of Florida in Florida Southern Railway Co. v. Brown also stated that the centerline presumption applies to "other way[s]," Florida Southern Ry. Co. v. Brown, 1 So. at 515 (alterations added), this court determines that it is proper to apply the centerline presumption to circumstances similar to, but not the same as, the specific examples found in Florida caselaw, consistent with Federal Circuit law.

In its decision in Castillo and Menendez, the Federal Circuit gave guidance as to the definition of "monument" under Florida law relevant to consideration of the centerline presumption regarding rail lines, and stated that a "rail line meets the definition of an

---

[47] The Florida District Court of Appeal for the Fifth District explained in Bischoff v. Walker in a footnote that "[t]itle to lands under navigable water is held by the State pursuant to article X, section 11, of the Florida Constitution." Bischoff v. Walker, 107 So. 3d at 1168 n.2 (alteration added). On the issue of navigable waters, Florida law appears to have diverged from the principle set out by the United States Supreme Court in Banks v. Ogden, which acknowledged that the centerline presumption might apply to a "river." Banks v. Ogden, 69 U.S. (2 Wall.) at 68.

artificial monument under Florida law." Castillo v. United States, 952 F.3d at 1321 (emphasis added). Florida law defines "monument" as: "'Monument' means an artificial or natural object that is permanent or semipermanent and used or presumed to occupy any real property corner, any point on a boundary line, or any reference point or other point to be used for horizontal or vertical control." FLA. STAT. § 472.005(11) (2022); see Castillo v. United States, 952 F.3d at 1321; see also Bischoff v. Walker, 107 So. 3d at 1168 (applying the general definition of "'monument' when used in describing land" in the context of deed construction). Based on this definition of "monument," and the application of the centerline presumption to "other way[s]," Fla. S. Ry. Co. v. Brown, 1 So. at 515 (alteration added), and "other similar strip[s]," FLA. STAT. § 177.085(1) (alteration added), the centerline presumption can apply to railroad rights-of-way such as that in the cases currently before the court. See Castillo v. United States, 952 F.3d at 1321 (explaining that "under Florida law, the centerline presumption applies to the railroad right-of-way" at issue in the above captioned cases).

Under Florida law, a party challenging the application of the centerline presumption to particular cases, such as defendant does in the above captioned cases, may rebut the presumption by one of two methods. First, the challenger may "present evidence of the grantor's intent not to convey to the centerline" of the right-of-way. See Bischoff v. Walker, 107 So. 3d at 1171;[48] Castillo v. United States, 952 F.3d at 1322 ("Thus, a party may rebut the centerline presumption by 'present[ing] evidence of the grantor's intent not to convey to the centerline' of the railway." (alteration in original) (quoting Bischoff v. Walker, 107 So. 3d at 1171)). Second, the challenger may present evidence that "the strip of land being claimed is titled in someone else." Rogers v. United States, 184 So. 3d at 1098.

In order to succeed when "present[ing] evidence of the grantor's intent not to convey to the centerline," Bischoff v. Walker, 107 So. 3d at 1171 (alteration added), Florida courts have held that such "contrary intent" must be "clearly expressed" in the conveyance. See Servando Bldg. Co. v. Zimmerman, 91 So. 2d at 293; see also Bischoff v. Walker, 107 So. 3d at 1168 ("The presumption is that ownership extends to the centerline of a monument unless a contrary intent is clearly expressed."). The Federal

---

[48] While the District Court of Appeal of Florida for the Fifth District in Bischoff specifically addressed the application of the centerline presumption to a canal, the District Court of Appeal's reasoning with respect to the standards for rebutting the centerline presumption can be applied to the railroad right-of-way at issue in the above captioned cases. The District Court of Appeal for the Fifth District explained that "[t]he presumption is that ownership extends to the centerline of a monument unless a contrary intent is clearly expressed," and held that a "canal is a natural monument" under Florida law, making the centerline presumption applicable. See Bischoff v. Walker, 107 So. 3d at 1168 (alteration added). As discussed above, this court on remand has concluded that the railroad corridor at issue in the above captioned cases can also meet the definition of "monument" under Florida law, see FLA. STAT. § 472.005(11), and, further, the railroad corridor qualifies as an "other similar strip," FLA. STAT. § 177.085(1), or an "other way." Fla. S. Ry. Co. v. Brown, 1 So. at 515. Accordingly, the standards for rebutting the centerline presumption in Bischoff and other cases not concerning railroad corridors are considered by this court to be applicable to the above captioned cases.

Circuit similarly explained "[t]his contrary intent must be 'clearly expressed.'" <u>Castillo v. United States</u>, 952 F.3d at 1322 (alteration added) (quoting <u>Servando Bldg. Co. v. Zimmerman</u>, 91 So. 2d at 293). The Supreme Court of Florida, in the case of <u>Smith v. Horn</u>, described above, had relied on "Devlin on Deeds" to describe the showing required to rebut the centerline presumption:

> "Unless the deed manifests an intention on the part of the grantor to limit the boundary line, the line, when the land is bounded by a nonnavigable stream or highway, extends to the center of such stream or highway, if the grantor is the owner of the fee. Hence, where a deed describes the land conveyed as extending 500 feet to a street or avenue, and thence at right angles along the street 120 feet, etc., to the place of beginning, the fee of the land to the center of the street is conveyed subject to the public easement, notwithstanding the line of 500 feet extends only to the side of the street, and not to its center. When the avenue is no longer used as a street, the land is freed from the easement."

<u>Smith v. Horn</u>, 70 So. at 436 (quoting 2 ROBERT T. DEVLIN, A TREATISE ON THE LAW OF DEEDS § 1024 (3d ed. 1897)). The Florida District Court of Appeal for the Fifth District in <u>Bischoff v. Walker</u> later explained:

> The presumption is that ownership extends to the centerline of a monument unless a contrary intent is clearly expressed:
>
> > [I]n all rivers, streams, or other watercourses deemed to be nonnavigable, the presumption is that the boundary line between owners of lands bordering on the watercourses is in the middle thread of the watercourse. When such lands are conveyed with the stream or watercourse described as a boundary, there is a presumption that the grantor intends that the boundary of the lands of the grantee should extend to the middle of such stream or watercourse. An intent that the soil in the river should be owned by a person who does not own the abutting upland is so improbable that it will never be presumed in the absence of an express exception in the grant.

<u>Bischoff v. Walker</u>, 107 So. 3d at 1168 (alteration in original) (quoting 12 AM. JUR. 2D, Boundaries § 17 (2012)). The Supreme Court of Florida in <u>Jacksonville, Tallahassee & Key West Railway Co. v. Lockwood</u> also discussed the evidence necessary to rebut the centerline presumption:

> The abutting proprietor is prima facie owner of the soil to the middle of the highway, subject to the easement in favor of the public; the rule being founded on the presumption that the ground was originally taken from such proprietors, and for the sole purpose of being used as a highway. <u>Dunham v. Williams</u>, 37 N.Y. 251[, 251 (N.Y. 1867)]; <u>Stiles v. Curtis</u>, 4 Day, 328, 333 [(Conn. 1810)]. In our judgment, the presumption arising from the deed from Hargrove [the grantor], conveying the land, and bounding it on the east by

> Thompson street, is, in the absence of proof to the contrary, that Hargrove owned to the center of the street.

Jacksonville, T. & K.W. Ry. Co. v. Lockwood, 15 So. at 329 (alterations added). Moreover, when a deed contains a conveyance "by reference to the monument," as was the case in Bischoff v. Walker, which considered the use of "east of canal" in a conveyance, the deed "creates the presumption that the boundary ran to the centerline of the canal." See Bischoff v. Walker, 107 So. 3d at 1168-69. Similarly, if the property at issue is "described as 'Bounded . . . on the East'" by a certain road, the centerline of the referenced road becomes the boundary of the property. See Brooks v. City of West Miami, 41 So. 2d 556, 556 (Fla. 1949) (capitalization and ellipsis in original). In the context of a subdivision plat, "clear intention" not to convey to the centerline is met by the subdivider's reservation of rights not intended to be conveyed. See Peninsular Point, Inc. v. S. Ga. Dairy Co-op., 251 So. 2d at 691-93 (holding that the plat language "and does hereby dedicate to the perpetual use of the public, as public highways, the streets as shown hereon, reserving unto itself, its heirs, successors, assigns, or legal representatives, the reversion or reversions of the same," was "sufficiently clear to meet the 'clear intent' necessary to avoid application of the Smith v. Horn rule"[49]).

As noted above, the party seeking to rebut the centerline presumption may rely not only on a showing of the grantor's intent not to convey the property claimed, but may also rebut the centerline presumption by presenting evidence that "the strip of land being claimed is titled in someone else." Rogers v. United States, 184 So. 3d at 1098. The Supreme Court of Florida in the case of Jacksonville, Tallahassee & Key West Railway Co. v. Lockwood explained:

> It is conceded that a description bounding land by a highway conveys to the center of the highway (Railroad Co. v. Brown, [sic] 23 Fla. 104, 1 South 512; Sherman v. McKeon, 38 N.Y. 266 [(1868)]; 3 Washb. Real Prop 420 et seq.; Gould v. Railroad Co., [sic] 142 Mass. 85, 7 N.E. 543 [(1886)]; Clark v. Parker, 106 Mass. 554 [(1871)]), but it is asserted, on the principle of non dat qui non habet[50] (Church v. Stiles, 50 Vt. 642, [sic][51] 10 Atl. 674 [(1887)]), and very properly, that it does so only where the grantor himself has the title. The abutting proprietor is prima facie owner of the soil to the middle of the highway, subject to the easement in favor of the public; the rule being founded on the presumption that the ground was originally taken from such proprietors, and for the sole purpose of being used as a highway.

---

[49] The "Smith v. Horn rule" mentioned by the Florida District Court of Appeal for the First District in Peninsular Point refers to the centerline presumption as applied in the context of a subdivision plat. See Peninsular Point, Inc. v. S. Ga. Dairy Co-op., 251 So. 2d at 692-93; see also Smith v. Horn, 70 Fla. at 436.

[50] "Non dat qui non habet" is Latin for "[y]ou can't give what you haven't got." Ancient Legal Maxims and Modern Human Rights, 18 CAMPBELL L. REV. 75, 120 (1996) (alteration added).

[51] The correct citation for Church v. Stiles is 59 Vt. 642, 10 A. 674 (1887).

Dunham v. Williams, 37 N.Y. 251 [(1867)]; Stiles v. Curtis, 4 Day, 328, 333 [(Conn. 1810)]. In our judgment, the presumption arising from the deed from Hargrove, conveying the land, and bounding it on the east by Thompson street, is, in the absence of proof to the contrary, that Hargrove owned to the center of the street. Unless this presumption prevails, then the title must, in all cases of this kind, where there is such description, be deraigned back to an ownership to such center at the time the street was laid out; for, if the presumption of such ownership does not obtain in favor of one grantor, then it cannot in favor of another. It is not to be presumed that Hargrove conveyed more than he owned, and the deed is as strong evidence of plaintiffs' title to the center of the street as it is of title to any part of the named lots.

Jacksonville, T. & K.W. Ry. Co. v. Lockwood, 15 So. at 329 (last emphasis, alterations, and footnotes added). Accordingly, in order to rebut the centerline presumption on the theory that "the land being claimed is titled in someone else," the challenger must demonstrate that title to the land at issue was held by a party other than the grantor from which the claimant of the centerline presumption received title, at the time that the grantor made the relevant conveyance to the claimant. See Rogers v. United States, 184 So. 3d at 1098. In the above captioned cases, therefore, to rebut the centerline presumption on this theory, defendant must demonstrate that title to the railroad corridor land was held by someone other than the Merwitzers or the Mosses, the relevant grantors of the land in the two subdivisions at issue in the part of the cases currently before the court, at the time the subdivisions were platted.

In its first supplemental brief after remand, defendant acknowledges that while in general plaintiffs have the burden of proving ownership of property, once the centerline presumption has been asserted, "defendant has the burden to establish to rebut the centerline presumption." In the part of the cases remaining before the court on remand, defendant argues that it has rebutted the centerline presumption with respect to all plaintiffs' claims by presenting evidence that, following the 1937 conveyance, the Florida East Coast Railway "held fee simple title to the land underlying the entire 100' wide railroad corridor."[52] When examining the language of the documents on which defendant

---

[52] Neither plaintiffs nor defendant have argued on remand whether the centerline presumption is applicable only to easements adjacent to the plaintiffs' properties, or whether the centerline presumption applies to all easements that lie between the plaintiffs' parcels and the centerline of the railroad corridor, when a railroad corridor or other right-of-way is composed of multiple easements. Given the result reached in this Opinion after remand, whether the centerline presumption applies to all the easements remains an open issue with respect to the following plaintiffs, each of whom owns property adjacent to a portion of the railroad corridor composed of two rights-of-way:

Castillo plaintiffs

- Jose F. and Dora A. Dumenigo,
- Humberto J. and Josefa Marcia Diaz,

tries to rely, this court applies Florida law, see Rogers v. United States, 814 F.3d at 1305, including the Supreme Court of Florida's statement in the case of Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126 (Fla. 2000), that "[i]t is axiomatic that when construing a document, courts should give effect to the plain meaning of its terms." Id. at 132 (alteration added); see also Noblin v. Harbor Hill Dev., L.P., 896 So. 2d 781, 783 (Fla. Dist. Ct. App. 2005) (addressing "the intent of the parties in accordance with the plain language employed in the deed, which is what we must consider to discern the meaning of the pertinent provisions in the deed").

**The 1933 Tax Sale**

As noted above, the 1937 deed and the 1938 affidavit, as relied upon by defendant to rebut the centerline presumption, both reference a tax sale which they state occurred on August 7, 1933. Defendant produced the 1937 deed for the first time in opposition to the Castillo and Menendez plaintiffs' earlier motions for reconsideration, although, as the Federal Circuit noted, "[t]he trial court did not address the 1937 quitclaim tax deed submitted by the government." Castillo v. United States, 952 F.3d at 1319. The 1938 affidavit was first submitted by defendant following the additional discovery period after the remand. The 1937 deed and the 1938 affidavit are the only documents referencing the 1933 tax sale provided to the court.[53] According to both the 1937 deed and the 1938

---

- Luis Crespo,
- Jose Luis and Grace Barsello Napole,
- Bernardo D. and Norma A. Manduley,
- Danilo A. and Dora Rodriguez,
- Avimael and Odalys Arevalo,
- Dalia Espinosa, Daniel Espinosa and Sofira Gonzalez;

Menendez plaintiffs

- Norma D. Gomez and Jose M. Martinez,
- Nelson Menendez and Osvaldo Borras, Jr.,
- Luis R. Schmidt;

Hernandez plaintiff

- Miriam Hernandez;

Lima plaintiff

- Claro Lima;

Alvarez plaintiff

- Eduardo and Marilyn Alvarez.

[53] The 1938 quitclaim deed does not reference the 1933 tax sale.

affidavit, at a tax sale on August 7, 1933, the Southern Drainage District appears to have acquired the interest it later conveyed to the Florida East Coast Railway. The record before the court, both for the earlier cross-motions for partial summary judgment before the remand and now after the remand, contains no contemporaneous documentation of the 1933 tax sale, such as certificates, deeds, or other records reflecting the properties acquired by purchasers or by the Southern Drainage District at the 1933 tax sale, the prior owners of those properties, or, most significantly, the nature of the interests acquired at the 1933 tax sale. Moreover, defendant and plaintiffs both indicate, in their first and second supplemental briefs on remand, after fully briefing the cross-motions for partial summary judgment on remand, despite the court's efforts to elicit any extant documents, that no records of the 1933 tax sale are available. Therefore, only two non-contemporaneous documents in the record before the court, the 1937 deed and the 1938 affidavit, contain information regarding the 1933 tax sale. With respect to the 1933 tax sale, the 1937 deed, which was closest in time to the 1933 tax sale, refers to

> the right, title, interest, claim, and demand which the said party of the first part [the Southern Drainage District] acquired at a sale held by Bob Simpson, on the 7th day of August, 1933, to enforce the collection of the unpaid taxes levied by said District for the year 1932), in and to the following described land

including "[a] One Hundred Foot Strip across East Half of Section Two, Township Fifty-four South, Range Forty East, Tallahassee Meridian, Fla."[54] (capitalization in original; alterations added).

The 1938 affidavit similarly refers to "rights acquired by the purchase on August 7, 1933, for unpaid taxes levied by said Drainage District for the year 1932 in and to the following described land," and further states that "the description of the property conveyed was an error in that the said SOUTHERN DRAINAGE DISTRICT intended to convey the following described land," including a description of "[a] strip of land 100' wide used as right-of-way for Florida East Coast Railway,"[55] and "that the error occurred by reason of the fact that said quit-claim deed failed to state that said property deeded was the said right-of-way of the Florida East Coast Railway" as described in the 1938 affidavit. (capitalization in original; alteration added).

---

[54] As noted above, although the 1937 deed also includes other descriptions of land "in Section Twenty-three, Township Fifty-four South, Range Forty East" and "in Section Twenty-one, Township Fifty-five South, Range Forty East," only the "One Hundred Foot Strip" in Section Two is in the vicinity of plaintiffs' properties and relevant to the issue before the court on remand.

[55] The 1938 affidavit does not address the lands described in the 1937 deed as "in Section Twenty-three, Township Fifty-four South, Range Forty East" and "in Section Twenty-one, Township Fifty-five South, Range Forty East," nor have the parties produced documents indicating the interests conveyed by the inclusion of the descriptions of those lands in the 1937 deed.

The "plain meaning" of the 1937 deed and the language of the 1938 affidavit only demonstrate that the Southern Drainage District acquired certain unspecified interests or "rights" in lands, including the land underlying the railroad corridor at issue in the above captioned cases, at a tax sale on August 7, 1933, in order to collect unpaid drainage district taxes. See Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d at 132 ("It is axiomatic that when construing a document, courts should give effect to the plain meaning of its terms."). The 1937 deed and 1938 affidavit are not conclusive with respect to the interest which the Southern Drainage District acquired in 1933 and conveyed in 1937, nor can the court, based on the evidence in the record before the court, determine the identity of the owner of that interest prior to the 1933 sale, the nature or extent of the interest, or the "rights" acquired by the Southern Drainage District at the 1933 tax sale. The words "used as right-of-way for Florida East Coast Railway" do not indicate who or which entity granted the right-of-way to the Florida East Coast Railway, nor whether the grant was of the land or the right-of-way itself. This lack of specific evidence with respect to the interest conveyed in 1933 creates an uncertainty in the history of the land at issue in the above captioned cases and the interest conveyed to the Florida East Coast Railway in 1937. Relevant to the cases currently before the court, the Florida District Court of Appeal for the Fifth District in Bischoff v. Walker explained:

> Florida law is in accord with the general rule adopted by the courts in other jurisdictions that there is a rebuttable presumption in favor of finding the boundary is the centerline of the monument referenced in the deed—here, the canal. To rebut the presumption, Walker would have had to present evidence of the grantor's intent not to convey to the centerline of the canal. He did not. In fact, he does not acknowledge the presumption. Instead, Walker's [defendant's] position on appeal is that summary judgment was proper because there were no facts at issue, and he argues on appeal that no extrinsic evidence should be considered in deciding what the deed meant. In the absence of evidence rebutting the presumption, summary judgment in favor of Bischoff was appropriate.

Bischoff v. Walker, 107 So. 3d at 1171 (alteration added). Because defendant seeks to establish that the railroad corridor land was titled in the Florida East Coast Railway, in order to rebut the centerline presumption, in this case defendant bears the burden of proof regarding rebutting the centerline presumption. See id.

**The 1937 Deed**

Defendant tries heavily to rely on the 1937 deed, as allegedly clarified by the 1938 affidavit, as evidence that the railroad corridor was owned in fee simple by the Florida East Coast Railway following the 1937 conveyance from the Southern Drainage District.[56]

---

[56] Plaintiffs in their reply briefs in support of their cross-motions for partial summary judgment on remand argue that the 1937 deed was "not recorded in the Miami-Dade County records," and, thereby, question the reliability of the 1937 deed. In response,

As noted above, Defendant first produced the 1937 deed in opposition to the Castillo and Menendez plaintiffs' motions for reconsideration. As described above, according to the 1937 deed, the Southern Drainage District stated that it

> remised, released, and quit-claimed, and by these presents does remise, release, and quit-claim unto the said party of the second part [Florida East Coast Railway], and all his heirs and assigns forever, all the right, title, interest, claim, and demand which the said party of the first part [the Southern Drainage District] acquired at a sale held by Bob Simpson, as Tax Collector of Dade County, on the 7th day of August, 1933, to enforce the collection of unpaid taxes levied by said District for the year 1932), in and to the following described land

including "[a] One Hundred Foot Strip across [the] East Half of Section Two," in consideration of the payment "of Southern Drainage District taxes for the years of 1932, 1933, 1934, 1935, [and] 1936 on the above named Lands." (capitalization in original; alterations added). Because the 1937 deed was a quitclaim deed, it only conveyed whatever title was held by the grantor when the deed was made, see Castillo v. United States, 952 F.3d at 1324 n.6; Florida East Coast Ry. Co. v. Patterson, 593 So. 2d at 577, and the deed "does not necessarily import that the grantor possesses any interest at all" in the land described. Miami Holding Corp. v. Matthews, 311 So. 2d at 803. The plain language of the 1937 deed provides no clarity as to the nature of the interest conveyed by the Southern Drainage District in 1937, the prior owner of that interest, or the extent of that owner's prior interest, for which reason the uncertainty concerning the ownership of the railroad corridor land remains. See Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d at 132 ("It is axiomatic that when construing a document, courts should give effect to the plain meaning of its terms."). In order to demonstrate that the 1937 deed conveyed fee simple title to the railroad corridor to the Florida East Coast Railway, and, therefore, to rebut the centerline presumption, defendant in the case currently before this court on remand must offer additional evidence to indicate the intent of the interest conveyed by the Southern Drainage District in the 1937 deed. See, e.g., Hastie v. Ekholm, 199 So. 3d 461, 463 (Fla. Dist. Ct. App. 2016) ("If a deed is 'ambiguous' the court may consider extrinsic evidence to determine 'the intent of the parties at the time the document establishing the easement was created.'" (quoting Branscombe v. Jupiter Harbour, LLC, 76 So. 3d 942, 947 (Fla. Dist. Ct. App. 2011))).

---

defendant filed a sur-reply and attached thereto a certified copy of the 1937 deed, arguing that "there is no genuine disputed issue of material fact as to the recording of this deed." Plaintiffs filed a response to defendant's sur-reply in which plaintiffs claim that "the entire issue of recordation is a red herring" and "an irrelevant deviation," despite plaintiffs previously themselves having raised the issue of the fact of recording of the 1937 deed. The certified copy of the 1937 deed provided by defendant indicates that the 1937 deed was, in fact, recorded, and the evidence does not present a genuine dispute of material fact as to the recording or validity of the 1937 deed.

### Florida Law in Effect at the Time of the 1933 Conveyance

Defendant, in its motions for partial summary judgment currently before the court, argues that under Florida law in effect at the time of the 1933 conveyance, the Southern Drainage District had the power to tax land and that the Southern Drainage District could acquire in fee simple title in land without issuance of a deed at a tax sale of lands for which tax had not been paid. Because of these reasons, defendant argues that "the 1937 deed clearly conveyed fee simple title to the subject lands to FECR [Florida East Coast Railway]." (alteration added). Defendant attempts to rely on a selection of Florida statutes, including a 1917 Florida statute, Chapter 7599 of the Florida Acts of 1917 (the 1917 Florida statute), the 1927 Florida statute, a 1929 Florida statute, Chapter 14543 of the Florida Acts of 1929 (the 1929 Florida statute), and a 1931 Florida statute, Chapter 15780 of the Florida Acts of 1931 (the 1931 Florida statute).[57] In its second supplemental brief after remand, defendant does not indicate which, if any, of the Florida statutes it relies upon are still active. Defendant also cites to two decisions of the Supreme Court of Florida, Buscher v. Mangan, 59 So. 2d 745 (Fla. 1952), and Wolfson v. Heins, 6 So. 2d 858, 859 (Fla. 1942), in support of its interpretation of Florida law. Of the sources of Florida law relied upon and produced by defendant after remand, however, defendant appears to rely primarily on the 1927 Florida statute. The sources of Florida law upon which defendant now relies were not previously raised by defendant before the court at the time of the Castillo and Menendez plaintiffs' motions for reconsideration and were argued for the first time after the remand.

Defendant's arguments with respect to the state of Florida law at the time of the 1933 tax sale rely primarily on the 1927 Florida statute. Section 1 of the 1927 Florida statute provided for the Southern Drainage District to conduct "annual assessments of taxes" which would be "levied and imposed upon all the lands within said [Southern Drainage] District," including the land over which the Florida East Coast Railway held a

---

[57] Since the enactment of the historical statutes relating to the Southern Drainage District, Florida law has re-designated such drainage districts as "water control districts" which operate pursuant to Chapter 298 of Title XXI of the Florida Statutes. See FLA. STAT. § 298.001 (2022) ("A water management district or a drainage district heretofore or hereafter created pursuant to the method authorized in this chapter or a water management district created by special act to operate under the authority of this chapter shall be designated as a water control district."); Id. § 298.01 ("It is the legislative intent that those water control districts established prior to July 1, 1980, pursuant to the process formerly contained in this section and former ss. [sections] 298.02 and 298.03, may continue to operate as outlined in this chapter." (alteration added)); Roach v. Loxahatchee Groves Water Control Dist., 417 So. 2d 814, 816 (Fla. Dist. Ct. App. 1982) ("The Legislature, in providing for the organization of water control districts (then commonly known as drainage districts) by the enactment of a general law now codified as Chapter 298, Florida Statutes (1981), conferred certain limited powers on these statutory creatures for the purpose of reclaiming and draining swamps and overflowed lands." (citing Ideal Farms Drainage Dist. v. Certain Lands, 19 So. 2d 234, 239 (1944); Palm Beach Cnty. v. S. Fla. Conservancy Dist., 170 So. 630 (1936)).

right-of-way. 1927 Fla. Laws 1307 (alteration added). Section 4 of the 1927 Florida statute further provided, with respect to the role of the county tax assessor in levying drainage taxes:

> That it shall be the duty of the Tax Assessor of each of the several Counties embraced in whole or in part within said District, to receive such list [of lands assessed, prepared by the Board of Supervisors of the Southern Drainage District] and he shall enter upon the tax roll of the County of which he is the Tax Assessor, the tax or assessment shown by said list to be assessed by this Act for such year against the lands described in said list; such tax or assessment shall be entered upon the tax roll in a separate column under the head of 'Southern Drainage District' opposite the name of the person or persons or corporation owning such land, or their or its legal representative, for State and County Taxes, then opposite the word "Unknown" in the manner provided by law for making up the tax roll for State and County taxes.[58] The tax or assessment levied by this Act shall constitute a lien upon the lands so assessed as of the first day of January of each year in which the entries aforesaid are made in said tax rolls, which lien shall be superior in dignity to all other liens upon said lands, except the lien for State and County taxes and Everglades Drainage District Taxes, to which it shall be inferior or secondary.

1927 Fla. Laws 1313-15 (capitalization in original; alteration and footnote added). Section 5 of the 1927 Florida statute provided that for lands for which taxes were not paid by the April following the year in which they were assessed, "the tax collector shall advertise and sell such lands," that tax sales of the lands could occur "in any year thereafter until [the lands are] sold," and that the drainage taxes owed on the land would gain interest at eight percent annually. 1927 Fla. Laws 1315-16 (alteration added). Section 6 of the 1927 Florida statute provided that at the tax sale,

> in case there are no bidders, the whole tract shall be bid off by the tax collector for the Southern Drainage District, and shall be held by said District during the period herein allowed for the redemption of said lands in like manner and with like effect as lands sold to the State for non-payment of state and county taxes are held by the State, as now provided by law; and the tax collector must offer all such lands as assessed.

1927 Fla. Laws 1316.

---

[58] No tax roll or list, as described in section 4 of the 1927 Florida statute, see 1927 Fla. Laws 1314, is included in the record before the court, and no such tax roll or list has been produced by either of the parties. Accordingly, the parties could not, and this court cannot determine the identity of any owner or owners of the land underlying the railroad corridor during the time at issue in the above captioned cases by reference to the tax roll or list.

Section 10 of the 1927 Florida statute provided:

That when land is bid off by the tax collector for the Southern Drainage District, the tax certificate shall be issued by the tax collector as of the date of sale in the name of the Southern Drainage District, and if the land is not redeemed on or before two years from the date of such certificate, the title to the same shall immediately vest in the said District without the issuing of any deed as provided in other cases,[59] and the certificates held by the said District shall be evidence of the title of the said District. The said Southern Drainage District may sell and convey the said lands by deed at the best price obtainable therefor, provided such price shall not be less than the amount of all drainage taxes upon said lands which shall have become due and payable thereon pursuant to the provisions of this Act.

1927 Fla. Laws 1318-19 (capitalization in original; footnote added).

Defendant relies, in particular, on the provisions of the 1927 statute which defendant characterizes as providing for "a public sale of the described lands to enforce the collection of the unpaid taxes," the issuance of tax certificates, the acquisition of title by the Southern Drainage District "without the issuance of a deed," and conveyance of fee simple in the acquired land to a later purchaser. (citing 1927 Fla. Laws 1316-17, 1318-22). Defendant emphasizes, in its second supplemental brief after the remand, that the 1927 Florida statute "was the one in operation in 1932 at the time of the default on the payment of the taxes," and that "[i]t was also the statute in place when the property was sold in 1933 and when the tax deed was issued to Florida East Coast Railway in 1937." (alteration added).

---

[59] As noted above, the 1937 "deed acknowledges receipt of Southern Drainage District taxes for the years of 1932, 1933, 1934, 1935, [and] 1936 on" the lands named therein, (alteration added), as well as that the Southern Drainage District's interests in the land were "acquired" in 1933. Defendant offers no explanation for the apparent inconsistency between the 1927 Florida statute's requirement of "two years" before title "shall immediately vest," see 1927 Fla. Laws 1318-19, and the 1937 deed's indication that the Southern Drainage District "acquired" its interests less than two years after the drainage district taxes were due for the year 1932, and that the Southern Drainage District quitclaimed its interests less than two years after the taxes for two of the years named, 1935 and 1936, became due. Likewise, defendant does not explain the significance of the two-year period prescribed by the 1927 Florida statute, nor do the other sources of Florida law relied upon by defendant and plaintiffs indicate what effect the two-year period could have had on the interests acquired by the Southern Drainage District in 1933 and conveyed to the Florida East Coast Railway in 1937. Therefore, the two-year period indicated by the 1927 Florida statute represents yet another area of uncertainty with respect to the nature and extent of the interest in the railroad corridor which eventually came to be held by the Florida East Coast Railway prior to the platting of the subdivisions in which plaintiffs currently hold a property interest.

The court notes that the text of the 1927 Florida statute relied on by defendant is consistent with the 1937 deed. The 1937 deed indicates that the Southern Drainage District acquired its interest at a tax sale in August of 1933, following non-payment of taxes assessed in 1932, consistent with section 5 of the 1927 Florida statute, which provided for tax sales of lands for which the assessed taxes were not paid by April of the year following their assessment. See 1927 Fla. Laws 1315-16. The fact that the Southern Drainage District's interest was acquired at a tax sale in 1933, but that there is no deed memorializing the 1933 tax sale, also appears consistent with section 6 of the 1927 Florida statute, which provided for the tax collector to "bid off" lands for which there were no bidders to the Southern Drainage District, see 1927 Fla. Laws 1316, and consistent with section 10 of the 1927 Florida statute, which provided that title would "immediately vest" in the Southern Drainage District after two years without issuance of a deed, although the significance of the 1927 Florida statute's two-year period requirement is not explained by defendant or the record before the court after the additional discovery period on remand. See 1927 Fla. Laws 1318-19. The 1937 deed is also consistent with the provision of section 10 of the 1927 Florida statute which permitted the Southern Drainage District thereafter to "sell and convey the said lands by deed at the best price obtainable therefor, provided such price shall be not less than the amount of all drainage taxes upon said lands which shall have become due and payable thereon pursuant to the provisions of this Act." 1927 Fla. Laws 1319. As noted above, the 1937 deed included language which "acknowledges receipt of Southern Drainage District taxes for the years of 1932, 1933, 1934, 1935, [and] 1936 on the above named Lands." (capitalization in original; alteration added).

Plaintiffs, in their second supplemental briefs after remand, argue that, pursuant to the 1927 Florida statute, "critically for the inquiry before this Court, the record is devoid of **any evidence** the owners of the fee estate in the land underlying the Florida East Coast Railway right-of-way in the 1930's failed to pay their taxes," and that "what is also in no way established on this record is that the Southern Drainage District acquired the fee estate in the land *underlying* the railroad by virtue of those fee owners' unpaid taxes." (emphasis in original). Defendant responds that "questioning who may have failed to pay taxes" "is irrelevant," because "[t]he 1937 tax deed cannot be overturned nearly a century later by speculating how it is possible that one or more property owners could have fallen behind or chosen not to pay drainage district taxes," and because the 1927 "Florida statute declared the 1937 tax deed is incontestable." (alteration added).

Section 10 of the 1927 Florida statute indicates that although title to the lands acquired by tax sale would "immediately vest in the said [Southern Drainage] District without the issuing of any deed," the Southern Drainage District would receive a certificate memorializing its purchase of the land at the tax sale, "and the certificates held by the said [Southern Drainage] District shall be evidence of the title of the said [Southern Drainage] District." 1927 Fla. Laws 1319 (alterations added). The parties to this litigation have not produced, and the record before the court before and after the remand does not contain, a certificate memorializing an interest acquired by the Southern Drainage District at the 1933 tax sale, despite this court having reopened discovery to allow for production of such documentation as well as specifically inquiring after such documentation in the

supplemental briefing, and defendant having indicated it had undertaken all available further discovery efforts. Defendant, in its second supplemental brief, admits to this lack of evidence, stating, "[u]nfortunately, almost 100 years later, the records related to the tax sale are no longer kept by Miami-Dade County." (alteration added). Section 10 of the 1927 Florida statute, however, provides that such certificate "shall be evidence of the title of the said District." 1927 Fla. Laws 1319 (emphasis added). Therefore, the precise interest the Southern Drainage District acquired in 1933 and allegedly quitclaimed to the Florida East Coast Railway in 1937 is difficult to ascertain in the absence of such a certificate memorializing the 1933 tax sale. Despite defendant's arguments to the contrary, the 1927 Florida statute does not resolve the uncertainty regarding ownership and establish for defendant that the Southern Drainage District acquired fee simple title in the railroad corridor in 1933, or that the Southern Drainage District conveyed fee simple title in the railroad corridor to the Florida East Coast Railway in 1937.

During the additional discovery period and multiple supplemental briefing rounds on remand, defendant also raised the 1917, 1929, and 1931 Florida statutes to try to more fully explain the taxing authority of the Southern Drainage District during the relevant period in response to instruction by the court for supplemental briefing. Defendant asserts that the 1917 Florida statute created the Southern Drainage District as "a sub-drainage district of the Everglades Drainage District." Section 1 of the 1917 Florida statute defined the "territorial boundaries" of the Southern Drainage District and referred to "tax[ing]" certain "lands," although without detailing the procedures for such taxation. 1917 Fla. Laws 403-04 (alteration added). Sections 5 and 6 of the 1917 Florida statute, moreover, provided for the hiring of a Chief Engineer by the Southern Drainage District to prepare, and the Southern Drainage District to adopt, a "'Plan of Reclamation'" to be carried out within the district. 1917 Fla. Laws 406-07. Section 7 of the 1917 Florida statute provided, in relevant part, for an initial tax levied specifically upon "land," which "shall become a lien upon the land against which it is assessed from the date of assessment, and shall be collected in the same manner as the annual installment of tax." 1917 Fla. Laws 407-08. Sections 8 and 9 of the 1917 Florida statute provided for the appointment of "Commissioners" to assess the lands in the Southern Drainage District pursuant to the Plan of Reclamation, 1917 Fla. Laws 408-09, and section 10 of the 1917 Florida statute stated, in relevant part, that the Commissioners

> shall assess the amount of benefits, and the amount of damages also, if any, that will accrue to the land of the district in such tracts, as may be convenient to proper assessment to public highways, railroads and other rights of way, not traversed by such works and improvements, from carrying out and putting into effect "The Plan of Reclamation" theretofore adopted.

1917 Fla. Laws 409 (emphasis added). Section 10 of the 1917 Florida statute further provided that "[t]he public highways, railroads and other rights of way shall be assessed according to the increased physical efficiency and decreased maintenance cost of roadways by reason of the protection to be derived from the proposed works and improvements." 1917 Fla. Laws 410 (emphasis and alteration added). The 1917 Florida statute directed such assessments to be made in a report, which was to be published,

and, according to section 12 of the 1917 Florida statute, "[a]ny owner of land or other property to be affected by said report may file exception to any part or all of the report" of the assessments. 1917 Fla. Laws 411 (alteration added). Section 12 of the 1917 Florida statute additionally provided for "any property owner" to challenge the assessment of the Commissioners and to "demand[] an assessment of his damages by a jury," at which point "an action to condemn the lands and other property that must be taken or damaged" would be brought by the Supervisors of the Southern Drainage District against the property owner. See 1917 Fla. Laws 412 (emphasis and alteration added). Section 14 of the 1917 Florida statute provided the levying of taxes assessed by the Southern Drainage District and stated that "[t]he said tax shall be apportioned to and levied on the lands in said district in proportion to the benefits as assessed and not in excess thereof . . . ." 1917 Fla. Laws 414 (alteration added).

Section 16 of the 1917 Florida statute made it "the duty of the Collector of each county in which lands of the Drainage District are situate," "to demand and collect such taxes at the same time that he demands and collects State and county taxes due on the same lands." 1917 Fla. Laws 416-17. Section 20 of the 1917 Florida statute authorized the Southern Drainage District to sue in Florida courts to enforce "delinquent tax bills," with the lawsuits being brought "against the land or lands on which such drainage tax has not been paid." 1917 Fla. Laws 419-20. Section 21 of the 1917 Florida statute provided that, when the Southern Drainage District prevailed in such lawsuits, the court "shall direct the Collector of a Commissioners [sic] of the Court to sell the lands described in the declaration, to the highest and best bidder, for cash in hand at public outcry," that the district "shall by proper deeds convey to the purchaser or purchasers the lands so sold, and the title to said land shall thereupon become vested in such purchaser," however, "any land owner shall have the right to redeem any and all lands sold at such sale within one year after the day when the lands are offered for sale."[60] See 1917 Fla. Laws 422 (capitalization in original; alteration added). Moreover, section 21 of the 1917 Florida statute further provided:

> That in any case where the lands are offered for sale by such collector or commissioner as provided by this Act, and the sum of the tax due, together with interest, costs and penalty, is not bid for the same, it shall be the duty of said collector or commissioner making such sale to bid the whole amount due thereon as aforesaid in the name of the district, and shall sell same to such district; and shall execute his deed therefor, conveying to such district

---

[60] The selling of lands "at public outcry" for failure to pay taxes due to the Southern Drainage District, as described in Section 21 of the 1917 Florida statute, 1917 Fla. Laws 422, appears to have occurred in the above captioned cases, as evidenced by the 1937 deed's statement that the interest conveyed by the 1937 deed was "acquired at a sale held by Bob Simpson, as Tax Collector of Dade County, on the 7th day of August, 1933, to enforce the collection of the unpaid taxes levied by said [Southern Drainage] District," (alteration added), although, as noted above, no direct evidence of the tax sale is included in the record before the court on remand.

such lands so sold to it, which said lands may be held and disposed of by
the Board of Supervisors as the interest of said district may demand.

1917 Fla. Laws 423.

Also attached to defendant's second supplemental brief after the remand are the
1929 and 1931 Florida statutes to support defendant's position regarding the centerline
presumption. The 1929 Florida statute provided that the Southern Drainage District was
"authorized, empowered and directed to refrain from levying, assessing, apportioning or
causing to be collected any reclamation tax on the lands embraced in said [Southern
District] District for the year 1930," and repealed "all laws or parts of laws in conflict with"
the 1929 Florida statute. 1929 Fla. Laws 1065 (alteration added). The 1931 Florida statute
provided for a one-percent commission to be paid to a tax collector for the collection of
the Southern Drainage District's drainage taxes and delinquent taxes. See 1931 Fla.
Laws 1392.[61]

As reflected above, the text of the 1917 Florida statute sections primarily address
the assessment of taxes on interests in land, including a passage in section 10 of the
1917 Florida statute directing the Southern Drainage District's Commissioner to assess
the "benefits, and the amount of damages also, if any, that will accrue to the land of the
district in such tracts, as may be convenient to proper assessment to public highways,
railroads and other rights of way," to be collected as taxes for the Plan of Reclamation.
See 1917 Fla. Laws 409. Section 12 of the 1917 statute further contemplates actions to
"condemn the lands and other property" to enforce taxes assessed. See 1917 Fla. Laws
412. The text of the 1929 Florida statute further states that the District's Reclamation
taxing authority, granted by the 1917 Florida statute, was suspended in 1930, but the
1929 Florida statute does not indicate if the suspension continued into 1932 or resumed
after 1930. See 1929 Fla. Laws 1065. The 1937 deed relied upon by defendant does not
state the nature of the taxes assessed and defaulted upon in 1932, which precipitated the
1933 tax sale. While the 1917 and 1929 Florida statutes provided by defendant with its
second supplemental brief after remand provide some information with respect to the
Southern Drainage District's procedures for assessing taxes and the kinds of taxes which
could be assessed, these statutes do not provide sufficient clarity to establish the
ownership interest under consideration during the remand. For this reason, defendant
cannot rely on the Florida statutes which governed the Southern Drainage District to

---

[61] According to defendant's second supplemental brief after remand, defendant relied on
"[a]n index to the special and local laws of Florida from 1845 to 1945" that "shows all
references to the Southern Drainage District," and which indicates "that the earliest
reference is 1917," the 1917 Florida statute, "and there are only two references after
1927," the 1929 and 1931 Florida statutes. (alteration added). The court's research,
however, indicates that other laws were passed by the Florida Legislature affecting the
Southern Drainage District during the period covered by defendant's inquiry, including in
1918, 1921, 1939, and 1941, although none of these statutes relating to the Southern
Drainage District appear to be relevant to the issues currently before the court on remand.

establish that the Southern Drainage District acquired fee simple title to the railroad corridor, and later was able to convey fee simple title to the Florida East Coast Railway.

Separately from the Florida statutes, in its first supplemental brief after remand, as indicated above, defendant also cites to the Supreme Court of Florida's decision in Buscher v. Mangan, 59 So. 2d 745, in support of defendant's repeated argument that "Florida law makes clear that the interest conveyed to the Southern Drainage District was fee simple title to the land described in the deed." The Buscher v. Mangan case concerned lands that "were sold by the tax collector for Broward County, Florida, for taxes due the Everglades Drainage District for the year 1927, to the Trustees of the Internal Improvement Fund," but for which sale a certificate was produced. See id. at 746. The Supreme Court of Florida in Buscher v. Mangan relied on a Florida statute identified by the Supreme Court of Florida as "Chapter 14717, Laws of Florida, Acts of 1931, F.S.A. c. 298 App. § 1530 et seq.,"[62] which "provided that said Everglades Drainage District tax sale certificates should be retained by the Trustees, and that such certificates could be redeemed within a fixed period, and if not redeemed, the fee simple title to the land embraced in such certificates would become vested in the Trustees." Id. Defendant, in its second supplemental brief, emphasizes that Buscher v. Mangan involved lands which "were sold by the county tax collector, for taxes due to the Everglades Drainage District," which defendant characterizes as "the exact situation" as in the above captioned cases. Moreover, relying on Buscher v. Mangan, defendant argues that "the only interest that Southern Drainage District could have acquired as a result of the tax sale was fee simple title." Additionally, defendant concludes and asserts that "the Southern Drainage District was a sub-drainage district of the Everglades Drainage District," and "there were multiple drainage districts created under Florida law, and most shared similar enabling statutes," which "consistently demonstrate a contemporaneous policy throughout the State of Florida that tax sales resulting from the non-payment of drainage district taxes would result in the conveyance of fee-simple title to the grantees of such deeds." (citing 1923 Fla. Laws 168 et seq. (Dade Drainage District); 1921 Fla. Laws 808 et seq. (Turnbull Hammock Drainage District); 1921 Fla. Laws 658 et seq. (Limestone Drainage District); 1921 Fla. Laws 549 et seq. (Napoleon B. Broward Drainage District); 1921 Fla. Laws 524 et seq. (Big Mound Drainage District); 1919 Fla. Laws 105 et seq. (Palm Beach Drainage and Highway)). Plaintiffs address Buscher only in a footnote, and offer only the following analysis: "The case is not informative to the issue before this Court."

There is an important distinction between the case of Buscher v. Mangan and the above captioned cases, namely that the Supreme Court of Florida in Buscher v. Mangan makes repeated reference to the certificate issued as a result of the 1927 tax sale, which served as a record of the nature of the property transferred in Buscher. See Buscher v. Mangan, 59 So. 2d at 746. As discussed above, no such certificate issued after the 1933

---

[62] The Supreme Court of Florida appears to have cited the relevant statute in Buscher inconsistently. In addition to the citation quoted above, the Supreme Court of Florida on the same page cites the statute as "Chapter 14717, Laws of Florida, Acts of 1931, F.S.A. c. 398 App. § 1530 et seq.," the difference between the two citations being "c. 298," as quoted above, and "c. 398," as quoted here. See Buscher v. Mangan, 59 So. 2d at 746.

tax sale is in the record currently before the court. Defendant concedes, in its second supplemental brief, that "there is not any record beyond the 1937 tax deed from the Southern Drainage District to Florida East Coast Railway, which reflects the tax sale in which Southern Drainage District acquired title on its face." Absent a tax certificate, defendant's reliance on Buscher v. Mangan does no more to resolve the uncertainty regarding what interest was transferred in 1933 than the more general Florida statutes cited by defendant. Moreover, the Supreme Court of Florida decision in Buscher concerned the Everglades Drainage District[63] and the application of a 1931 Florida statute to the actions of the Everglades Drainage District, unlike the above captioned cases, which concern the Southern Drainage District and the application of the 1927 Florida statute, upon which defendant has principally relied, along with the 1917 and 1929 Florida statutes and a different 1931 Florida statute from the law at issue in Buscher. See Buscher v. Mangan, 59 So. 2d at 746. Additionally, the 1927 Florida statute cited by defendant indicates, at section 1 of the 1927 Florida statute, that the statute concerns the levying of drainage district taxes "beginning with the year A. D. 1928, and ending with the year 1937." 1927 Fla. Laws 1313. The Supreme Court of Florida's opinion in Buscher, however, concerned land acquired at a tax sale "for taxes due the Everglades Drainage District for the year 1927," indicating that the 1927 Florida statute had not come into effect at the time the taxes levied in Buscher were due. See Buscher v. Mangan, 59 So. 2d at 746. The distinctions identified by this court between the above captioned cases on remand and the Supreme Court of Florida's decision in Buscher indicate that Buscher does not provide definitive information about Florida law which is relevant to the decision in the above captioned cases.

In addition to Buscher v. Mangan, defendant also cites, in its second supplemental brief after remand, to the Supreme Court of Florida's decision in Wolfson v. Heins, 6 So. 2d 858, however, defendant does not directly state the relevance of Wolfson v. Heins to the cases currently before the court on remand. In Wolfson v. Heins, the owners of land adjacent to a private street claimed that their easement over the private street continued after the private street had been sold to satisfy unpaid taxes on the land on which it was built. See id. at 859-60. The Supreme Court of Florida explained, in the portion of the decision cited by defendant, that "[w]here, as in this State, the levy and assessment is on the realty itself regardless of the existence of estates in it, an easement is destroyed by the tax sale of the servient estate." Id. at 860-61 (alteration added). The Supreme Court of Florida held that "[t]he grantee of the tax deed therefore took a fee-simple title to the private street, free from any easements previously encumbering the land, and this title was conveyed to the Wolfsons." Id. at 861 (alteration added).

In response to defendant's citation to Wolfson v. Heins, plaintiffs in their second supplemental brief after the remand argue that the case "is not instructive" because "there is zero evidence that the servient estate owners" in the above captioned cases "fell behind

---

[63] The 1917 Florida statute cited by defendant refers to the Southern Drainage District as a "sub-drainage district" of the Everglades Drainage District, but the Everglades Drainage District and Southern Drainage District are governed by separate statutes. See 1917 Fla. Laws 403.

on their taxes," and that, therefore, "the Southern Drainage District could not have acquired their land, and this entire point is irrelevant." The Supreme Court of Florida's holding in <u>Wolfson v. Heins</u> illustrates only that the tax sale of a parcel of land destroys any easements which encumbered the land prior to the tax sale. <u>See id.</u> This holding is not helpful to the issues in the above captioned cases after remand, as defendant must demonstrate that the 1933 tax sale[64] and the 1937 deed, in fact, conveyed a fee interest in the land underlying the railroad corridor to the Florida East Coast Railway in order to rebut the centerline presumption. As noted above, defendant has not demonstrated that fee simple title was conveyed in the 1933 tax sale and the 1937 deed, and <u>Wolfson v. Heins</u> provides no additional support to defendant's contention.

With respect to how to interpret the 1937 deed in light of the Florida law in effect at the time of the assessment of the unpaid taxes, plaintiffs respond to defendant and cite to language in the United States Court of Appeals for the Federal Circuit's remand decision that "[u]nder the summary-judgment standard," evidence should "be viewed favorably to the nonmoving party." <u>See</u> <u>Castillo v. United States</u>, 952 F.3d at 1324 n.6 (alteration added). The Federal Circuit stated,

> the 1937 deed indicates, at most, that the FEC Railway fell behind on its drainage-tax payments owed to the District and that, to clear the debt, the FEC Railway paid the unpaid drainage taxes for 1932–1936 and received from the District, in return, the quitclaim deed reflecting the clearance and removal of the District's tax lien.

<u>Id.</u> In order to support this interpretation of the 1937 deed, plaintiffs argue that in addition to taxing land, under Florida law in effect at the time of the assessment of the unpaid taxes, the Southern Drainage District "had authority to assess railroads" within its jurisdiction directly. Plaintiffs rely on two decisions of the Supreme Court of Florida to demonstrate that, during at the time of the assessment of the unpaid drainage taxes, the Southern Drainage District had the power to tax railroads, <u>Lee v. Atlantic Coast Line Railway Co.</u>, 200 So. 71 (Fla. 1941), cited for the first time in plaintiffs' second supplemental brief after the remand, and <u>Simpson v. Loftin</u>, 33 So. 2d 230 (Fla. 1948), cited for the first time in plaintiffs' reply briefs in support of their cross-motions for partial summary judgment after the remand, as well as Florida Statute § 195.01 (1941).

Responding to defendant's arguments, plaintiffs cite the Supreme Court of Florida's decision in <u>Lee v. Atlantic Coast Line Railway Co.</u> in their second supplemental brief during the remand period. The Supreme Court of Florida stated in <u>Lee v. Atlantic Coast Line Railway Co.</u>, in relevant part, that a statutory

---

[64] As demonstrated above, the record before the court on remand does not contain a deed or other documentation from the 1933 tax sale. The evidence of the 1933 tax sale is limited to general language in the 1937 deed, which states that an undefined "interest" was acquired by the Southern Drainage District at a tax sale on August 7, 1933, and the 1938 affidavit, which refers to "rights acquired by the purchase on August 7, 1933" in its description of the 1937 deed.

> amendment of 1925 specifically provides that the Comptroller [of the State of Florida] shall apportion railroad personal property values to districts and notify the county assessor of taxes of each county through which such railroad runs of the number of miles fo [sic] track and the value thereof, and the proportionate value of the personal property required to be allocated as taxable in the respective counties, special school districts, special road districts and other special districts that may exist.

Lee v. Atl. Coast Line Ry. Co., 200 So. at 75 (alterations added). Moreover,

> [t]he law requires the county tax assessors to assess property made subject to taxation by law, including real and personal property values reported to them by the Comptroller for completed assessment under the statutes of the State. It is the duty of the tax collector to collect all taxes assessed. In practice railroad taxes are collected by the State Comptroller. Valuations and allocations by the Comptroller are a part of the assessments.

Id. at 76 (alteration added). The Supreme Court of Florida, however, makes no mention of drainage districts in Lee v. Atlantic Coast Line Railway Co. With respect to Lee v. Atlantic Coast Line Railway Co., plaintiffs in the above captioned cases argue that the Supreme Court of Florida "acknowledged that the Florida statutes were amended in 1925 to allow for the taxation of railroads, which allowed the railroads' *personal property* to be apportioned to each county and allocated as 'taxable' by 'other special districts that may exist.'" (emphasis in original) (quoting Lee v. Atl. Coast Line Ry. Co., 200 So. at 75).

In addition to Lee v. Atlantic Coast Line Railway Co., plaintiffs also cite the Supreme Court of Florida's decision in Simpson v. Loftin in their reply briefs in support of their cross-motions for partial summary judgment. The Supreme Court of Florida's decision in Simpson v. Loftin concerned a statewide method for taxing railroads, rather than relying on counties levying their own taxes on railroads, and while the statute codifying the system had been passed in 1941, see FLA. STAT. § 195.01 (1941),[65] the

---

[65] The 1941 Florida Statute at § 195.01 provides, in relevant part, that

> the value of the locomotives, engines, passenger, sleeping, parlor, freight, platform, construction and other cars and appurtenances shall be apportioned by the comptroller pro rata to each mile of main track, branch, switch, spur track and side track, and the comptroller shall notify the county assessor of taxes of each county through which such railroad runs of the number of miles of track and the value thereof, and the proportionate value of the personal property taxable in their respective counties, special school districts, special road districts, and other special district that may exist, and he shall notify each incorporated city and town into which said railroad runs of the mileage, apportionment of rolling stock, and other property of said railroad within such city or town, and the value thereof shall be assessed by

Supreme Court of Florida stated that "[s]ome phase of it [the statewide railroad taxing system] has been in effect in this State for more than seventy-five years," at the time of the Supreme Court of Florida's opinion, which was issued in 1948. <u>See</u> <u>Simpson v. Loftin</u>, 33 So. 2d at 233 (alterations added). There is no indication in the Supreme Court of Florida's opinion in <u>Simpson v. Loftin</u> that the Southern Drainage District in particular, or drainage districts in general, possessed the authority to tax railroads at any time, even if certain "local taxing entities" did possess such authority. <u>See id.</u>

With respect to <u>Simpson v. Loftin</u>, plaintiffs argue, however, that "[p]rior to 1941, Florida did allow for local taxing authorities to tax railroads present in their jurisdictions," which plaintiffs argue made it possible that in 1932, the Southern Drainage District taxed the Florida East Coast Railway directly, on which taxes the Railway subsequently became delinquent, leading to a tax sale in 1933. (alteration added). Plaintiffs further argue, in their second supplemental brief on remand, that "[i]n 1941, Florida changed its laws so that the authority to tax railroads was centralized in one governmental body, unless the railroad actually owned real property unassociated with its railroad operations in the taxing district," and that, "[b]ecause Section 195.01 of the Florida Statutes of 1941 withdrew the Southern Drainage District's ability to tax the railroad, it follows that prior to 1941, the Southern Drainage District must have possessed the ability to tax the Florida East Coast Railway on the right-of-way running through it." (capitalization in original; alterations added; footnote omitted) (citing <u>Simpson v. Loftin</u>, 33 So. 2d at 233).

Defendant argues that "none of" plaintiffs' citations to <u>Lee v. Atlantic Coast Line Railway Co.</u>, <u>Simpson v. Loftin</u>, or to the 1941 Florida statute at section 195.01, "are applicable here." With respect to <u>Lee v. Atlantic Coast Line Railway Co.</u>, defendant argues that

> [t]he fact that a Florida statute was amended in 1925 to allow the taxing of a railroad's personal property has no impact on whether a drainage district can tax real property over which a railroad operates. Plaintiffs also fail to establish that the Southern Drainage District is a "special district that may exist" in order to tax the personal property of a railroad.

(alteration added). Additionally, defendant argues that "Plaintiffs do not identify any personal property of the railroad that was allegedly taxed, nor do they cite any case that supports that an easement – a real property use right – somehow qualifies as personal property." (citing <u>One Harbor Fin. Ltd. Co. v. Hynes Properties, LLC</u>, 884 So. 2d 1039, 1044 (Fla. Dist. Ct. App. 2004)). With respect to <u>Simpson v. Loftin</u>, defendant argues:

---

such city or town as provided by law, and upon the value thus ascertained and apportioned, taxes shall be assessed the same as upon the property of individuals.

Fla. Stat. § 195.01.

this issue resulting in a change in Florida law in 1941 is not relevant here. Even if Florida East Coast Railway had failed to pay its drainage taxes on the subject land and then lost that land in a tax sale, those potential events do not change the fact that it later paid those very taxes and acquired the land pursuant to the 1937 tax deed.

The decisions of the Supreme Court of Florida in Lee v. Atlantic Coast Line Railway Co. and Simpson v. Loftin and the 1941 Florida statute at section 195.01 do not support plaintiffs' argument that the Southern Drainage District had the authority to tax railroads during the period at issue in the above captioned cases. While Simpson v. Loftin, plaintiffs' original source for this reading of Florida law, indicated that undefined "local taxing entities," which did not explicitly include drainage districts, had lost their power to tax railroads by 1941 at the latest, see Simpson v. Loftin, 33 So. 2d at 233, Lee v. Atlantic Coast Line Railway Co. indicated that no later than 1925, the Florida state Comptroller had become the authority for taxing railroads, and while local tax collectors collected the taxes upon the railroads, it was the Comptroller who assessed and levied the taxes. See Lee v. Atl. Coast Line Ry. Co., 200 So. at 75-76. Moreover, even if the court credited plaintiffs' argument that Simpson v. Loftin and Lee v. Atlantic Coast Line Railway Co. represented that "local taxing entities," Simpson v. Loftin, 33 So. 2d at 233, and "special districts," Lee v. Atl. Coast Line Ry. Co., 200 So. at 75, possessed the power to tax railroads during the time at issue, there is no indication in either case that drainage districts, including the Southern Drainage District at issue, were "local taxing entities" or "special districts" as those terms were used in the decisions of the Supreme Court of Florida. While plaintiffs' arguments are unconvincing, that, however, is insufficient for defendant to prevail, as the burden lies with defendant to rebut the centerline presumption. See Bischoff v. Walker, 107 So. 3d at 1171.

As noted above, after considering the sources of Florida law relied on by defendant during further discovery and rounds of supplemental briefing, the 1937 deed remains unclear as to the nature of the interest acquired by the Southern Drainage District in 1933 and conveyed to the Florida East Coast Railway in 1937, whether fee simple title or only an easement, and defendant's evidence produced after remand regarding the content of Florida law at the time of the applicable conveyances, including defendant's citations to Buscher v. Mangan, Wolfson v. Heins, and the 1917, 1927, 1929, and 1931 Florida statutes is insufficient to rebut the centerline presumption. See Bischoff v. Walker, 107 So. 3d at 1171.

**The 1938 Quitclaim Deed and 1938 Affidavit**

Additionally, defendant tries to rely on the 1938 quitclaim deed and the subsequent 1938 affidavit to suggest that the 1937 deed's description of "[a] One Hundred Foot Strip" should have been more specifically described as indicating the strip was "used as right-of-way for Florida East Coast Railway," rather than the earlier 1937 deed's more general and vague language. (alteration added). Defendant produced the 1938 quitclaim deed and 1938 affidavit for the first time during the additional discovery period after the remand, and the 1938 quitclaim deed and 1938 affidavit were the only additional evidence

produced to supplement the record "as is appropriate" following the United States Court of Appeals for the Federal Circuit's limited remand to this court.[66] See Castillo v. United States, 952 F.3d at 1325. Defendant produced both the 1938 quitclaim deed and 1938 affidavit during the remand to try to demonstrate that the 1937 deed conveyed fee simple title to the Florida East Coast Railway. As described above, the 1938 quitclaim deed appears to memorialize a conveyance by which the Florida East Coast Railway, with the assent of its receivers, "granted, remised, released and quit-claimed" to the Southern Drainage District "all the right, title, interest, claim and demand" held by the Florida East Coast Railway to "the East half of Section 2, Township 54 South, Range 40 East, except a strip of land one hundred feet wide used as right of way for Florida East Coast Railway," and explained that Florida East Coast Railway was quitclaiming its interests because the subject land was not "held or required for railroad purposes." (capitalization in original; alteration added). As discussed above, consistent with the Federal Circuit's holding with respect to the 1937 deed, as a quitclaim deed, the 1938 quitclaim deed conveyed only whatever interest was held by the grantor, see Castillo v. United States, 952 F.3d at 1324 n.6; Fla. E. Coast Ry. Co. v. Patterson, 593 So. 2d at 577, and the 1938 quitclaim deed "does not necessarily import that the grantor possesses any interest at all . . . ." Miami Holding Corp. v. Matthews, 311 So. 2d at 803. The plain meaning of the 1938 quitclaim deed provides no indication as to the interests which the Florida East Coast Railway held regarding the lands concerned, except to say that the Florida East Coast Railway did not quitclaim whatever interests it held in a "strip of land one hundred feet wide used as right of way," so as to indicate that the Florida East Coast Railway retained, at least, a right-of-way over that strip. See Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d at 132 ("It is axiomatic that when construing a document, courts should give effect to the plain meaning of its terms."). Beyond the right-of-way, the 1938 quitclaim deed does not provide evidence that the Florida East Coast Railway owned any other interest in the land concerned, including a fee interest.

As described above, the after the fact 1938 affidavit contains a sworn statement from the then President and Secretary of the Southern Drainage District, which defendant tries to argue "clarif[ies]" the interest conveyed in the 1937 deed. (alteration added). The affiants to the 1938 affidavit swore that the 1937 deed had been intended to quitclaim the Southern Drainage District's interests in

> [a] strip of land 100' wide used as right-of-way for Florida East Coast Railway, passing across the East one-half (1/2) of Section 2, Township 54 South Range forty (40) East, Tallahassee Meridian, Florida;

---

[66] Similar to the 1937 deed, the 1938 quitclaim deed and 1938 affidavit were available to the parties, but not submitted to this court, when the parties previously conducted discovery and briefed the prior cross-motions for partial summary judgment which this court decided in its June 29, 2018 Opinion. Consistent with the Federal Circuit's limited remand to supplement the factual record "as is appropriate," see Castillo v. United States, 952 F.3d at 1325, this court on remand properly considers the recently submitted 1938 quitclaim deed and 1938 affidavit in order to resolve the currently pending cross-motions for partial summary judgment.

that the error occurred by reason of the fact that said quit-claim deed failed to state that said property deeded was the said right-of-way of the Florida East Coast Railway[.]

(capitalization in original; alterations added). The difference at issue being the omission of the phrase "used as right-of-way for Florida East Coast Railway" in the 1937 deed.[67] (capitalization in original; alteration added). The affiants to the 1938 affidavit further swore that the 1938 quitclaim deed from the Florida East Coast Railway "reconvey[ed] all of the property hereinabove described, save and except that which was intended to be deeded" to the Florida East Coast Railway by the 1937 deed. (alteration added). The affiants also swore that the "SOUTHERN DRAINAGE DISTRICT has no claim of title whatsoever against any part of the East half of Section 2," and that the affiants made the affidavit "for the purpose of clearing and quieting any cloud upon the title of the said land" as a result of the 1937 deed and 1938 quitclaim deed. (capitalization in original).

Defendant argues that the 1938 affidavit states that the interest which the 1937 deed was intended to cover was "fee title" in "[a] *strip of land*," (emphasis in original; alteration added), and "to ensure that there was no ambiguity, FECR [Florida East Coast Railway] and Southern Drainage District executed two additional documents [the 1938 quitclaim deed and 1938 affidavit] the following year to clarify the property that FECR acquired." (alterations added). The 1938 affidavit, however, does not "clarify" the 1937 deed as defendant argues it does. In the 1938 affidavit, the affiants purported to correct an "error" in the execution of the 1937 and 1938 deeds insofar as the 1937 deed allegedly incorrectly described the land concerned, but no corrected deed appears to have been executed and none was included in the record before this court at any time.[68] Further, the

---

[67] The 1938 affidavit does not give a fully accurate quotation of the land description at issue in the 1937 deed. The 1937 deed, as noted above, gives the land description at issue as "[a] One Hundred Foot Strip across East Half of Section Two, Township Fifty-four South, Range Forty East, Tallahassee Meridian, Fla." (alteration added). The 1938 affidavit, although appearing to quote the 1937 deed, characterizes the 1937 deed's land description as "[a] strip 100' across East one-half (1/2) of Section 2, Township 54 South Range forty (40) East, Tallahassee Meridian, Florida," a description which differs from the actual 1937 deed in word order, capitalization, and use of abbreviations. (alteration added).

[68] The insufficiency of the 1938 quitclaim deed and the 1938 affidavit to establish that the Florida East Coast Railway owned the railroad corridor in fee simple is consistent with the lack of thorough documentation of the events relevant to the issues currently before this court. After original cross-motions for partial summary judgment, motions for reconsideration, an appeal, and, on remand, multiple rounds off additional discovery and supplemental briefing, the parties have not produced materials from the 1933 tax sale or other documents memorializing what interest was conveyed by the Southern Drainage District to the Florid East Coast Railway. Those documents, which the parties have produced, over the entire life of the current litigation, leave gaps in the record before the court which it is unlikely further discovery or argumentation could fill.

"correction" provided in the 1938 affidavit relates only to the description of the land in which the Southern Drainage District quitclaimed its interests; the 1938 affidavit does not indicate what those interests were, or what interests the Florida East Coast Railway received. The "correction" to the 1937 deed offered by the after the fact 1938 affidavit does not indicate that the interest that was being conveyed was fee simple, as defendant argues. Rather, based on the 1938 affidavit's statement that the property intended to be deeded in 1937 "was the said right-of-way," (emphasis added), the 1938 affidavit, indeed, could be read to indicate that the right-of-way itself, and not the underlying land, was the interest intended to be conveyed to the Florida East Coast Railway.

When arguing that the court should consider the 1938 affidavit in order to find in defendant's favor regarding the centerline presumption, defendant asserts that the 1938 affidavit "does not alter anything concerning the contents of that deed," but rather "is a nearly-contemporaneous statement that was filed to clarify any potential confusion as to what particular land description had been conveyed in the 1937 tax deed." Defendant also argues that the 1938 affidavit is not "'self-serving' in that there is no interest of the Southern Drainage District or its then President and Secretary served by the affidavit."[69] Plaintiffs respond that "[t]he 1938 Affidavit literally alters the content of the 1937 quitclaim deed by clarifying that the 'strip of land' referenced in the 1937 quitclaim deed should further be described as 'used as right-of-way by Florida East Coast Railway.'" (alteration added). Moreover, the 1937 deed did not indicate the nature of the interest conveyed to the Florida East Coast Railway and no further deed regarding that interest appears to be on record, nor was one produced for the court's review. For these reasons, both the 1938 quitclaim deed and 1938 affidavit produced by defendant during the remand are insufficient to clarify the nature of the interest acquired by the Southern Drainage District

---

[69] While defendant claims that the 1938 affidavit is not "'self-serving,'" the affidavit was sworn-to by the President and Secretary of the Southern Drainage District, the grantor of the 1937 deed and the grantee of the 1938 quitclaim deed, both of whom held their respective offices during 1937 and 1938, which raises concerns of credibility due to self-interest and a possible lack of impartiality, which, although discounted by defendant, were not further discussed or supported by defendant. See, e.g., Suess v. United States, 535 F.3d 1348, 1364 (Fed. Cir. 2008) (explaining that "[a] self-serving reference to 'negotiations'" in an affidavit "does not suffice to prove intent to contract on the part of the government" (alteration added)); Square One Armoring Servs. Co. v. United States, 162 Fed. Cl. 331, 343 (2022) (discussing ""'self-serving' documents'" which "'are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment'" (quoting Vivid Techs., Inc. v. Am. Sci. & Eng'g., Inc., 200 F.3d 795, 812 (Fed. Cir. 1999) (quoting Nieves v. Univ. of P.R., 7 F.3d 270, 276 n.9 (1st Cir. 1993)))); 2M Rsch. Servs., LLC v. United States, 148 Fed. Cl. 99, 105 (2020) (explaining for the purposes of eligibility under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(2)(B) (2018), that "[t]his Court has previously found that '[s]elf-serving affidavits and unaudited balances, alone, are not considered sufficient to establish a plaintiff's net worth,'" (second alteration in original) (quoting Info. Scis. Corp. v. United States, 86 Fed. Cl. 269, 280 (2009), and citing Doe v. United States, 54 Fed. Cl. 337, 342 (2002))).

in 1933, and later quitclaimed to the Florida East Coast Railway in 1937, as defendant must do in order to rebut the centerline presumption as to the issue currently under consideration on the limited remand to this court.

### Deeds in the Subdivision Chains of Title

Defendant, in its motions for partial summary judgment on remand, additionally attempts to rely on the deeds including the chains of title for the Zena Gardens and Princess Park Manor subdivisions, which were previously produced late by plaintiffs in support of the prior motions for reconsideration, to argue that changes to the relevant land descriptions in those deeds over time "reflect that a portion of the former railroad corridor was previously part of the land owned by Plaintiffs' predecessors-in-interest in the 1920s, but after the tax sale and deed, the legal descriptions explicitly excluded that land," referring to the land underlying the railroad corridor. As noted above, and as previously noted by this court in its decision denying the prior motions for reconsideration, the subdivision chains of title are only the chains of title of the properties owned by the named plaintiffs Reinaldo F. Castillo and Nelson Menendez, and do not constitute evidence of clean title held by any of the remaining plaintiffs, including the plaintiffs in the <u>Hernandez</u> and <u>Lima</u> cases. <u>See</u> <u>Castillo v. United States</u>, 140 Fed. Cl. at 598. With respect to the Zena Gardens chain of title, defendant argues that the change in the deeds from describing the land conveyed as "subject to" the railroad right-of-way prior to the 1937 conveyance, to describing the land conveyed as "less" the right-of-way after the 1937 conveyance, indicates that in each case the grantor "clearly intended to exclude that strip of land [the railroad corridor] from the conveyance." (alteration added). With respect to the Princess Park Manor chain of title, defendant argues that the change in the deeds from describing the land conveyed as "less" the railroad right-of-way prior to the 1937 conveyance, to describing the land conveyed both as "less" and as "East of" the railroad right-of-way after the 1937 conveyance, is "evidence of the grantor's intent not to convey to the centerline of the railroad corridor." (capitalization in original). By arguing that the deed language changes reflect an intent to exclude the railroad corridor from conveyances of the surrounding land after the 1937 deed, defendant attempts to provide evidence, although indirectly, that the Florida East Coast Railway, and not the owners of the adjacent land, owned the railroad corridor in fee simple.

The wording of the 1924 Russo, 1925 Lanese, 1927 Lanese, 1934 Dallas Investment Company, 1936 Long Company, 1945 Hollett, 1945 Merwitzer, 1945 Central Construction, 1946 Merwitzer, 1947 Eristavi-Tchitcherine, and 1949 Moss deeds, which defendant relies on to rebut the centerline presumption, do not express an intent to exclude the railroad corridor under the standards expressed in Florida law. The language which appears in the 1924 Russo, 1925 Lanese, and 1927 Lanese deeds describes the land conveyed as "subject to" the Florida East Coast Railway right-of-way. Under Florida law, use of "subject to" language in the deeds is indicative that the easement or right-of-way to which the property is "subject" runs over the land, not that it is excluded from it. <u>See</u> <u>Hastie v. Ekholm</u>, 199 So. 3d at 464 (finding that deeds which conveyed land "SUBJECT TO an easement for road purposes" and "SUBJECT TO a Right of Way for ingress and egress" imposed an easement on the property which prevented construction of a fence (capitalization in original)). The use of "subject to" in the 1924 Russo, 1925 Lanese, and 1927 Lanese deeds are evidence that, at the time of those conveyances,

the Florida East Coast Railway right-of-way ran over the property that would become Zena Gardens, rather than being separate from it.

The language which appears in the 1945 Hollett, 1945 Merwitzer, 1945 Central Construction, and 1946 Merwitzer deeds in the Zena Gardens chain of title, and in the 1934 Dallas Investment Company, 1936 Long Company, 1947 Eristavi-Tchitcherine, and 1949 Moss deeds in the Princess Park Manor chain of title, describes the land conveyed as "less" the Florida East Coast Railway right-of-way. The Florida District Court of Appeal for the Fifth District's decision in the case of Dean v. MOD Properties, Ltd., 528 So. 2d 432, indicates that the use of "less" in reference to an easement or right-of-way does not exclude the land underlying the easement or right-of-way from the conveyance. The court in Dean held that

> "less and except the following described *easement*" (emphasis added) did not serve to reserve to MOD any right of reversion as to the fee simple title but served simply to exclude the recorded *easement* in favor of the City from the title interest being conveyed and to prevent the recorded easement from constituting a breach of the covenants of warranty in each deed.

Id. at 434 (emphasis in original). Accordingly, the use of "less" in relation to the Florida East Coast Railway right-of-way does not exclude the railroad corridor from the 1945 Hollett, 1945 Merwitzer, 1945 Central Construction, 1946 Merwitzer, 1934 Dallas Investment Company, 1936 Long Company, 1947 Eristavi-Tchitcherine, and 1949 Moss deeds. Rather, pursuant to the Florida District Court of Appeal for the Fifth District's holding in Dean, the land underlying the Florida East Coast Railway's right-of-way was conveyed by the deeds in question, while the deeds recognized that the right-of-way running over the land remained the property of the Florida East Coast Railway, and, therefore, was excluded from the conveyance. See id.

The 1947 Eristavi-Tchitcherine and 1949 Moss deeds also described the land conveyed therein as "East of the" Florida East Coast Railway right-of-way. (capitalization in original). The Florida District Court of Appeal for the Fifth District case Bischoff v. Walker, discussed above, held that conveying land "East of" a monument was a conveyance by "reference to a monument" and, therefore, that the title was "presumed to run to the center of the monument." Bischoff v. Walker, 107 So. 3d at 1169-71 (capitalization in original) (discussing land described as "lying East of Canal"). Similarly, the Supreme Court of Florida in Brooks v. City of Miami determined that the description "Bounded . . . on the East by" a road set the boundary line at the centerline of that road. Brooks v. City of Miami, 41 So. 2d at 556 (capitalization and ellipsis in original). Because the Florida East Coast Railway right-of-way, as discussed above, can be construed as a "monument" for the purposes of Florida law, see Bischoff v. Walker, 107 So. 3d at 1168-69 (defining a "monument" under Florida law); Castillo v. United States, 952 F.3d at 1321 ("A rail line meets the definition of an artificial monument under Florida law."), by conveying land "East of" the Florida East Coast Railway right-of-way, (capitalization in original), the 1947 Eristavi-Tchitcherine and 1949 Moss deeds did not exclude the land underlying the railroad corridor from their conveyances, but only excluded the railroad right-of-way running over that land. For these reasons, defendant cannot rely on the language employed in the deeds contained in the Zena Gardens and Princess Park

Manor chains of title to indirectly clarify that the Florida East Coast Railway obtained fee simple title to the land underlying the railroad corridor.

On remand, defendant has argued in its motions for partial summary judgment that "under the second method identified by the Federal Circuit" to rebut the centerline presumption, to "show that 'the strip of land being claimed is titled in someone else,'" Castillo v. United States, 952 F.3d at 1320 (quoting Rogers v. United States, 184 So. 3d at 1098), "the United States has rebutted the centerline presumption." Defendant in the cases currently before the court, however, has not met its burden to successfully rebut the centerline presumption, as discussed above. As indicated above, following the remand of the Castillo and Menendez cases to this court, the parties engaged in lengthy additional discovery to try to supplement the record, as well as submitted multiple rounds of supplemental briefing to address issues identified by the court. As indicated above, defendant's motions for partial summary judgment on remand attempted to rely on additional evidence to rebut the centerline presumption which defendant produced and identified during the additional discovery period after remand, as well as the 1937 deed and subdivision chains of title deeds, which had been produced during the consideration of the motions for reconsideration in Castillo and Menendez, after full briefing and after the court had ruled on the previously filed cross-motions for partial summary judgment in those cases. The court bases its decision in the above captioned cases on the record now before the court, after the remand, additional discovery, and further briefing, consistent with the Federal Circuit's mandate on remand to determine whether the centerline presumption could be rebutted following "appropriate further development of the factual record." See id. at 1325. The evidence upon which defendant relies, including defendant's sources of Florida law and the newly identified 1938 quitclaim deed and 1938 affidavit, does not resolve the uncertainty regarding the nature of the interest acquired by the Southern Drainage District in 1933, quitclaimed to the Florida East Coast Railway in 1937. Given the remaining uncertainty, the court determines that defendant has failed to rebut the centerline presumption.

As noted above, each plaintiff in the above captioned cases took title to their respective properties by reference to the applicable subdivision plats and, thereby, incorporated the description of the land contained therein. Because defendant has failed to rebut the centerline presumption, and because all remaining plaintiffs with claims currently pending before the court own property adjacent to a portion of the railroad corridor constituted by one or more of the four rights-of-way, the plaintiffs in the Castillo, Menendez, Hernandez, and Lima cases presumptively own their properties up to the centerline of the railroad corridor.[70] Only the portion of the railroad corridor conveyed to the Florida East Coast Railway by the Holman deed, as determined in this court's June 29, 2018 Opinion, see Castillo v. United States, 138 Fed. Cl. at 734, and not part of the Federal Circuit's remand, see Castillo v. United States, 952 F.3d at 1317 n.2, because this court granted partial summary judgment to the government with respect to the land

---

[70] Consistent with the Alvarez parties' agreement to stay the Alvarez case due to the substantially similar issues in the above captioned cases, the logic of this Opinion applies to the Castillo, Menendez, Hernandez, and Lima cases, and should apply to the claim at issue in Alvarez.

conveyed by the Holman deed, which ruling was not challenged on appeal, see id., is excluded from this application of the centerline presumption.

As noted above, plaintiffs in the above captioned cases have submitted chains of title only for parcel 01-4002-001-1430, owned by Castillo plaintiff Reinaldo F. Castillo and located in Zena Gardens, and for parcel 01-4002-002-1690, owned by Menendez plaintiff Nelson Menendez and Osvaldo Borras, Jr. and located in Princess Park Manor. In order to recover just compensation for the taking of the land up to the centerline of the railroad corridor, each plaintiff still must demonstrate clear title to the parcel of land which that plaintiff owns. Accordingly, prior to the adjudication of the amount of just compensation owed to each plaintiff, all plaintiffs who have not already submitted chains of title for their respective properties can be required to do so. Further proceedings will be scheduled by separate Order. The effect of the court's ruling in this Opinion on the claims in Alvarez, Case No. 21-610L, will also be addressed in future proceedings.

## CONCLUSION

Because the evidence produced by defendant in an attempt to rebut the centerline presumption after the remand, following extended additional discovery and multiple rounds of supplemental briefing, is insufficient to demonstrate that the land underlying the portions of the railroad corridor composed of any of the four rights-of-way were titled in the Florida East Coast Railway, defendant has not rebutted the centerline presumption. Accordingly, plaintiffs are presumed to have fee simple title to the land underlying the railroad corridor adjacent to their properties up to the centerline. Defendant's motions for partial summary judgment in the above captioned cases are **DENIED**, and plaintiffs' cross-motions for partial summary judgment in the above captioned cases are **GRANTED**.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**